## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AGATHA LEWANDOWSKA GIANNESE; and ANDREA FAHEY, individually and on behalf of all others similarly situated, | Case No.: 3:25-cv-01717-VAB |
| Plaintiffs, | |
| v. | |
| EDGEWELL PERSONAL CARE BRANDS, LLC, | March 27, 2026 |
| Defendant. | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ...................................................................................................... 1

I.      BACKGROUND.................................................................................................. 2

      A.    Factual Allegations.................................................................................. 2

      B.    The FDCA and the Monograph System for Regulation of OTC Drugs. ...... 4

      C.    History of FDA Regulation of Sunscreen. ...................................................... 5

            1.    1978 - The Advance Notice of Proposed Rulemaking. .................... 5

            2.    The 1993 Tentative Final Monograph................................................ 6

            3.    The 1999 Final Monograph................................................................ 7

            4.    2011 Final Rule. ....................................................................... 8

            5.    The CARES Act and Administrative Order M020. .......................... 8

      D.    Legal Standards. ........................................................................................ 11

ARGUMENT............................................................................................................. 12

I.      Plaintiffs' Claims Are Preempted by the FDCA. .................................................... 12

      A.    The Claims Are Impliedly Preempted Because They Are Entirely Based on the FDCA and Would Require the Court to Interpret and Apply Complex FDA Regulations. ...................................................................................... 13

      B.    The Claims Are Expressly Preempted Because They Would Impose Requirements Additional to and Different from Those Imposed by the FDCA. ...................................................................................................... 17

            1.    FDA does not contemplate retesting, or include a threshold for accuracy against which subsequent tests could be evaluated. ......... 18

            2.    FDA addresses variation via the control formulation, not subsequent testing. ..................................................................................... 19

             3.    The FDCA provides an exclusive list of reasons why test results can be disregarded, which does not include the results of a subsequent panel. ..................................................................................... 20

      C.    The Claims Are Expressly Preempted Because Plaintiffs' Testing Methodology Is Not Exactly The Same As FDA's Methodology. ............. 21

            1.    Plaintiffs' test results show that the lab used a different definition of MED. ..................................................................................... 21

             2.    Plaintiffs' test did not use the "expected SPF" as required by FDA regulations. ..................................................................................... 22

Defendant's Memorandum of Law in Support of Motion to Dismiss

II.     The Court Should Dismiss the Case Under the Doctrine of Primary Jurisdiction. 22

III.    Plaintiffs Lack Article III Standing Because They Have Not Alleged Facts Showing that the Products They Purchased Were Inaccurately Labeled. ............................. 24

IV.     Plaintiffs Lack Standing to Seek Injunctive Relief. ............................................... 27

V.      Plaintiffs' State Law Claims Fail For Numerous Reasons. ..................................... 28

        A.      The Unjust Enrichment Claims Must Be Dismissed Because Connecticut Law Does Not Apply. ................................................................................... 28

        B.      The Breach of Warranty Claims Must Be Dismissed for Lack of Notice. . 29

        C.      The Claims Sounding in Fraud Must Be Dismissed Under Fed. R. Civ. P. Rule 9(b) Because the Allegations Do Not Support a "Strong Inference" of Fraudulent Intent. ................................................................................... 30

        D.      Plaintiffs' Fraud and Negligent Misrepresentation Claims Are Barred by the Economic Loss Rule. ................................................................................... 32

                i.      The Illinois Moorman doctrine bars Plaintiff Giannese's negligent misrepresentation claim. ...................................... 32

                ii.     The Florida economic loss rule bars Plaintiff Fahey's fraud and negligent misrepresentation claims. ...................................... 33

        E.      Plaintiff Giannese's Claim for Breach of Implied Warranty Fails for Lack of Privity Because She Alleges She Purchased the Product from Amazon. ... 34

CONCLUSION ......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All Am. Tel. Co. v. AT & T, Inc.*,
2010 WL 7526933 (S.D.N.Y. Jan. 19, 2010) ............................................................... 23

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) ...................................................................................................... 12

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................................................... 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................... 11

*Bakopoulos v. Mars Petcare US, Inc.*,
592 F. Supp. 3d 759 (N.D. Ill. 2022) .................................................................... 34, 35

*Barnes v. KOS, Inc.*,
2025 WL 1928027 (S.D.N.Y. July 14, 2025) ......................................................... 26, 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................... 11

*Berni v. Barilla S.P.A.*,
964 F.3d 141 (2d Cir. 2020) .................................................................................. 27, 28

*Bubak v. Golo, LLC*,
2025 WL 2860044 (9th Cir. Oct. 9, 2025) ............................................................. 15, 16

*Buckman Co. v. Pls. Legal Comm.*,
531 U.S. 341 (2001) ...................................................................... 13, 14, 15, 16

*Cameron v. Battery Handling Sys., Inc.*,
524 F. Supp. 3d 860 (C.D. Ill. 2021) ......................................................................... 34

*Canale v. Colgate-Palmolive Co.*,
258 F. Supp. 3d 312 (S.D.N.Y. 2017) ......................................................................... 17

*In re Chantix (Varenicline) Mktg., Sales Practices & Products Liab. Litig.
(No. II)*,
735 F. Supp. 3d 352 (S.D.N.Y. 2024) ................................................................ 14, 15, 16

Defendant's Memorandum of Law in Support of Motion to Dismiss

*Clinger v. Edgewell Pers. Care Brands, LLC*,
  2023 WL 2477499 (D. Conn. Mar. 13, 2023) ............................................................. 17

*Colella v. Atkins Nutritionals, Inc.*,
  348 F. Supp. 3d 120 (E.D.N.Y. 2018) .................................................................. 23, 24

*Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*,
  2024 WL 2106837 (D. Conn. Mar. 1, 2024) ....................................................... 28, 29

*Connick v. Suzuki Motor Co., Ltd.*,
  174 Ill.2d 482 (Ill. 1996) ......................................................................................... 30

*Critcher v. L'Oreal USA, Inc.*,
  2019 WL 3066394 (S.D.N.Y. July 11, 2019), *aff'd*, 959 F.3d 31 (2d Cir.
  2020) .................................................................................................... 4, 18, 21, 22

*Dalewitz v. Procter & Gamble Co.*,
  2026 WL 74274 (S.D.N.Y. Jan. 9, 2026) .................................................................. 25

*Daly v. FitLife Brands, Inc.*,
  2023 WL 6388112 (N.D. Ill. Sept. 29, 2023) ........................................................... 32

*Davis v. Angelcare USA, LLC*,
  727 F. Supp. 3d 99 (D. Conn. 2024) ........................................................................ 28

*DiCroce v. McNeil Nutritionals, LLC*,
  82 F.4th 35 (1st Cir. 2023) ................................................................................. 14, 16

*Dimuro v. Estee Lauder Companies, Inc.*,
  2013 WL 12080901 (D. Conn. Nov. 22, 2013), a*ff'd sub nom. DiMuro
  v. Clinique Labs., LLC*, 572 Fed. App'x. 27 (2d Cir. 2014) ...................................... 30

*Dunning v. Supergoop, LLC*,
  2026 WL 501627 (S.D.N.Y. Feb. 24, 2026) .................................................. 25, 26, 27

*Ellis v. Tribune Television Co.*,
  443 F.3d 71 (2d Cir. 2006) ....................................................................................... 23

*Fieger v. Pitney Bowes Credit Corp.*,
  251 F.3d 386 (2d Cir. 2001) ..................................................................................... 28

*Field Day, LLC v. Cnty. of Suffolk*,
  463 F.3d 167 (2d Cir. 2006) ..................................................................................... 11

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*,
  218 Ill. 2d 326 (2006) .............................................................................................. 33

*Gibbons v. Bristol-Myers Squibb Co.*,
   919 F.3d 699 ................................................................................................................. 4

*Gisvold v. Merck & Co., Inc.*,
   62 F. Supp. 3d 1198 (S.D. Cal. 2014)......................................................................... 15

*Glover v. Bausch & Lomb, Inc.*,
   6 F.4th 229 (2d. Cir. 2021)................................................................................. 13, 14, 16

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016)......................................................................................... 11

*Harmon v. Lenovo (United States) Inc.*,
   2024 WL 1741264 (S.D. Ill. Apr. 23, 2024)............................................................... 35

*Helprin v. Harcourt, Inc.*,
   277 F. Supp. 2d 327 (S.D.N.Y. 2003).......................................................................... 11

*Herlth v. Merck & Co., Inc.*,
   2022 WL 788669 (D. Conn. Mar. 15, 2022) ............................................................... 31

*Hicks v. L'Oréal U.S.A., Inc.*,
   2023 WL 6386847 (S.D.N.Y. Sept. 30, 2023).............................................................. 25

*Hicks v. L'Oreal U.S.A., Inc.*,
   2024 WL 4252498 (S.D.N.Y. Sept. 19, 2024)........................................................ 25, 26

*Kampmann v. Procter & Gamble Co.*,
   699 F. Supp. 3d 678 (C.D. Ill. 2023) .......................................................................... 33

*Kell v. Lily's Sweets, LLC*,
   2024 WL 1116651 (S.D.N.Y. Mar. 13, 2024) ........................................................ 25, 26

*In re KIND LLC "Healthy & All Nat." Litig.*,
   209 F. Supp. 3d 689 (S.D.N.Y. 2016).......................................................................... 24

*Kinman v. Kroger Co.*,
   604 F. Supp. 3d 720 (N.D. Ill. 2022) .......................................................................... 30

*Kouyate v. Harvard Drug Grp. LLC*,
   2025 WL 2773159 (S.D.N.Y. Sept. 26, 2025)............................................................... 5

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
   478 Fed. App'x. 679 (2d Cir. 2012).............................................................................. 31

v

Defendant's Memorandum of Law in Support of Motion to Dismiss

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006).................................................................................. 31

*Loreto v. Procter & Gamble Co.*,
    515 F. App'x 576 (6th Cir. 2013) ......................................................................... 14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).............................................................................................. 25

*Lurenz v. Coca-Cola Co.*,
    2024 WL 2943834 (S.D.N.Y. June 10, 2024) ...................................................... 26

*Lurenz v. Coca-Cola Co.*,
    2025 WL 2773188 (S.D.N.Y. Sept. 29, 2025)....................................................... 27

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020).................................................................................... 11

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*,
    265 F.R.D. 106 (S.D.N.Y. 2010) .......................................................................... 11

*Marentette v. Abbott Labs., Inc.*,
    886 F.3d 112 (2d Cir. 2018).................................................................................. 12

*McDaniel v. Upsher-Smith Lab'ys, Inc.*,
    893 F.3d 941 (6th Cir. 2018) ................................................................................ 14

*In re Medtronic, Inc.*,
    623 F.3d 1200 (8th Cir. 2010) .............................................................................. 13

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996).............................................................................................. 12

*Melton v. Century Arms, Inc.*,
    243 F. Supp. 3d 1290 (S.D. Fla. 2017) ................................................................ 34

*Michael Grecco Prods., Inc. v. RADesign, Inc.*,
    112 F.4th 144 (2d Cir. 2024) ................................................................................ 12

*Moorman Mfg. Co. v. Nat'l Tank Co.*,
    91 Ill. 2d 69, 435 N.E.2d 443 (1982)............................................................... 32, 33

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
    710 F.3d 71 (2d Cir. 2013)................................................................................... 4, 5

Defendant's Memorandum of Law in Support of Motion to Dismiss

*O'Connor v. Henkel Corp.*,
   2015 WL 5922183 (E.D.N.Y. Sept. 22, 2015) .............................................................. 4

*Ocampo v. Countrywide Home Loans, Inc.*,
   2020 WL 1532392 (D. Conn. Mar. 31, 2020) ............................................................... 31

*Onaka v. Shiseido Ams. Corp.*,
   2024 WL 1177976 (S.D.N.Y. Mar. 19, 2024) ..................................................... 25, 27

*Patane v. Nestlé Waters N. Am., Inc.*,
   314 F. Supp. 3d 375 (D. Conn. 2018) .................................................................... *passim*

*Patora v. Vi-Jon, LLC*,
   2023 WL 5610300 (S.D.N.Y. Aug. 30, 2023) .................................................. 4, 12, 16

*PDK Labs, Inc. v. Friedlander*,
   103 F.3d 1105 (2d Cir. 1997) ..................................................................................... 13

*Perez v. Nidek Co.*,
   711 F.3d 1109 (9th Cir. 2013) ....................................................................... 15, 16, 17

*Phillips v. Scott*,
   446 F. Supp. 2d 70 (D. Conn. 2006) ........................................................................... 28

*POM Wonderful LLC v. Coca-Cola Co.*,
   573 U.S. 102 (2014) .................................................................................................... 12

*Retail Clerks v. Schermerhorn*,
   375 U.S. 96 (1963) ...................................................................................................... 12

*Reyes v. Upfield US Inc.*,
   694 F. Supp. 3d 408 (S.D.N.Y. 2023) ......................................................................... 31

*Rodriguez v. Ford Motor Co.*,
   596 F. Supp. 3d 1050 (N.D. Ill. 2022) ........................................................................ 35

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ........................................................................................ 30

*Rudy v. D.F. Stauffer Biscuit Co., Inc.*,
   666 F. Supp. 3d 706 (N.D. Ill. 2023) .................................................................... 29, 33

*Sewell v. Bernardin*,
   795 F.3d 337 (2d Cir. 2015) ........................................................................................ 12

Defendant's Memorandum of Law in Support of Motion to Dismiss

*Slafter v. Haier US Appliance Sols., Inc.*,
    605 F. Supp. 3d 1102 (S.D. Ill. 2022)....................................................................... 30, 35

*Sneed v. Ferrero U.S.A., Inc.*,
    656 F. Supp. 3d 777 (N.D. Ill. 2023) ........................................................................ 33, 35

*Thompson v. Procter & Gamble Co.*,
    2018 WL 5113052 (S.D. Fla. Oct. 19, 2018)................................................................. 34

*Tiara Condo. Ass'n v. Marsh & McLennan Cos. Inc.*,
    110 So. 3d 399 (Fla. 2013)............................................................................................. 33

*Truss v. Bayer Healthcare Pharms. Inc.*,
    2022 WL 16951538 (S.D.N.Y. Nov. 15, 2022).............................................................. 18

*Turner v. GAC Star Quality, LLC*,
    671 F. Supp. 3d 897 (N.D. Ill. 2023) ............................................................................ 33

*Tyman v. Pfizer, Inc.*,
    2017 WL 6988936 (S.D.N.Y. Dec. 27, 2017) ........................................................... 30, 34

*U.S. v. W. Pac. R.R. Co.*,
    352 U.S. 59 (1956)......................................................................................................... 23

*Warth v. Seldin*,
    422 U.S. 490 (1975)....................................................................................................... 25

*Wilson v. ColourPop Cosmetics, LLC*,
    2023 WL 6787986 (N.D. Cal. Sept. 7, 2023) ................................................... 14, 16, 17

*Wyeth v. Levine*,
    555 U.S. 555 (2009)......................................................................................................... 5

**Statutes**

Coronavirus Aid, Relief, and Economic Security Act, 15 U.S.C. §§ 9001 *et
    seq.* ................................................................................................................................. 8

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*...........................*passim*

Fla. Stat. § 501.201 ............................................................................................................. 4

810 ILCS 5/2-313 to 5/2-315 ............................................................................................. 4

810 ILCS 5/2-607 ............................................................................................................. 29

815 ILCS 505/1 ......................................................................................................... 4

**Other Authorities**

21 C.F.R. §§ 10.25(a), 10.30 ..................................................................................... 17

21 C.F.R. § 101.9(g)(5) ............................................................................................. 19

21 C.F.R. §§ 201.327 *et seq.* ..................................................................................... 8

37 Fed. Reg. 26456 (Dec. 12, 1972)........................................................................... 5

43 Fed. Reg. 38206 (Aug. 25, 1978) ...................................................................... 5, 6

58 Fed. Reg. 28194 (May 12, 1993)........................................................................ 6, 7

64 Fed. Reg. 27666 (May 21, 1999)........................................................................ 7, 8

66 Fed. Reg. 67485 (Dec. 31, 2001)........................................................................... 8

72 Fed. Reg. 49070 (Aug. 27, 2007) .......................................................................... 8

76 Fed. Reg. 35620 (June 17, 2011)........................................................................... 8

84 Fed. Reg. 6204 (Feb. 26, 2019) ........................................................................... 10

Fed. R. Civ. P. 9(b) ........................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 11

Fed. R. Evid. 201(b) .................................................................................................. 11

FDA Final Administrative Order (OTC000006) (Sept. 24, 2021) ................................ *passim*

U.S. Const. art. VI, cl. 2 ............................................................................................ 12

Defendant's Memorandum of Law in Support of Motion to Dismiss

## INTRODUCTION

There are no state laws – nor have there ever been any state laws – that require or regulate sun protection factor (SPF) value statements on sunscreen, much less that impose specific testing requirements and methodologies for determining SPF levels. Instead, the requirement that an SPF value be declared on sunscreen products is a *federal* requirement, and the method of testing is a *federal* creation, promulgated and revised by FDA over the course of *fifty years* of notice-and-comment rulemaking. Plaintiffs concede this. The entire theory of their case – that the SPF value shown on the label of Defendant's sunscreen product is inaccurate – is predicated on testing purportedly (but not actually) conducted pursuant to those same *federal* standards.

Plaintiffs' allegations are preempted, for two reasons. *First*, they are impliedly preempted by 21 U.S.C. § 337(a), which reserves the right to enforce the FDCA to the United States. It is obvious that Plaintiffs are seeking to enforce the FDCA – the statement they are challenging is required by FDA regulations to appear on the product; the stated SPF value and Plaintiffs' challenge to it were both derived from testing done under those regulations; and, as a result, resolving the dispute would necessarily require interpretation and application of those regulations. That is enforcement. That task is reserved to FDA by statute. *See* Part II.A, *infra*.

*Second*, the claims are expressly preempted because they seek to impose a requirement that is "different from" and "not identical" to the requirements imposed by the FDCA. *See* 21 U.S.C. § 379r(a)(2). After extensive rulemaking, FDA adopted a testing procedure that bases the SPF value off of a single panel of at least ten test subjects, validated *not* by testing additional subjects, but by also testing a "control" formulation on the original test subjects. Plaintiffs' efforts to assert claims on the basis of a second test performed years later by a third party would thus impose a different and non-identical standard. That would be the case even if Plaintiffs' testing followed FDA's protocols, but it does not, which separately mandates preemption. *See* Part II.B, *infra*.

Aside from whether the claims are preempted, the Court should dismiss them under the doctrine of primary jurisdiction. The requirement that sunscreen products bear SPF labeling and the manner in which SPF values are to be determined are the key issues in the case, and both rest

1

Defendant's Memorandum of Law in Support of Motion to Dismiss

soundly in FDA's discretion. For the Court to weigh in on them would intrude on the balance FDA has struck and risk inconsistent decisions at the state level – precisely what Congress sought to avoid by passing the FDCA to establish "national and uniform" standards. *See* Part III, *infra*.

Plaintiffs' claims also fail because they lack Article III standing. Plaintiffs do not allege that they tested either of the products they purchased. They allege instead that their attorney also purchased the product at a separate time and place, and tested that product. Second Circuit case law requires a "meaningful link" between the tested product and the products Plaintiffs purchased. The allegations in the Complaint – testing of a *single* product, neither geographically nor temporally proximate to Plaintiffs' purchases – come nowhere near meeting that standard. *See* Part IV, *infra*. Plaintiffs separately lack standing to seek injunctive relief, as they are well aware of the purported overstatement of SPF value on the label. *Id.*

Lastly, Plaintiffs' state law claims also fail for a series of independent reasons. The unjust enrichment claim purportedly brought "under Connecticut common law" must be dismissed because Connecticut common law does not apply. The breach of warranty claims fail for lack of notice. The claims that sound in fraud – *i.e.*, the tort and state consumer protection law claims – are barred by Rule 9(b) because there are no facts alleged showing that Edgewell knew that the SPF value on the product was inaccurate. The negligent misrepresentation and fraud claims are barred by the economic loss rule. And, Plaintiff Giannese's claim for breach of implied warranty fails for lack of privity because she alleges she purchased the product from Amazon. *See* Part V. Defendant respectfully requests that the claims be dismissed.

## I.     BACKGROUND

### A.     Factual Allegations.

Plaintiffs Agatha Lewandowska Giannese and Andrea Fahey ("Plaintiffs") allege that Defendant Edgewell Personal Care Brands, LLC's ("Edgewell") Hawaiian Tropic Active SPF Sport Sunscreen lotion ("Product") is deceptively advertised because the SPF value listed on the front panel is different from the SPF value that resulted when Plaintiffs' counsel purchased the

Product and commissioned independent testing of it.

Plaintiff Giannese alleges that she purchased the Product on or about July 28, 2023, from Amazon.com. Compl. ¶ 9. Plaintiff Fahey alleges that she bought the Product at a Publix store in Florida on or about May 2, 2025. *Id.* ¶ 10. Plaintiffs allege that on or about February 21, 2025, Plaintiffs' counsel purchased the Product at a CVS in Miami, Florida. *Id.* ¶ 23. Plaintiffs' counsel allegedly submitted the Product to a laboratory, which performed testing and "calculat[ed] the label SPF, following the FDA testing methods embodied in [the FDA Final Rule]." *Id.* ¶ 24. The Complaint notes that testing began on May 29, 2025, and concluded on July 16, 2025. *Id.*

The Complaint alleges that this test returned an SPF value of 20 (after rounding down), and that the results were "derived from the testing methods embodied in the FDA Final Rule and FDA Final Administrative Order." *Id.* ¶ 25 (citing Ex. A). Plaintiffs allege that the Products that they purchased "came in the same bottle and with the same labeling as the Product sent for testing by Plaintiffs' counsel, contained the same percentage of active ingredients as the Product sent for testing by Plaintiffs' counsel," and were produced and manufactured in the same way. *Id.* ¶ 27. They allege that Defendant was or should have been aware that the SPF protection provided by the product was lower than 50, because Defendant also tested the Product. *Id.* ¶ 30.

Both Plaintiffs allege that they relied on the SPF 50 statement on the Product label, and paid a premium for the Product but did not receive the "full intended use" of it. *Id.* ¶¶ 36, 40, 43, 47. They each allege that they used the Product and found it to be "not as advertised," and "later discontinued [their] use of the Product." *Id.* ¶¶ 39, 46.

Plaintiffs do *not* allege, on the basis of their counsel's test result or otherwise, that the correct SPF value for the Product is 20; they allege instead that the SPF value is "significantly lower than 50." *Id.* ¶¶ 27, 28, 29, 30. The Complaint makes no reference to any state laws or regulations regarding SPF labeling, or any compliance threshold for SPF testing, or any methodology other than FDA's methodology for determining the SPF value of a sunscreen.

Plaintiffs seek to represent a class of "all persons who . . . purchased [the Product] in the United States" during the applicable limitations period. *Id.* ¶ 48. Plaintiff Giannese seeks to

Defendant's Memorandum of Law in Support of Motion to Dismiss

represent a subclass of consumers who purchased the Product in Illinois, and Plaintiff Fahey seeks to represent a subclass of consumers who purchased the Product in Florida. *Id*. ¶¶ 49-50.

On behalf of themselves and the purported nationwide class, Plaintiffs assert a cause of action for unjust enrichment. *Id*. ¶¶ 60-70. On behalf of the purported Illinois subclass and herself, Plaintiff Giannese asserts causes of action for deceptive practices in violation of 815 ILCS 505/1, *see id*. ¶¶ 71-87, breach of express warranty in violation of 810 ILCS 5/2-313, *see id*. ¶¶ 88-100; and breach of implied warranty in violation of 810 ILCS 5/2-314 and 5/2-315. *Id*. ¶¶ 88-100. On behalf of the purported Florida subclass and herself, Plaintiff Fahey asserts a cause of action for deceptive practices in violation of Fla. Stat. § 501.201. *Id*. ¶¶ 108-121. On behalf of the putative Illinois and Florida classes, Plaintiffs Giannese and Fahey respectively assert causes of action for fraud in violation of Illinois and Florida common law, *see id*. ¶¶ 122-132, and negligent misrepresentation. *Id*. ¶¶ 133-142. Plaintiffs pray for actual, compensatory, and/or punitive damages, prejudgment interest, restitution and "all other forms of equitable monetary relief," injunctive relief, and attorneys' fees and costs. *Id*. (Prayer for Relief).

**B.      The FDCA and the Monograph System for Regulation of OTC Drugs.**

The Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA") is the centerpiece of a "comprehensive federal regulatory scheme to protect consumers from fraud or misrepresentation in the sale of food, drugs, and cosmetics." *Critcher v. L'Oreal USA, Inc.*, 2019 WL 3066394, at *2 (S.D.N.Y. July 11, 2019), *aff'd*, 959 F.3d 31 (2d Cir. 2020) (quoting *O'Connor v. Henkel Corp.*, 2015 WL 5922183, at *3 (E.D.N.Y. Sept. 22, 2015). In passing it, Congress intended to pass "a national and uniform regulatory scheme" to address these issues, which "up until the FDCA's passage, had been subject to the disparate laws of the states." *Patora v. Vi-Jon, LLC*, 2023 WL 5610300, at *3 (S.D.N.Y. Aug. 30, 2023).

The FDCA allows drugs deemed to be "generally recognized as safe and effective" ("GRASE") to be marketed without prior FDA approval. *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013). For prescribed drugs, this is done via pre-market approval, a process that includes approval of "the exact text in the proposed label." *Gibbons v.*

*Bristol-Myers Squibb Co.*, 919 F.3d 699, 707 (citing *Wyeth v. Levine*, 555 U.S. 555, 568 (2009)).

For over the counter ("OTC") drugs, however, FDA instead often deploys the monograph system, pursuant to which it establishes conditions, such as active ingredients, uses (indications), doses, routes of administration, labeling, and testing, under which an OTC drug in a given therapeutic class is GRASE. *Nat. Res. Def. Council,* 710 F.3d at 75. Products that comply with the conditions set forth in an applicable monograph may be lawfully marketed without an approved new drug application. *Id*. FDA monographs set forth rules governing labeling, and may include testing methodologies for final formulations, or as in the case of sunscreens, certain product attributes, such as SPF values. *Kouyate v. Harvard Drug Grp. LLC*, 2025 WL 2773159, at *3 (S.D.N.Y. Sept. 26, 2025).

### C.    History of FDA Regulation of Sunscreen.

FDA regulation of sunscreen began in 1972, when it issued a request for information regarding active ingredients used in topical analgesics, including for sunburn prevention, and appointed a panel to review this information. 37 Fed. Reg. 26456 (Dec. 12, 1972). FDA then began a rulemaking process regarding sunscreen products that would span the next fifty years.

### 1.    1978 - The Advance Notice of Proposed Rulemaking.

In the 1978 Advance Notice of Proposed Rulemaking ("ANPR"), FDA concluded for the first time that sun exposure could be bad for health, including that over-exposure to sunlight damages the skin and that the cumulative exposure to sunlight from childhood into adulthood can lead to skin cancer. ANPR, 43 Fed. Reg. 38206 (Aug. 25, 1978), at 38209. It recommended application of sunscreen as one way of mitigating these outcomes. *Id*. at 38212. The ANPR noted that, although sunscreen had previously been considered a cosmetic, "products intended to be used for prevention of sunburn" would now be considered drugs under the FDCA. *Id*. at 38209.

FDA noted the use in Europe of a sun protection factor or "SPF" value, defined as the ratio of the amount of energy required to produce a minimum erythema dose ("MED") through a sunscreen product to the amount of energy required to produce an MED without any sunscreen. *Id*. at 38213. FDA described SPF value as "a practical guide" that could "aid the consumer in

Defendant's Memorandum of Law in Support of Motion to Dismiss

selecting the most suitable sunscreen for his/her own purposes." *Id*. To ensure "proper use" of SPF values, FDA proposed "final product testing of each formulation." *Id*.

The ANPR set out a detailed testing methodology for determining SPF value. *Id*. at 38259. This methodology, which FDA would modify continuously for the next fifty years, involved, for each test subject, determining the MED on unprotected skin, on skin protected by a standardized "control" formulation, and on skin protected by the test product, and the use of statistical methods to calculate a single SPF value from these test results. *Id*.

### 2. The 1993 Tentative Final Monograph.

In 1993, FDA published a tentative final monograph ("TFM") in which it responded to the extensive comments it had received regarding the ANPR, including to "public comments submitted in response to a notice of public meeting to discuss *appropriate testing procedures for OTC sunscreen drug products*, presentations made at the public meeting, and public comments submitted in response to the meeting." TFM, 58 Fed. Reg. 28194 (May 12, 1993), at 28194 (emphasis added).[1] In addition to responding to comments on all aspects of the proposed sunscreen rule, the TFM responded specifically to many comments related to testing, compliance, and safety:

FDA Response to Comments on the testing methodology

> . . . the seriousness of the consequences that may result if a consumer relies upon an inaccurately labeled sunscreen (e.g., one that promises more protection than it actually affords) mandates that the final formulation of OTC sunscreen drug products be tested *using standardized and validated testing procedures*. Labeled SPF values should be based on testing conducted under the most carefully controlled conditions so that results are as accurate as possible. The outcome of an accurate and reproducible testing procedure ensures that competitive products on the market with the same SPF value provide essentially the same degree of protection. *The agency believes that this can be accomplished best by requiring all manufacturers to use fully evaluated and validated testing procedures for testing the final formulation of OTC sunscreen drug products*.

TFM, 58 Fed. Reg. at 28248 (emphasis added).

---

[1] The public meeting had been held on January 26, 1988, "to discuss recommendations of the Topical Analgesic Panel regarding final product testing and related claims of OTC sunscreen drug products" and FDA extended the period for submission of comments on the testing procedures and related claims for OTC sunscreen drug products to May 26, 1988, "*to allow full opportunity for informed comments on the testing procedures*." *Id*. at 28194 (emphasis added).

Defendant's Memorandum of Law in Support of Motion to Dismiss

FDA Response to comments on testing procedures, including concern for test subjects:

> *The agency is aware that including an untreated control site in the randomization scheme could expose the test subject to an excessive dose of UV radiation on unprotected skin.* To prevent this from occurring, the agency is proposing that the untreated control site be exposed to a series of UV radiation doses that are appropriate to determining the test subject's inherent MED as proposed in §352.73. The agency is also proposing that the appropriate standard preparation be included in the randomization pattern. *Therefore, the agency is proposing that a standard preparation, as specified in §352.70, be run every time a sunscreen drug product is tested. If the SPF of the sunscreen standard falls outside its specified range, the entire test should be considered invalid.*

*Id*. at 28263 (emphasis added).

FDA Response to comments on variability and "strictly standardized testing procedures":

> The agency points out that the SPF value is not an absolute predictor of sunscreen protection. There are many variables involved in sunscreen use (e.g., skin type, latitude, altitude, whether the consumer is at the beach or in a city, and spreading characteristics of the product). *The value of the SPF is that it is derived by strictly standardized testing procedures and, therefore, provides a convenient means of product-to-product comparison.* The SPF provides consumers a means to evaluate and compare sunscreen drug products based upon the consumer's previous experience in the sun and previous use of products with an identified SPF value.

*Id*. at 28266 (emphasis added).

The TFM also considered comments on other topics, such as the definition of MED, which it redefined as "the smallest dose of UV radiation that produces redness reaching the borders of the exposure site." *Id*. at 28269.[2] In connection with the issuance of the TFM, FDA again solicited public comment. *Id*. at 28294-295.

### 3.    The 1999 Final Monograph.

In 1999, FDA issued the Final Monograph ("FM") for OTC Sunscreen Drug Products. *See* 64 Fed. Reg. 27666 *et seq*. The FM considered comments submitted in response to the 1993 TFM and broadly retained testing methods and protocols from the TFM. The FM again revised the definition of MED, this time to mean "[t]he quantity of erythema-effective energy . . . required to

---

[2] FDA also responded to comments related to the makeup of the control formulation and its use in higher-SPF products (*id*. at 28250-254); the use of artificial light vs. sunlight (*id*. at 28254-256); the type of artificial light source and whether a solar simulator should emit UVA as well as UVB light (*id*. at 28256-260).

Defendant's Memorandum of Law in Support of Motion to Dismiss

produce the first perceptible redness reaction with clearly defined borders.'' *Id*. at 27667.

FDA noted in the FM that several commenters had "questioned the ability of current testing methods to accurately and reproducibly determine SPF values for high SPF products," and responded that "the test method proposed in the tentative final monograph (TFM) . . . represents at this time a straightforward, well-understood, and sound method for measuring these values." *Id*. at 27680. FDA later stayed the effective date of the FM to allow it time to add provisions related to UVA protection. 66 Fed. Reg. 67485 (Dec. 31, 2001).

### 4.    2011 Final Rule.

On June 17, 2011, FDA published the Final Rule on Labeling and Effectiveness Testing, Sunscreen Drug Products for Over-the-Counter Human Use. 76 Fed. Reg. 35620 (June 17, 2011) *et seq*. The Final Rule addressed "labeling and effectiveness testing issues raised by the nearly 2,900 submissions [FDA] received in response to [the 2007 Proposed Rule]".[3] *Id*. at 35620. The 2011 Final Rule "included the SPF test from the 1999 final rule," although FDA noted that it had "made several revisions" to the test parameters, including the makeup of the standard or "control" solution, the parameters of the solar simulator, the number of subjects required for a valid test panel (reduced to 10-13 subjects, with 10 valid results), the test site and subsites, the application of the test materials, and the definition of MED, in response to comments it had received. *Id*. at 35644-645 (Table 4). The Final Rule was codified at 21 C.F.R. §§ 201.327 *et seq*.

### 5.    The CARES Act and Administrative Order M020.

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which adopted the 1999 FM, except that labeling and effectiveness of sunscreen would be governed by the 2011 Final Rule, *i.e.*, by 21 C.F.R. §§ 201.327 *et seq*. *See* 21 U.S.C. § 355h(a)(2) ("With respect to sunscreen drugs . . . the applicable requirements . . . shall be the requirements specified in part 352 of title 21, Code of Federal Regulations, as published on May

---

[3] In 2007, FDA had issued a proposed rule that would amend the 1999 Final Monograph. 72 Fed. Reg. 49070 (Aug. 27, 2007). The proposed rule addressed "formulation, labeling, and testing requirements" based on "public comments and new data and information that have come to FDA's attention." *Id*. Discussion of the 2007 proposed rule is omitted here for brevity, as it was superseded by the 2011 Final Rule and the Administrative Order.

Defendant's Memorandum of Law in Support of Motion to Dismiss

21, 1999 . . . except that the applicable requirements governing effectiveness and labeling shall be those specified in section 201.327 of title 21, Code of Federal Regulations."). FDA accordingly issued an Administrative Order adopting those standards. *See* Defendant's Request for Judicial Notice ("RJN"), Ex. A (FDA, Final Administrative Order (OTC000006) Over-the-Counter Monograph M020: Sunscreen Drug Products for Over-the-Counter Human Use (Sept. 24, 2021)).

The currently applicable testing protocols are contained in § M020.80 of the Administrative Order and provide detailed instructions regarding:

(a) **the UV source** (solar simulator), and how it must be calibrated. *Id*. § M020.80(a).

(b) **the control sunscreen**, (or "SPF standard") including a detailed recipe for the makeup of the control formulation, and how it must be prepared and verified. *Id*. § M020.80(b).

(c) **selection of test subjects**, including instructions on how many subjects (enough to produce 10 valid results), and to use only subjects with skin types 1, 2, or 3. *Id*. § M020.80(c).

(d) **sunscreen application**, including specifications regarding the locations of the sites and subsites, the amount of sunscreen to be applied (2mg/cm2), the method of applying it (via finger cot), and the time period before any exposure to UV radiation. *Id*. § M020.80(d).

(e) **UV exposure / test protocols.** The Administrative Order contains detailed instructions on exposing test subjects to UV radiation. In brief, an initial MED on unprotected skin is determined for each subject by administering a series of UV radiation doses to subsites to an unprotected site, with the doses increasing in a geometric series represented by $1.25^n$ (each dose 25% greater than the prior one), in order to determine the smallest dose that produces the MED, defined as "perceptible redness of the skin with clearly defined borders at 16 to 24 hours after exposure." *Id*. § M020.80(e)(1),(2). Then, final MEDs are determined for subsites that are unprotected, subsites that are protected with the control sunscreen, and subsites that are protected by the test product, by administering a series of five UV doses to the relevant test sites. *Id*. § M020.80(e)(3). The middle dose of each series is determined by multiplying the initial unprotected MED times the expected SPF. *Id*. (The expected SPF of unprotected skin is 1, and

Defendant's Memorandum of Law in Support of Motion to Dismiss

the expected SPF of the control product is 16.3.) The percentage increase between the doses in the series is a function of the expected SPF of the test product. *Id*. The Administrative Order also provides rules for evaluating test sites and subsites (usually done the next day), and contains an exclusive list of reasons why test data can be considered invalid. *Id*. § M020.80(e)(4),(5).

**(f)  SPF calculation.** An SPF value is then calculated for each test subject by dividing the unprotected MED by the MED on skin protected by the test product. The mean and standard deviation of the valid results are then calculated, and a formula is applied to determine the labeled SPF value. This is done for both the test product and the control formulation, and "in order for the SPF determination of a test product to be considered valid, the SPF value of the [control formulation] should fall within the standard deviation range of the expected SPF (*i.e.* 16.3 plus or minus 3.43)." *Id*. § M020.80(f).

As described above, these standards and testing protocols are the outcome of more than fifty years of investigation and collaboration between FDA and scientists, public health officials, consumer advocacy groups, and industry, whose input has been considered and harmonized into a single rule by FDA, which is appropriately the agency responsible for enforcement of it. 21 U.S.C. § 337(a).

During this process, FDA considered thousands of comments, including many that discussed inherent variability in sunscreen use and effectiveness, potential variation in SPF values determined via FDA's testing methodology, [4] and safety concerns associated with testing UV radiation on human subjects. The Administrative Order therefore reflects a considered balance struck by FDA regarding how best to deal with these issues while at the same time

---

[4] In 2019, FDA issued a proposed rule on Sunscreen Drug Products for Over-the-Counter Human Use. 84 Fed. Reg. 6204 (Feb. 26, 2019) et seq. In the preamble to the proposed rule, FDA expressly considered evidence of variation in SPF value testing, which it found stems from the fact that "determining which of several areas on a single subject's back should be considered to meet this 'clearly defined borders' criteria [i.e., determination of the MED] is an exercise of clinical judgment" which leads to "variability both between tested SPF values for individual study subjects *and for determined SPF results achieved across multiple labs testing the same sunscreen formulation*." *Id*. at 6238 (emphasis added). FDA proposed use of SPF ranges (a proposal which was not adopted), but notably it did not respond to evidence of variability by proposing more or subsequent testing. FDA reproposed these rules in 2021 in the form of a Proposed Order. *See* Def.'s RJN, Ex. E (Proposed Order (OTC000008) Amending Over-the-Counter Monograph M020: Sunscreen Drug Products for Over-the-Counter Human Use (posted September 24, 2021)).

Defendant's Memorandum of Law in Support of Motion to Dismiss

providing consumers with useful information to protect themselves against negative consequences of exposure to UV radiation.

### D.    Legal Standards.

A defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id*. Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006). But a court may consider "any 'written instrument' that is attached to [the complaint] as 'an exhibit,' " "incorporated in it by reference," or "integral to the complaint." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (citations omitted). A pleading incorporates a document by reference where it makes "a clear, definite and substantial reference to the document[ ]." *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003)).

A court may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Federal Rule of Evidence 201(b) permits a court to take judicial notice of facts that are "not subject to reasonable dispute" because they (1) are "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).

"Dismissal under Rule 12(b)(6) is therefore appropriate if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are

Defendant's Memorandum of Law in Support of Motion to Dismiss

barred as a matter of law.'" *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 150 (2d Cir. 2024) (quoting *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015)).

**ARGUMENT**

### I.   Plaintiffs' Claims Are Preempted by the FDCA.

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States," are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Congress therefore has 'the power to preempt state law' through federal legislation." *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). Preemption is either expressly stated by statute or implied. *Id.* (citing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76-77 (2008)).

In considering whether federal law preempts state law in a given case, the "ultimate touchstone" is the intent of Congress in passing the statute. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)). In passing the FDCA, Congress' intent was to pass a "*national* and *uniform* regulatory scheme ... which up until the FDCA's passage, had been subject to the disparate laws of the states." *Patora*, 2023 WL 5610300, at \*3 (emphasis added).

To effectuate this goal, Congress provided in Section 337(a) of the FDCA, that "all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a). "What this provision reflects is that only the federal government — not private parties — may enforce violations of the FDCA." *Patane v. Nestlé Waters N. Am., Inc.*, 314 F. Supp. 3d 375, 385 (D. Conn. 2018) (citing *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 109 (2014) (noting that "the FDCA and its regulations provide the United States with nearly exclusive enforcement authority")). Congress also included an express preemption provision, which states that "no State or political subdivision of a State may establish or continue in effect any requirement . . . that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter." 21 U.S.C. § 379r(a)(2).

Taken together, the FDCA's express preemption provision and the implied preemption that

12
Defendant's Memorandum of Law in Support of Motion to Dismiss

flows from the statute's reservation of enforcement to the United States have created what federal courts refer to as a "narrow gap" for claims to avoid preemption. *Glover v. Bausch & Lomb, Inc.*, 6 F.4th 229, 237 (2d. Cir. 2021). In order to fit through this "narrow gap" and avoid preemption, the conduct underlying the claim must *violate* the FDCA (or else the claim is expressly preempted by 379r), but the claim cannot exist *because* the conduct violates the FDCA. *Id.* at 237; *In re Medtronic, Inc.*, 623 F.3d 1200, 1204 (8th Cir. 2010).

In this case, Plaintiffs' claims do not fit through either side of the "narrow gap." They are impliedly preempted because they are predicated entirely on the FDCA and would require this Court to interpret and apply FDA regulations to adjudicate them. At the same time, they are expressly preempted because they would thereby impose requirements that are not identical to those imposed by the FDCA, namely that sunscreen products be subject to retesting, and to testing not done pursuant to FDA regulations.

### A.    The Claims Are Impliedly Preempted Because They Are Entirely Based on the FDCA and Would Require the Court to Interpret and Apply Complex FDA Regulations.

Section 337(a) has "long been understood to have an implied preemptive effect." *Patane*, 314 F. Supp. 3d at 385; *see also Buckman Co. v. Pls. Legal Comm.*, 531 U.S. 341, 349 n.4 (2001) ("[I]t is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with [FDCA requirements.]'"). The Second Circuit has thus held that, if a plaintiff's "true goal is to privately enforce alleged violations of the FDCA," she cannot bring a state law cause of action. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997).

In *Buckman*, the Supreme Court applied Section 337 to preempt claims that had been brought under state tort laws to challenge allegedly fraudulent representations made to FDA during the premarket approval process for a medical device. 531 U.S. at 352-53. It noted that the claims "exist solely by virtue of the FDCA disclosure requirements," that the federal enactments were "a critical element" to plaintiff's case, and that the statutory scheme reflected "clear evidence that Congress intended that the [statute] be enforced exclusively by the Federal Government." *Id.* (citing 21 U. S. C. § 337(a)). Holding the claims impliedly preempted, the Supreme Court

13
Defendant's Memorandum of Law in Support of Motion to Dismiss

explained that the statutory scheme reflected a "delicate balance of statutory objectives," and that allowing state law actions "would exert an extraneous pull on the scheme established by Congress." *Id.* at 348, 353.

Since *Buckman*, courts have dismissed claims as impliedly preempted by Section 337 if an FDA regulation is "critical to [plaintiff's] case," *see McDaniel v. Upsher-Smith Lab'ys, Inc.*, 893 F.3d 941, 948 (6th Cir. 2018), or if the claim "would not exist in the absence of the FDCA." *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 579 (6th Cir. 2013); *see also Glover*, 6 F.4th at 239 (cause of action may not exist "solely by virtue of the FDCA").

In *Patane v. Nestle Waters N. Am., Inc.*, 314 F. Supp. 3d 375 (D. Conn. 2018), the plaintiff alleged that Nestlé deceptively marketed water as "100% Natural Spring Water" despite the fact that it was not "spring water" as that term is defined by federal law. *Id.* at 378-79 (citing 21 C.F.R. § 165.110(a)(2)(vi)). This District Court noted that the claims were "wholly FDCA-dependent" and that plaintiffs conceded that their claims were "co-existent with the FDCA and FDA regulations and will rise or fall" based on whether plaintiffs could prove a violation of them. *Id.* at 387, 388. As a result, this Court concluded that although the claims were "clothe[d] in the garb of state law," plaintiffs were "suing solely to enforce the FDCA," and thus the claims were impliedly preempted. *Id.* at 389. *See also, e.g.*, *DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 41-42 (1st Cir. 2023) (holding allegation that Lactaid was improperly marketed as a dietary supplement impliedly preempted because it was "premised entirely on [plaintiff's] belief that said label violates the FDCA" and thus "the FDCA 'is a critical element in [plaintiff's] case'"); *Wilson v. ColourPop Cosmetics, LLC,* 2023 WL 6787986, at *8 (N.D. Cal. Sept. 7, 2023) (finding allegation that makeup products contained harmful ingredients preempted because the "[h]armful [i]ngredients" referred to FDA regulations, such that the claims arise from and exist solely because of the FDCA).

Courts also dismiss claims as impliedly preempted if resolving them would require the Court to apply an FDA regulation to test the veracity of the advertising at issue. In *In re Chantix (Varenicline) Mktg., Sales Practices & Products Liab. Litig. (No. II)*, 735 F. Supp. 3d 352 (S.D.N.Y. 2024), for example, the plaintiffs alleged that defendant's drug product Chantix was

14
Defendant's Memorandum of Law in Support of Motion to Dismiss

contaminated by the presence of nitrosamines, and that the contaminated batches were falsely marketed as therapeutically equivalent to FDA-approved Chantix, because they no longer met the FDA definition for therapeutic equivalence. *Id.* at 380. The Court held that a claim about product equivalency might theoretically survive preemption if the truth of it could be determined by reference to standards other than FDA standards, but not "where a claim requires interpretation of a matter that is exclusively within the jurisdiction and expertise of the FDA and FDCA." *Id.* (quotation omitted). The Court noted that there were no state law standards on the subject, and thus plaintiffs' exclusive reliance on FDA's standard for therapeutic equivalence was an "impermissible attempt to privately enforce the FDCA via state-law causes of action." *Id.* at 381. (citing *Patane*, 314 F. Supp. 3d at 386). *See also, e.g.*, *Perez v. Nidek Co.*, 711 F.3d 1109, 1120 (9th Cir. 2013) (finding fraudulent omission allegations related to approval status of LASIK machine required resolution of technical questions that "rest[ed] within the enforcement authority of the FDA, not this Court"); *Bubak v. Golo, LLC*, 2025 WL 2860044, at *1 (9th Cir. Oct. 9, 2025) (dismissing allegation that dietary supplement label impermissibly made implied disease claims as preempted because it "necessarily requires litigating the alleged underlying FDCA violation, and the plain text of the FDCA leaves that determination in the first instance to the FDA's balancing of risks and concerns in its enforcement process") (quotations omitted).

In this case, Plaintiffs' claims are impliedly preempted under Section 337, *Buckman* and the foregoing case law, for three reasons:

*First*, the challenged statement – the numerical SPF value – is required to appear on the Product pursuant to an FDCA disclosure requirement. The Administrative Order provides that, on the principal display panel, the label must state "SPF [Insert numerical SPF value resulting from testing under M020.80]" and that "[t]he entire text shall appear in the same font style, size, and color with the same background color." Admin. Order § M020.50(a)(1)(i)(A)-(B); *see also Gisvold v. Merck & Co., Inc.*, 62 F. Supp. 3d 1198, 1202 (S.D. Cal. 2014) ("Significantly, the regulations . . . *mandate* that OTC sunscreen labels state the SPF value resulting from the detailed testing procedure described in the regulation."). The Complaint is thus a challenge to a statement that "exist[s] solely

by virtue of the FDCA disclosure requirements." *Buckman*, 531 U.S. at 353; *Glover*, 6 F.4th at 239.

*Second*, like in *Patane*, Plaintiffs' claims are "wholly FDCA-dependent" on and "co-existent" with FDA regulations, and "rise or fall based solely on whether [Plaintiffs] prove [violation of them.]" *Patane*, 314 F. Supp. 3d at 388. There can be no doubt about this, because the *only* facts Plaintiffs allege in support of their claim is that Plaintiffs' counsel purchased the Product and submitted the Product to a laboratory, which performed testing and "calculate[ed] the label SPF, *following the FDA testing methods embodied in FDA Final Rule . . . ,*" *see* Compl. ¶ 24 (emphasis added), and that the test results were "*derived from the testing methods embodied in the FDA Final Rule and FDA Final Administrative Order.*" *Id*. ¶ 25 (emphasis added). Showing a violation of the FDCA is thus not only a "critical element" of Plaintiffs' case – it is the *sine qua non* of Plaintiffs' case – and this too requires preemption. *Patane*, 314 F. Supp. 3d at 385 n.9; *DiCroce,* 82 F.4th at 42; *Wilson*, 2023 WL 6787986, at *8.

*Third*, like in *In re Chantix*, Plaintiffs' claims "can[not] be resolved through reference to standards other than those of the FDA." 735 F. Supp. 3d at 380. Plaintiffs do not allege that there are any state standards for determining numerical SPF values, and Plaintiffs' own alleged results purport to (but do not) follow FDA's required testing protocol. If the case proceeds, the Court will therefore become the arbiter of complex questions related to whether testing did or did not comply with FDA regulations, and which test should be credited, and whether additional testing should be performed, and other technical matters related to compliance with FDA regulations. *In re Chantix*, 735 F. Supp. 3d at 380; *Perez*, 711 F.3d at 1112; *Bubak*, 2025 WL 2860044, at *1. This would exert an "extraneous pull" on the "delicate balance of statutory objectives" struck by FDA and could also lead to a patchwork of state law rulings, the opposite of the "national and uniform regulatory scheme" Congress sought to establish. *Buckman,* 531 U.S. at 348, 353; *Patora*, 2023 WL 5610300, at *3.

To be sure, Plaintiffs will argue that their claims are rooted in common law duties that pre-date the SPF requirements, *i.e.*, fraud and misrepresentation. But so were the claims in *Patane*

(misrepresentation), *Wilson* (non-disclosure of harmful ingredients), and *Perez* (fraudulent omission). The relevant point is that in order to prove their case, Plaintiffs will have to prove that the SPF value on Defendant's Product is false, and the only way to prove that – the only way that Plaintiffs themselves have even suggested – is via application of FDA's detailed testing methodology.[5]

There is a better entity to make such determinations: FDA itself – which, as discussed *supra*, has spent the last fifty years considering and revising a highly technical process for answering this very question, and is the entity Congress determined should enforce the FDCA. 21 U.S.C. § 337(a). If Plaintiffs or their counsel believe FDA's testing methodology is insufficient or should be revised, the FDCA provides an avenue for them: citizens may petition FDA to take administrative action. *See* 21 C.F.R. §§ 10.25(a) and 10.30. The Court should dismiss the claims as impliedly preempted.

### B. The Claims Are Expressly Preempted Because They Would Impose Requirements Additional to and Different from Those Imposed by the FDCA.

In addition to the bar on private enforcement, the FDCA expressly preempts imposition of any requirement that is "different from or in addition to, or that is otherwise not identical with, a requirement under this chapter . . . ." 21 U.S.C. § 379r(a)(2). The Second Circuit has interpreted this provision to mean that the FDCA preempts "not only those state laws that are in conflict with it . . . but also any state law that provides for . . .requirements that are not *exactly the same* as those set forth in the FDCA and its regulations." *Critcher v. L'Oréal USA*, Inc., 959 F.3d 31, 35-36 (2d Cir. 2020) (emphasis added); *see also, e.g.*, *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 320 (S.D.N.Y. 2017) ("Where federal law specifically regulates the subject matter of a plaintiff's state law claims, and those claims seek to impose requirements not identical to federal

---

[5] *Cf.*, *e.g., Clinger v. Edgewell Pers. Care Brands, LLC*, 2023 WL 2477499, at *12 (D. Conn. Mar. 13, 2023) in which this Court found no implied preemption because the common law fraud elements "do[] not require the plaintiffs to prove that there was a violation of the FDCA."

Defendant's Memorandum of Law in Support of Motion to Dismiss

requirements, those state law claims are preempted."); *Truss v. Bayer Healthcare Pharms. Inc.*, 2022 WL 16951538, at *3-4 (S.D.N.Y. Nov. 15, 2022) (same).

In *Critcher*, the plaintiff alleged that the label of a cosmetic product was misleading notwithstanding its compliance with FDA's labeling requirements, because the label did not disclose that all of the product could not be dispensed from the tube. *Critcher*, 959 F.3d at 34. The Second Circuit found the claim expressly preempted, and explained:

> In light of the technical nature of [FDA labeling] requirements—combined with Congress's broad, categorical statement of preemption in the FDCA—we are reluctant to conclude that states may impose *other* labeling requirements that have not been imposed by Congress or the FDA. If we were to impose such *additional* labeling requirements, we would be construing state law to impose many "requirements" that are not contained in the federal statute, or in the regulations issued thereunder, and to disrupt what Congress intended to be a uniform—and federally-led—regulatory scheme.

*Id*. at 38 (emphasis in original).

In *Truss*, the plaintiffs alleged that the statements "hypoallergenic" and "dermatologically tested" on Coppertone sunscreen products were deceptive because the product contained benzophenone, "a byproduct of octocrylene," an active ingredient in the product. 2022 WL 16951538, at *1. The court reasoned that the claims were based on non-disclosure, but that disclosure was not required because FDA required only disclosure of "active ingredients" and "inactive ingredients," whereas benzophenone was not an ingredient, but a degradation byproduct. *Id*. at *4. It thus found the allegations preempted, noting that "[b]ecause . . . the FDCA does not mandate disclosure of degradation byproducts . . . , the labeling duties plaintiffs seek to impose are additional to those imposed by the FDCA." *Id*.

In this case, Plaintiffs seek to impose different and additional requirements by asserting that Defendant's label is deceptive because of subsequent testing performed at the behest of their counsel. This is at odds with FDA's required methodology for determining and stating SPF values on sunscreen, for multiple reasons:

    **1.    FDA does not contemplate retesting, or include a threshold for accuracy against which subsequent tests could be evaluated.**

The Administrative Order requires manufacturers to determine an SPF value using the testing procedures in § M020.80, and the SPF value must be "prominently placed on the principal display panel." Admin. Order §§ M020.10, M020.20, M020.50(a). As discussed *supra*, the testing procedures and protocols are extremely specific and entail the use of a single test panel, a control formulation, and statistical methods for ensuring that a valid SPF value is determined. A manufacturer has no discretion to decide not to conduct this testing, or to conduct it using any other methodology, and is required to rely on the test when labeling the sunscreen product.

The Administrative Order contains no reference to conducting additional testing; nor is there any compliance threshold that subsequent tests would need to fall within. By challenging the SPF value on the basis of subsequent testing conducted by a private third party, Plaintiffs are thus seeking to impose requirements that are different from those imposed by the FDCA.

### 2.    FDA addresses variation via the control formulation, not subsequent testing.

FDA is well aware of variability inherent in sunscreen test results. Rather than dealing with this via more testing, however, it chose instead to insist on a standardized method for determining SPF values. *See* Part I.C, *supra*; TFM, at 28266 ("There are many variables involved in sunscreen use . . . . *The value of the SPF is that it is derived by strictly standardized testing procedures* and, therefore, provides a convenient means of product-to-product comparison.") (emphasis added).

If FDA had wanted to impose a compliance threshold *on the test product* that could be challenged via subsequent testing, it could easily have done so. In the context of food labeling, for example, FDA regulations state that a food with a label declaring total calories, added sugars, and other nutrients is misbranded if the nutrient content of a composite sample is greater than 20% in excess of the value for that nutrient declared on the label. *See* 21 C.F.R. § 101.9(g)(5).

But there is no compliance threshold for the results on the test product, and thus no compliance threshold that can be applied to subsequent SPF value testing. Instead, FDA enforces adherence to its standardized testing procedures and protocols by applying a compliance threshold to the *control formulation* in *the original test*. *See* Admin. Order § M020.80(f) (test result valid

Defendant's Memorandum of Law in Support of Motion to Dismiss

unless the results for the control formulation fall outside a broad range: [16.3 +/- 3.4, or an SPF of 12.87 to 19.73]). FDA is thus focused on adherence to its required protocols, having determined that this is the best way to provide consistent and useful SPF values to consumers without unnecessarily irradiating volunteers. Plaintiffs' attempt to challenge the SPF value on the label via subsequent testing performed by a private third party is different from what FDA prescribes, and therefore preempted.

### 3. The FDCA provides an exclusive list of reasons why test results can be disregarded, which does not include the results of a subsequent panel.

The Administrative Order provides an exclusive list of reasons why a test result can be considered invalid: (i) if erythema is not present on either the unprotected or protected test sites; (ii) if the responses are inconsistent with the series of UV doses administered; and (iii) if the subject was non-compliant, meaning that he or she either withdrew from the test or did not shield the test sites from further UV radiation until the MED was determined. Admin. Order § M020.80(e)(5). Conspicuously absent from this list is a test result being considered invalid for being inconsistent with another, later, test performed by a third party.

And it is easy to understand why, in light of the confusion and expense that would result if SPF values on labels could be challenged via subsequent testing. Manufacturers might choose, for example, to run multiple test panels, and would then need to determine for themselves which results to put on labels. Plaintiffs' attorneys would run still more tests, and assert that their results are the correct ones. Is the court to be the arbiter of this, without any FDA compliance threshold to refer to, and if so, what is the likelihood that it will make the same decision FDA would, much less the same decision as courts applying the laws of the other forty-nine states? How many volunteers should be irradiated in pursuit of Plaintiffs' claims and the claims that other plaintiffs' counsel will certainly file? This would amount to an entirely separate regulatory regime, and these are just some of the questions that will need to be answered if the Court agrees that Plaintiffs can state a claim by simply running another version of an inherently variable test.

FDA has chosen a different path. Over the course of fifty years, taking into consideration

the inherent variability of human skin types and the way that people use sunscreens, the technical challenges and safety concerns associated with exposing volunteer subjects to UV radiation, and weighing those and other challenges against the benefits of providing consumers with useful information that they can use to protect themselves against harmful UV radiation and lessen their risk of skin cancer, FDA has determined that the best approach is to *require* manufacturers to state the SPF value on the front panel of their sunscreen products, and to *require* that they do so by conducting and relying on testing done pursuant to a rigorous and highly detailed testing methodology. That is what Edgewell has done, and the Complaint does not allege otherwise. Plaintiffs' attempt to use subsequent testing to challenge the SPF value would thus impose additional and different obligations, and is expressly preempted.

### C. The Claims Are Expressly Preempted Because Plaintiffs' Testing Methodology Is Not Exactly The Same As FDA's Methodology.

Even if Plaintiffs' challenge to Defendant's label were not preempted for the reasons set forth above, it is still expressly preempted. The Second Circuit has held that "the FDCA preempts . . . any state law that provides for . . . requirements that are not *exactly the same* as those set forth in the FDCA and its regulations." *Critcher*, 959 F.3d at 35-36. Plaintiffs' testing methodology is not "exactly the same" as that required by FDA, for the following reasons:

#### 1. Plaintiffs' test results show that the lab used a different definition of MED.

The Administrative Order defines MED as "the smallest UV dose that produces perceptible redness of the skin (erythema) with clearly defined borders at 16-24 hours after exposure." Admin. Order § M020.80(e). Plaintiffs' test results, on the other hand, define MED as "the smallest UV dose that produces perceptible redness of the skin (erythema) with clearly defined borders at 16-24 hours after exposure (*Score of at least 1 on the MED Scoring Scale*)." Compl., Ex. A, at 7 (emphasis added). The "MED Scoring Scale" is then defined as follows:

Score / Description
0      No erythema present

0.5    Ambiguous erythema, and/or no clear border, and/or not filling
       more than 50% of the exposure subsite

Defendant's Memorandum of Law in Support of Motion to Dismiss

| 1 | Perceptible *unambiguous* erythema with *defined borders filling more than 50% of the exposure subsite* |
|---|---|
| 2 | Moderate to intense erythema |

*Id*. (emphasis added). There is no "MED Scoring Scale" in FDA regulations or the Administrative Order.[6] As discussed above, the MED is integral to each step of FDA's detailed testing methodology, including the selection of UV doses for each series of exposures. By adopting a different definition of this fundamental component of the test, therefore, Plaintiffs have used and seek to enforce a test methodology that is not "exactly the same" as FDA's methodology, and thus the claims are expressly preempted. *Critcher*, 959 F.3d at 35-36.

### 2. Plaintiffs' test did not use the "expected SPF" as required by FDA regulations.

The Administrative Order states that, after determination of the initial MED, three series of five doses of UV radiation should be administered to each subject, one series each on test sites for (i) unprotected skin, (ii) skin protected by the "control" sunscreen, and (iii) skin protected by the test product. The middle exposure – the third of the five exposures – is set based on X, which is the initial MED *multiplied by the expected SPF*. *See* Admin. Order § M020.80(e)(1) (emphasis added).

In this case, because the Product is labeled SPF 50, the "expected SPF" for the test product would be 50. Instead of using 50, however, Plaintiffs' test results indicate that "subjects 1-4 were tested at SPF 25" and "subjects 5-13 were tested at SPF 20." Compl., Ex. A, at 12. This has the effect of making it impossible for the resulting SPF value to even approach 50, and again constitutes use of a test methodology that is not "exactly the same" as the FDA method, and requires dismissal of the Complaint as expressly preempted. *Critcher*, 959 F.3d at 35-36.

## II. The Court Should Dismiss the Case Under the Doctrine of Primary Jurisdiction.

Aside from whether the Court determines that Plaintiffs' claims are preempted, it should also dismiss the case out of deference to FDA, pursuant to the doctrine of primary jurisdiction. This doctrine seeks to "promot[e] proper relationships between the courts and administrative

---

[6] The "MED Scoring Scale" is a feature of the ISO 24444 SPF-testing methodology, which is a separate method of determining an SPF value.

Defendant's Memorandum of Law in Support of Motion to Dismiss

agencies charged with particular regulatory duties." *All Am. Tel. Co. v. AT & T, Inc.*, 2010 WL 7526933, at \*1 (S.D.N.Y. Jan. 19, 2010). Its purpose is to "allocate initial decision-making responsibility between courts and agencies and to ensure that they do not work at cross-purposes." *Id.* The Second Circuit has explained that recourse to the doctrine of primary jurisdiction is appropriate "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (quoting *U.S. v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)).

The question of sunscreen labeling generally, and the declaration and substantiation of SPF values on the labels of sunscreen products specifically, has been placed with the "special competence" of FDA. *See* Part I.C, *supra*. Not surprisingly, the Second Circuit's four-factor test to determine whether to dismiss an action under the primary jurisdiction doctrine weighs decisively in favor of deferring to FDA. Those factors are: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

As to the first factor, while questions of consumer deception are, of course, not outside of the conventional expertise of judges, in this case the "question at issue" requires application of FDA's detailed testing methodology, and determinations regarding what test results should be credited, what is an appropriate compliance threshold, and – ultimately – what SPF value should be on the label of the Product. This certainly involves "policy considerations within [FDA's] field of expertise," such as how to balance the inherent variability in sunscreen testing, the risks such testing poses to test subjects, and the need to provide consumers with useful information to help them avoid the negative consequences of UV exposure. *See Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 140 (E.D.N.Y. 2018) (finding claims within FDA's "particular field of expertise" where FDA "has promulgated rules regarding the precise types of . . . claims and

Defendant's Memorandum of Law in Support of Motion to Dismiss

disclosure requirements"). With respect to the second factor, the issue is "particularly within the agency's discretion," as reflected by the fifty years of notice-and-comment rulemaking described in Part I.C on the topic of SPF values and the testing needed for substantiation of same. *In re KIND LLC "Healthy & All Nat." Litig.*, 209 F. Supp. 3d 689, 695 (S.D.N.Y. 2016) (finding issues like whether genetically modified ingredients foreclose a product from being labeled as "natural" to be "particularly within FDA's discretion"). Third, there exists a real and current danger of inconsistent rulings, both because there is no compliance standard for subsequent testing, and so courts have no guidelines to apply to determine what difference should be considered misleading, and because Plaintiffs' counsel is currently actively pursuing similar litigation in other forums against other sunscreen manufacturers. *Colella*, 348 F. Supp. 3d at 141 (finding risk of inconsistent ruling in light of "lawsuits in at least three jurisdictions that assert claims substantively almost identical to those asserted by the instant Plaintiff").[7] Finally, while Defendant is not aware of a pending application to FDA on this issue, FDA has considered public comments and information regarding the variability in SPF values continuously since 1978, a process that is ongoing today. *Id*. (finding that "numerous parties have made applications to FDA concerning [the claims]"). *See also supra*, n.4.

As a result, because the issue of SPF values and the testing required to substantiate such claims has been the exclusive province of FDA for almost fifty years, and there are no state standards that could be applied, the Court should dismiss the case in deference to FDA.

## III.    Plaintiffs Lack Article III Standing Because They Have Not Alleged Facts Showing that the Products They Purchased Were Inaccurately Labeled.

Plaintiffs' theory of injury depends entirely on their counsel's testing of a unit of product they themselves did not purchase. Because they do not allege facts showing a meaningful link between that testing and their own purchases, the Complaint does not plead sufficient facts to show

---

[7] *See* Defendant's RJN, at Ex. B (Complaint in *Barrales v. L'Oreal, Inc. USA*, 2:25-cv-07912-AH-MAR (C.D. Cal. Filed 8/22/2025) (alleging SPF value on label of sunscreen product is inaccurate based on testing of product purchased by plaintiffs' counsel)); Ex. C. (Complaint in *Fahey v. Sunbum, LLC*, No. 3:25-cv-02263-H-SBC (S.D. Cal. Filed 8/29/2025) (same)); Ex. D (Complaint in *Krasnova v. Clinique Laboratories LLC*, No. 1:25-cv-02060 (E.D. Cal. Filed 12/29/2025) (same)). Each of these cases was filed by Plaintiffs' counsel in this case.

Defendant's Memorandum of Law in Support of Motion to Dismiss

injury for purposes of Article III standing.

Standing requires Plaintiffs to allege an injury in fact that is "concrete and particularized." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). And, in a putative class action, the named plaintiffs "must allege and show that they personally have been injured," not that injury may have occurred to other, unidentified purchasers. *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Accordingly, Plaintiffs must plead facts that "allow the inference that the [purchased Products] in fact [were misbranded], or that there was a material risk that they [were]." *Hicks v. L'Oréal U.S.A., Inc.* ("*Hicks I*"), 2023 WL 6386847, at *7 (S.D.N.Y. Sept. 30, 2023). When, as in this case, Plaintiffs rely on product testing to support allegations of misbranding, the "direct route" to pleading injury is by testing the actual product purchased. *Onaka v. Shiseido Ams. Corp.*, 2024 WL 1177976, at *2 (S.D.N.Y. Mar. 19, 2024); *Dunning v. Supergoop* ("*Dunning I*")*, LLC*, 2025 WL 34822, at *4 (S.D.N.Y. Jan. 6, 2025); *Hicks v. L'Oreal U.S.A., Inc.* ("*Hicks II*"), 2024 WL 4252498, at *9 (S.D.N.Y. Sept. 19, 2024).

Plaintiffs did not test their own purchases, and instead tested units of the product their "counsel purchased" for purposes of this litigation. (Compl. ¶¶ 23-24). They have therefore foregone the "direct route" and must "meaningfully link[]" their counsel's testing to their own purchases. *Dunning I*, 2025 WL 34822, at *4-5; *Onaka*, 2024 WL 1177976, at *2, *4; *Dalewitz v. Procter & Gamble Co.*, 2026 WL 74274, at *4-6 (S.D.N.Y. Jan. 9, 2026). Plaintiffs must plead facts explaining "why a third party's analysis can be reasonably extrapolated to [their] individual purchase[s]." *Kell v. Lily's Sweets, LLC*, 2024 WL 1116651, at *5 (S.D.N.Y. Mar. 13, 2024).

To determine whether a "meaningful link" exists between a sample tested and a plaintiff's actual purchases, courts within the Second Circuit consider several factors, including temporal proximity, geographic proximity, and the number of samples tested. Most significant is temporal proximity: the testing must have occurred "reasonably near in time" to the plaintiff's purchases. *Dunning I*, 2025 WL 34822, at *5 (quotations omitted). "Products purchased close in time are likelier to have the relevant characteristics in common than those purchased over wide ranges of time." *Dunning v. Supergoop, LLC* ("*Dunning II*"), 2026 WL 501627, at *5 (S.D.N.Y. Feb. 24,

Defendant's Memorandum of Law in Support of Motion to Dismiss

2026). Courts also assess whether there is a "geographic connection" between the plaintiff's purchases and the products tested—such as whether the tested products were purchased in the same state as plaintiff's purchases or were otherwise produced through a standardized manufacturing process sufficient to excuse a lack of geographic proximity. *Barnes v. KOS, Inc.*, 2025 WL 1928027, at *6 (S.D.N.Y. July 14, 2025). Finally, courts examine the scope of testing itself; testing "'should involve more than a small number'" of samples to support an inference that the alleged mislabeling was pervasive. *Dunning I*, 2025 WL 34822, at *5 (citing *Hicks II*, 2024 WL 4252498, at *10). These factors provide the answer to the ultimate question of whether the alleged mislabeling "is so widespread as to render it plausible that any Plaintiff purchased a mislabeled Product at least once." *Hicks II*, 2024 WL 4252498, at *10 (internal quotations and citations omitted).

Here, Plaintiffs' allegations fail under every factor. With respect to the number of products tested, Plaintiffs' allegations rest on testing conducted on a *single unit* of the Product purchased by Plaintiffs' counsel for purposes of this litigation. Compl. ¶¶ 23-25. That is plainly insufficient. For instance, a similar class action alleging inaccurate SPF mislabeling was dismissed for lack of standing where plaintiffs tested two samples of a body sunscreen and three samples of a face sunscreen; the court found this was "too few samples to suggest broad mislabeling." *Dunning II*, 2026 WL 501627, at *6. Courts have repeatedly reached the same conclusion when, as in this case, testing involved only one or a handful of samples. *See, e.g., Lurenz v. Coca-Cola Co.*, 2024 WL 2943834, at *3-4 (S.D.N.Y. June 10, 2024) (dismissing claim where plaintiff "alleges that he tested only a single sample" and did not allege that it was purchased from a store he frequented or that the product was systemically mislabeled); *Kell*, 2024 WL 1116651, at *4 (rejecting testing "based on just two or three samples").

Temporal proximity also cuts decisively against standing. The tested unit was both purchased and tested *years* after Giannese's 2023 purchase and several months from Fahey's May 2025 purchase. Plaintiffs do not allege that the tested unit reflects SPF performance at the time they made their purchases; nor do they allege facts suggesting that any alleged SPF discrepancy

existed when their purchases were made. *See Lurenz v. Coca-Cola Co.*, 2025 WL 2773188, at *6 (S.D.N.Y. Sept. 29, 2025) (finding that seven-month gap between the date of plaintiff's purchases and the date he alleges the tested samples were collected did not meet the "reasonably near in time" test); *Onaka*, 2024 WL 1177976, at *3 (finding no injury absent information about "when exactly [plaintiff] purchased each particular [product]" even though plaintiff's alleged purchase occurred "in September 2021" and the testing took place in "September or October of 2021"); *Barnes*, 2025 WL 1928027, at *5 ("Because Plaintiffs' testing allegations are temporally remote, they fail to establish a sufficient link between their purchased Products and the third-party test.")

The final factor, geographic proximity, likewise undermines any inference of representativeness. The tested Product was purchased at a CVS in Florida, while Plaintiffs made their purchases through different retailers, including Amazon (delivered to Illinois) and a Publix in an unspecified area of Florida. Compl. ¶¶ 9-10, 23. Plaintiffs do not allege that the tested unit was manufactured under the same conditions or through a standardized process. Nor do they allege that SPF performance is invariant across geography, time, or manufacturing runs, or even that all Hawaiian Tropic SPF 50 sunscreen products uniformly provide less than SPF 50 protection. *Dunning II*, 2026 WL 501627, at *6.

In short, because Plaintiffs did not test the products they purchased, they must show why it is reasonable to infer that the products they purchased had an SPF that is "significantly lower than 50." Compl. ¶¶ 27-30. Their allegations – that Plaintiffs' counsel purchased a single unit from a geographically removed location, at a different time – do not provide the requisite "meaningful link." The claims should be dismissed for lack of Article III standing.

## IV.    Plaintiffs Lack Standing to Seek Injunctive Relief.

Plaintiffs separately lack standing to seek injunctive relief. To establish standing for prospective relief, a plaintiff must allege a real and immediate "threat of future injury;" past exposure to allegedly unlawful conduct is insufficient. *Berni v. Barilla S.P.A.*, 964 F.3d 141, 147 (2d Cir. 2020). Plaintiffs cannot make that showing here.

By their own allegations, Plaintiffs now believe that the Product's SPF 50 representations

Defendant's Memorandum of Law in Support of Motion to Dismiss

are false, and have "discontinued" their use of the Product. Compl. ¶¶ 39, 46. Having filed this lawsuit, Plaintiffs are indisputably aware of the alleged mislabeling and cannot plausibly allege that they face a real risk of being misled in the future.[8] *See Berni*, 964 F.3d at 147 (noting that "past purchasers of a consumer product who claim to be deceived by that product's packaging . . . have, at most, alleged a past harm" and are not likely to be deceived again). Courts in this Circuit routinely hold that once a plaintiff is aware of the alleged deception, there is no imminent risk of future injury sufficient to support injunctive relief. *See, e.g., Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 162 (D. Conn. 2024) (dismissing injunctive relief claim because "the Second Circuit has 'squarely foreclosed the possibility of injunctive relief for past purchasers'") (citing *Berni*, 964 F.3d at 148); *Dunning I*, 2025 WL 34822, at *6-7 (applying *Berni* to dismiss injunctive relief claims at the pleading stage, despite plaintiffs' allegations that they "would purchase the [sunscreen products] again if they had a true SPF Label Value of SPF 40, as advertised.").

Accordingly, even if Plaintiffs had standing to pursue damages—which they do not—they independently lack standing to seek injunctive relief, and those claims should be dismissed.

## V. Plaintiffs' State Law Claims Fail For Numerous Reasons.

### A. The Unjust Enrichment Claims Must Be Dismissed Because Connecticut Law Does Not Apply.

Plaintiffs' unjust enrichment claims – brought "under Connecticut common law," *see* Compl. ¶ 61 – must be dismissed because Connecticut law does not apply. A federal court sitting in diversity applies the forum state's choice-of-law principles. *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001). Connecticut follows the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws for quasi-contract claims such as unjust enrichment. *Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 2024 WL 2106837, at *14 (D. Conn. Mar. 1, 2024) (applying "most significant relationship test"); *Phillips v. Scott*, 446 F.

---

[8] Plaintiffs do not even allege that they intend to purchase the Product again in the future, rendering the possibility of future harm even more remote.

Supp. 2d 70, 80 (D. Conn. 2006) (same).

The "most significant relationship" test considers (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship, (b) the place where the benefit or enrichment was received, (c) the place where the act conferring the benefit or enrichment was done, (d) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment. Rest. (2d) Conflicts of Law § 221 (1971). The most important factors in an unjust enrichment claim sounding in restitution are "the place where the relationship was centered" and the "place where the benefit was received." *Conn. Gen. Life Ins. Co.*, 2024 WL 2106837, at *14.

Here, Plaintiffs are residents of Florida and Illinois and allege purchases made in their respective home states, not Connecticut. Accordingly, the relationship between Plaintiffs and Edgewell was "centered" in their home states. Likewise, the "place where the benefit or enrichment was received" and "where the act conferring the benefit or enrichment was done" is also Florida and Illinois, respectively. Plaintiffs' cause of action for unjust enrichment is expressly brought "under Connecticut common law." Compl. ¶ 61 (Count I). Connecticut unjust enrichment law does not apply, and the claim therefore must be dismissed.

**B.    The Breach of Warranty Claims Must Be Dismissed for Lack of Notice.**

"Under Illinois law, a plaintiff must provide notice to a putative defendant before filing suit to bring a claim for breach of express or implied warranty." *Rudy v. D.F. Stauffer Biscuit Co., Inc.*, 666 F. Supp. 3d 706, 720 (N.D. Ill. 2023). *See* 810 ILCS 5/2-607(3)(a) ("[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.") Plaintiffs in this case do not allege that they provided the requisite notice, and are thus "barred from any remedy." *Id.*

Plaintiffs allege that Defendant had "actual and constructive [knowledge]" because it performed testing on the Product and has knowledge of the active ingredients of the product.

29

Defendant's Memorandum of Law in Support of Motion to Dismiss

Compl. ¶ 98. But there are no specific allegations regarding Defendant's testing, such as when it was done or what it shows, nor any allegations regarding the active ingredients or why they would necessarily put Defendant on notice that the SPF claims are not correct. Further, the Illinois Supreme Court has explained that mere "generalized knowledge" of a product line's problems is not enough to establish actual knowledge of a particular plaintiff's problem with a particular product. *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 492-93 (Ill. 1996); *see also, e.g.*, *Kinman v. Kroger Co.*, 604 F. Supp. 3d 720, 727 (N.D. Ill. 2022) (dismissing warranty claims where plaintiff did not provide notice and alleged that Defendant knew or should have known on the basis of customer complaints). Accordingly, "relief is foreclosed" under Illinois warranty law, and the warranty claims should be dismissed. *Slafter v. Haier US Appliance Sols., Inc.*, 605 F. Supp. 3d 1102, 1108 (S.D. Ill. 2022).

> **C.** **The Claims Sounding in Fraud Must Be Dismissed Under Fed. R. Civ. P. Rule 9(b) Because the Allegations Do Not Support a "Strong Inference" of Fraudulent Intent.**

All of Plaintiffs' claims are premised on the allegation that Edgewell falsely represented that the Product provides SPF 50 protection while selling a product that allegedly provides less protection. Because the gravamen of that allegation is fraudulent conduct, Rule 9(b)'s heightened pleading standard applies to Plaintiffs' fraud claim as well as their consumer protection, negligent misrepresentation, and unjust enrichment claims. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'") (quoting Fed. R. Civ. P. 9(b)); *Dimuro v. Estee Lauder Companies, Inc.*, 2013 WL 12080901, at *6 (D. Conn. Nov. 22, 2013), a*ff'd sub nom. DiMuro v. Clinique Labs., LLC*, 572 Fed. App'x. 27 (2d Cir. 2014) (applying Rule 9(b) to fraud, unjust enrichment, and consumer protection claims); *Tyman v. Pfizer, Inc.*, 2017 WL 6988936, at *6 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted*, 2018

Defendant's Memorandum of Law in Support of Motion to Dismiss

WL 481890, at *1 (S.D.N.Y. Jan. 18, 2018) (applying Rule 9(b) to plaintiffs' negligent misrepresentation, unjust enrichment, and FDUTPA claims).

To satisfy Rule 9(b), Plaintiffs must allege "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). As relevant here, Plaintiffs must "allege facts that give rise to a *strong inference* of fraudulent intent." *Herlth v. Merck & Co., Inc.*, 2022 WL 788669, at *7 (D. Conn. Mar. 15, 2022) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)) (emphasis added and quotations omitted). "This strong inference can be shown '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Lerner*, 459 F.3d at 290-91). It is insufficient for a plaintiff to allege a "general profit motive common to all corporations." *Id.* (quotations omitted). And conclusory allegations that a defendant "knew or should have known" of a purported falsity likewise fail to plead fraudulent intent. *Ocampo v. Countrywide Home Loans, Inc.*, 2020 WL 1532392, at *7 (D. Conn. Mar. 31, 2020).

Here, Plaintiffs' allegations fall short of establishing a "strong inference" of fraudulent intent. They do not allege Edgewell had a "motive and opportunity" to commit fraud, and instead merely claim that Edgewell intentionally misrepresented the Product's SPF protection "for the purpose of increasing its revenues and maximizing its corporate profits." (Compl. ¶ 127). That is insufficient. *Lerner*, 459 F.3d at 290-91 (generalized desire to increase profits does not establish fraudulent intent); *see also*, e.g., *Herlth*, 2022 WL 788669, at *8 (disregarding "conclusory allegations of Merck's potential profit motive"); *ARMOUR Cap. Mgmt. LP v. SS&C Techs.*, Inc., 2018 WL 1368908, at *6 (D. Conn. Mar. 16, 2018) ("When pleading that a defendant had a motive and opportunity to commit fraud, a plaintiff cannot rely on 'a general profit motive common to all corporations.'") (quoting *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 Fed. App'x. 679, 681 (2d Cir. 2012)); *Reyes v. Upfield US Inc.*, 694 F. Supp. 3d 408, 430 (S.D.N.Y. 2023) ("[I]t is well-settled that a company's general profit motive is insufficient to plead scienter.").

Plaintiffs also do not allege any facts showing that Edgewell consciously misrepresented the Product's SPF protection at the time the Product was labeled, or that it had any intent to defraud consumers. They make formulaic recitations that Edgewell "knew or should have known" the SPF value was inaccurate based on its "chemical formula," "active ingredients," or internal testing. Compl. ¶¶ 28-30, 32. But they plead no facts explaining *how* the Product's formula or ingredients necessarily precluded an SPF 50 value, nor any facts about what internal testing Edgewell conducted, when such testing allegedly occurred, or how those results contradicted the label claim or deviated from the FDA requirements. *See Daly v. FitLife Brands, Inc.*, 2023 WL 6388112, at *8 (N.D. Ill. Sept. 29, 2023) ("[I]t is one thing to know something about a product that ends up not strictly matching the product's label . . . it is quite another to allege that [this] suggests an intent to *defraud.*") (emphasis in original). Testing conducted by Plaintiffs' counsel in 2025 does not plausibly establish that the SPF representation was false—or known to be false— when the Product was labeled or sold. These conclusory allegations do not give rise to a strong inference that Edgewell knowingly or intentionally misrepresented the Product's SPF, and thus all claims sounding in fraud—including the fraud, negligent misrepresentation, ICFA, FDUTPA, unjust enrichment, and related claims—must be dismissed under Rule 9(b).

### D.    Plaintiffs' Fraud and Negligent Misrepresentation Claims Are Barred by the Economic Loss Rule.

Regardless of whether Plaintiffs can satisfy Rule 9(b), their tort claims (Counts VI–VII) fail as barred by state economic loss doctrines, because they seek only economic damages and thus impermissibly attempt to recast disappointed commercial expectations as tort claims.

> #### i.    *The Illinois Moorman doctrine bars Plaintiff Giannese's negligent misrepresentation claim.*

Under Illinois law, the *Moorman* doctrine bars recovery in tort for "purely economic losses" arising out of a failure to perform contractual obligations. *Moorman Mfg. Co. v. Nat'l Tank*

*Co.*, 91 Ill. 2d 69, 91, 435 N.E.2d 443, 453 (1982). As the Illinois Supreme Court explained, the remedy for "loss relating to a purchaser's disappointed expectations . . . lies in contract." *Id.* at 86. Courts applying Illinois law have repeatedly dismissed negligent misrepresentation claims under the *Moorman* doctrine where plaintiffs seek purely economic losses arising from their purchase of a tangible consumer product. *See, e.g.*, *Sneed v. Ferrero U.S.A., Inc.*, 656 F. Supp. 3d 777, 787 (N.D. Ill. 2023) (applying doctrine to dismiss negligent misrepresentation claim alleging that candy manufacture misrepresented the product's cream content); *Rudy v. D.F. Stauffer Biscuit Co., Inc.*, 666 F. Supp. 3d 706, 723 (N.D. Ill. 2023) (dismissing negligent misrepresentation claim related to mislabeled cookie products); *Kampmann v. Procter & Gamble Co.*, 699 F. Supp. 3d 678, 694 (C.D. Ill. 2023) (holding that doctrine would bar negligent misrepresentation claim related to mislabeled over-the-counter products).[9]

Here, Plaintiff Giannese seeks only economic damages—namely, a refund of the full price or the price premium—based on the allegation that the Product failed to perform as advertised. Compl. ¶¶ 40, 141, 142. That is paradigmatic commercial loss governed by warranty and consumer protection law, not tort. Accordingly, the *Moorman* doctrine squarely applies, and Plaintiff Giannese's negligent misrepresentation claim must be dismissed.

> ii.    *The Florida economic loss rule bars Plaintiff Fahey's fraud and negligent misrepresentation claims.*

Florida law bars Plaintiff Fahey's tort claims because she seeks only economic harm, and the gravamen of those claims is that the Product failed to conform to its label. In Florida, the economic loss rule prohibits a tort action "if the only damages suffered are economic losses." *Tiara Condo. Ass'n v. Marsh & McLennan Cos. Inc.*, 110 So. 3d 399, 401 (Fla. 2013). Although *Tiara Condo.* limited the scope of Florida's economic loss rule, courts applying Florida law continue to

---

[9] Illinois recognizes a narrow exception for negligent misrepresentation claims only where the defendant supplies something "intangible" and is in the business of supplying information for the guidance of others in business transactions. *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 335 (2006); *Rudy v. D.F. Stauffer Biscuit Co., Inc.*, 666 F. Supp. 3d 706, 723 (N.D. Ill. 2023). That exception does not apply here, where the extent of Plaintiff Giannese and Edgewell's dealings was "the delivery of a tangible product." *Turner v. GAC Star Quality, LLC*, 671 F. Supp. 3d 897, 906 (N.D. Ill. 2023).

Defendant's Memorandum of Law in Support of Motion to Dismiss

dismiss tort claims where the alleged misrepresentation concerns a product's quality or performance and results only in economic loss, similar to that of a warranty claim. *See Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1302 (S.D. Fla. 2017) (dismissing negligent misrepresentation and fraud claims as barred by Florida's economic loss rule because the product did not function as advertised and caused "only economic harm"); *Tyman*, 2017 WL 6988936, at *18, *report and recommendation adopted*, 2018 WL 481890, at *1 ("If the gravamen of the case is that defendant's product failed to conform to its label . . . the economic loss rule bars tort claims, including negligent misrepresentation claims, seeking solely economic damages."); *Thompson v. Procter & Gamble Co.*, 2018 WL 5113052, at *3 (S.D. Fla. Oct. 19, 2018) (dismissing negligent misrepresentation claim related to mislabeled dish detergent).

Plaintiff Fahey alleges the Product did not provide the advertised SPF protection and that she suffered economic losses as a result. Compl. ¶¶ 46-47. As in *Melton*, *Tyman,* and *Thompson*, the "gravamen" of Fahey's claim is that the Product did not conform to its label. This theory is indistinguishable from a warranty claim and closely mirrors the breach of warranty allegations asserted elsewhere in the Complaint. *See id.* ¶¶ 95, 99, 106-107. Therefore, her fraud and negligent misrepresentation claims are barred by Florida's economic loss doctrine.

**E.**     **Plaintiff Giannese's Claim for Breach of Implied Warranty Fails for Lack of Privity Because She Alleges She Purchased the Product from Amazon.**

Plaintiff Giannese's breach of implied warranty claim brought under Illinois law (Count IV) fails for the additional reason that she lacks vertical privity with Edgewell. In Illinois, if a plaintiff claims breach of an implied warranty in a case involving purely economic damages (like this one), the plaintiff "must be in vertical privity of contract with the seller: only the immediate seller may be sued." *Cameron v. Battery Handling Sys., Inc.*, 524 F. Supp. 3d 860, 865 (C.D. Ill. 2021) (internal quotations omitted); *see also Bakopoulos v. Mars Petcare US, Inc.*, 592 F. Supp. 3d 759, 767 (N.D. Ill. 2022) ("Privity of contract is required in Illinois to recover economic damages for breach of implied warranty."). A plaintiff must allege a direct buyer-seller relationship with the defendant; a manufacturer cannot be sued for breach of implied warranty when the product

Defendant's Memorandum of Law in Support of Motion to Dismiss

was purchased from an independent retailer. *See Slafter v. Haier US Appliance Sols., Inc.*, 605 F. Supp. 3d 1102, 1108 (S.D. Ill. 2022) ("Contractual privity does not exist between a manufacturer and a person who buys from an independent dealer."); *Rodriguez v. Ford Motor Co.*, 596 F. Supp. 3d 1050, 1056 (N.D. Ill. 2022) (same).

Here, Plaintiff Giannese alleges that she purchased the Product "from Amazon's online website"—not from Edgewell directly. Compl. ¶ 9. That allegation is dispositive. Courts applying Illinois law routinely dismiss implied warranty claims if the plaintiff did not purchase the product directly from the defendant. *See Sneed*, 656 F. Supp. 3d at 786 ("Because Sneed has not adequately alleged a direct relationship with Ferrero U.S.A., Inc. her claims of breach of an implied warranty are dismissed."); *Harmon v. Lenovo (United States) Inc.*, 2024 WL 1741264, at \*6 (S.D. Ill. Apr. 23, 2024) (dismissing for lack of privity where plaintiff alleged "only that she purchased [the product] from third-party retailers, including Amazon.com"); *Bakopoulos,* 592 F. Supp. 3d at 767-68 (dismissing implied warranty of merchantability claim for lack of privity). Because Plaintiff Giannese lacks vertical privity with Edgewell and seeks only economic damages, her implied warranty of merchantability claim must be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Motion to Dismiss be granted and that the Complaint be dismissed with prejudice.

Dated: March 27, 2026                    Respectfully submitted,


                                         HOGAN LOVELLS US LLP

                                         */s/ Trenton H. Norris (pro hac vice)*
                                         Trenton H. Norris (Bar No. 209235)
                                         4 Embarcadero Center, Suite 3500
                                         San Francisco, CA 94111
                                         Telephone: (415) 374-2300
                                         trent.norris@hoganlovells.com

                                         George Langendorf (Bar No. 209236)

35
Defendant's Memorandum of Law in Support of Motion to Dismiss

(*pro hac vice*)
125 High Street, Suite 2010
Boston, MA 01944
Telephone: (617) 371-1000
george.langendorf@hoganlovells.com

Lauren R. Greenspoon (ct04846)
James D. Geisler (ct31447)
SHOOK, HARDY & BACON, L.L.P.
185 Asylum Street
City Place 1, Suite 3701
Hartford, CT 06103
Tel. No: (860) 515-8901
Fax No.: (860) 515-8911
lgreenspoon@shb.com
jgeisler@shb.com

James Patrick Muehlberger (51346) (*pro hac vice*)
SHOOK, HARDY & BACON, L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel. No. 816-474-6550
Fax No. : 816-421-5547
jmuehlberger@shb.com

Patrick L. Oot (ct31556)
SHOOK, HARDY & BACON, L.L.P.
1800 K Street NW
Suite 1000
Washington, DC 20006
Tel. No.: 202-783-8400
Fax No.: 202-783-4211
oot@shb.com

*Attorneys for Defendant*
*EDGEWELL PERSONAL CARE BRANDS, LLC*

Defendant's Memorandum of Law in Support of Motion to Dismiss

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2026, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's CM/ECF system. Parties may access this filing through the Court's CM/ECF system.

*/s/ Trenton H. Norris (pro hac vice)*
Trenton H. Norris (Bar No. 209235)

*Attorneys for Defendant*
*EDGEWELL PERSONAL CARE BRANDS, LLC*

Defendant's Memorandum of Law in Support of Motion to Dismiss