## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AGATHA LEWANDOWSKA GIANNESE; and ANDREA FAHEY, individually and on behalf of all others similarly situated, | Case No.: 3:25-cv-01717-VAB |
| Plaintiffs, | |
| v. | |
| EDGEWELL PERSONAL CARE BRANDS, LLC, | June 5, 2026 |
| Defendant. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FAC[1]

Plaintiffs Agatha Lewandowksa Giannese and Andrea Fahey, individually and on behalf of all others similarly situated, submit this response in opposition to the motion to dismiss (ECF No. 41 & 41-1 (the "Motion" or "Mot.")) the First Amended Class Action Complaint (ECF No. 40 (the "FAC")) filed by Defendant Edgewell Personal Care Brands, LLC.

## INTRODUCTION

In this consumer class action, Plaintiffs seek to redress the false, deceptive, and unlawful manner in which Defendant has labeled, distributed, and marketed its sunscreen product "Hawaiian Tropic Everyday Active SPF 50 Sport Sunscreen Lotion" (the "Product"). Plaintiffs and members of the putative classes purchased the Product based on Defendant's representations

---

[1]     Plaintiffs attempted to file this opposition brief shortly in advance of the June 5, 2026 deadline but their counsel was unable to access the CM/ECF system. This brief was filed by counsel in the early morning hours of June 6, 2026, as soon as Plaintiffs' counsel was able to access the filing system. Plaintiffs apologize for the delay in the filing of this brief, and do not oppose a commensurate extension of Defendant's deadline to submit a reply in further support of its Motion.

that the Product provides SPF 50-level protection from the sun's harmful radiation. Unbeknownst to them, however, the Product actually provides only SPF 20 protection – 60% less than what Defendant represents to consumers on the label – as independent, Food and Drug Administration ("FDA")-compliant laboratory testing commissioned by Plaintiffs' counsel shows. At SPF 20, the Product provides far less protection from the sun's harmful rays—and is of significantly lower quality and worth far less money—than a sunscreen that actually provides SPF 50 protection.

By falsely representing the SPF protection provided by the Product on its label, in violation of applicable FDA regulations, Defendant has knowingly misled and continues to knowingly mislead consumers into believing that they are purchasing a sunscreen with better filtration, absorption, and reflection capabilities against ultraviolet radiation than the lower-SPF product that they actually receive, thereby deceiving them into paying a premium price for a non-premium product. Defendant's practices of falsely, deceptively, and misleadingly representing that the Product provides SPF protection of 50 on the Product's labeling induced Plaintiffs and numerous other consumers into either purchasing a product they otherwise would not have purchased at all, or paying significantly more for it than they would have paid had it been accurately labeled.

Defendant was required to perform FDA-compliant *in vivo* testing of the Product's SPF value that yielded an SPF 50 result prior to bringing the Product to market in the United States. Plaintiffs allege that Defendant failed to perform this testing or that, if Defendant did perform it, the testing yielded a result nowhere close to SPF 50. In the Motion, Defendant says it performed the requisite testing in compliance with applicable regulations prior to the Product's launch – and yet, has thus far refused to produce the results of that testing to Plaintiffs, despite their numerous informal requests for them in advance of mediation and, more recently, their formal requests for them in discovery. Even after Plaintiffs offered to voluntarily dismiss this case in exchange for

Defendant's production (pursuant to any protective order acceptable to Defendant) of the results of any FDA-compliant premarket testing of the Product's SPF value that yielded a result of 50 or higher, Defendant has refused to cough up its test results.  Most recently, Defendant moved to stay discovery for the sole purpose of further delaying the production of these test results.  Defendant's refusal to produce these basic materials – which, again, would simply reflect the results of FDA-mandated premarket testing of an over-the-counter drug used by countless Americans to prevent against skin cancer – is significant for purposes of the Motion, because the primary, preemption-based arguments for dismissal raised in the Motion depend upon (a) Defendant having conducted this testing prior to bringing the Product to market, and (b) the results of that testing showing that the Product provides an SPF value of 50 or higher.

In the Motion, Defendant moves to dismiss the FAC for lack of subject-matter jurisdiction on the following grounds: (1) Plaintiffs' claims are expressly and impliedly preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"); (2) Plaintiffs' claims are within the primary jurisdiction of the FDA; and (3) Plaintiffs lack Article III standing because the sunscreen lotion in the containers of the Product that they personally purchased was not subjected to SPF testing. Defendant also moves to dismiss Plaintiffs' claims, on various grounds, for failure to state a claim for relief pursuant to Rule 12(b)(6). None of Defendant's arguments for dismissal stand up to scrutiny – in fact, all have been consistently rejected by courts in prior cases involving similar SPF mislabeling claims, many against Defendant itself.

Plaintiffs' claims are not preempted, this Court is well equipped to adjudicate them, and they are adequately pled. The Motion should be denied in its entirety.

**HISTORY OF THE INSTANT LITIGATION**

On October 10, 2025, Plaintiffs initiated this action by filing the Complaint, alleging seven claims for violation of Connecticut, Florida, and Illinois law against Defendant on behalf of themselves and three classes of other similarly situated consumers (one nationwide class and two subclasses, one comprised of purchasers of the Product in Illinois and the other comprised of purchasers of the Product in Florida).  (ECF No. 1.)

Rather than respond to the Complaint, Defendant asked Plaintiffs if they would like to attend mediation to explore early resolution. Plaintiffs agreed and the parties thereafter jointly asked the Court to extend Defendant's response deadline until February 27, 2026, a month following the mediation.  The Court granted the requested extension on November 24, 2025. (ECF No. 15.). The parties' mediation was unsuccessful.

On March 27, 2026, Defendant filed a motion to dismiss the Complaint.  (ECF No. 36.)

On April 17, 2026, Plaintiffs filed the operative First Amended Class Action Complaint, alleging six claims for violation of Connecticut, Florida, and Illinois law against Defendant on behalf of themselves and three classes of other similarly situated consumers (one nationwide class and two subclasses, one comprised of purchasers of the Product in Illinois and the other comprised of purchasers of the Product in Florida).  (ECF No. 40.)

On May 1, 2026, Defendant filed the Motion to dismiss the FAC. (ECF. No. 41.) Together with the Motion, Defendant filed a motion to stay discovery. (ECF No. 43.)

**PRIOR SPF-MISLABELING LITIGATION AGAINST DEFENDANT**

This is not the first time Defendant has been sued for allegedly misrepresenting the SPF protection provided by its sunscreen products in violation of state law.

Beginning in June 2016, Defendant was hit with seven putative class actions alleging SPF mislabeling claims similar to the claims alleged here; after all seven cases were consolidated in October 2016 on a single master docket in the Eastern District of New York, *In re Edgewell Pers. Care Co. Litig.*, No. 16CV3371KAMRLM, 2018 WL 7858623, at *1 (E.D.N.Y. Sept. 4, 2018), the court denied a motion to dismiss filed by the Defendant (including on the ground that the court should defer to the "primary jurisdiction" of the FDA with respect to plaintiffs' claims), and the litigation was thereafter voluntarily dismissed with prejudice by stipulation of the parties pursuant to Rule 41 on April 30, 2019 (before discovery had commenced).

On October 23, 2017, while the seven consolidated matters were being litigated in the Eastern District of New York, Defendant was sued in the Central District of California in *Keskinen v. Edgewell Personal Care Products, LLC*, another putative class action alleging SPF mislabeling claims similar to the claims alleged here. Defendant filed a motion to dismiss (including on the ground that the FDA is vested with exclusive authority over SPF labeling), which the court denied. *See Keskinen v. Edgewell Pers. Care Co.*, No. 217CV07721ABPJWX, 2018 WL 6137607, at *1 (C.D. Cal. Apr. 17, 2018). With several disputes concerning the scope of discovery in the case pending, and before any exchange of discovery appears to have occurred, the case was voluntarily dismissed with prejudice by stipulation of the parties pursuant to Rule 41 on June 21, 2019.

On April 20, 2018, while the SPF-mislabeling litigation against Defendant was playing out in both the Eastern District of New York and the Central District of California, Defendant was once again hit with a putative class action alleging SPF mislabeling claims similar to the claims alleged here. *See Anglin et al. v. Edgewell Personal Care Brands LLC et al.*, No. 4:18-cv-00639-NCC (E.D. Mo.). Once again Defendant filed a motion to dismiss, which the court in large part denied (but granted in part with leave to cure in an amended complaint). *See Anglin v. Edgewell*

*Pers. Care Co.*, No. 4:18-CV-00639-NCC, 2018 WL 6434424, at *1 (E.D. Mo. Dec. 7, 2018). After the plaintiffs filed an amended complaint curing the deficiencies identified in the court's opinion (concerning their SPF testing methodology), the case was voluntarily dismissed with prejudice by notice of the plaintiffs pursuant to Rule 41 on April 18, 2019 (before discovery had commenced).

**THE FDCA**

The FDCA authorizes the FDA to regulate, among other things, the ingredients and labeling of nonprescription drugs such as the sunscreen product at issue. The FDCA was amended by the Food and Drug Administration Modernization Act of 1997 (Pub. L. No. 105-115 (Nov. 21, 1997) 111 Stat. 2296) ("Modernization Act"), which included a provision expressly pre-empting state law requirements regarding nonprescription drugs, including sunscreen products. Section 751 of the FDCA, 21 U.S.C. § 379r(a), specifically prohibits state requirements that are not identical with federal requirements: "no State . . . may establish or continue in effect any requirement (1) that relates to the regulation of a drug . . . and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter[.]"  Notably, the FDCA contains a "savings clause" which states, *inter alia*, that "[n]othing in this section shall prevent a State or political subdivision thereof from enforcing, under any relevant civil or other enforcement authority, a requirement that is identical to a requirement of this chapter." 21 U.S.C. § 379f.

**ARGUMENT**

I.      **Plaintiffs' Claims are Not Preempted by the FDCA**

As a threshold matter, the United States Supreme Court has "long presumed that Congress does not cavalierly pre-empt state-law causes of action," particularly in cases involving the historic police powers of the states to regulate health and safety. *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

485 (1996); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest."); *Holk v. Snapple Bev. Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) (referring to a "presumption against preemption").

"[W]hen considering a preemption argument in the context of a motion to dismiss, the factual allegations relevant to preemption must be viewed in the light most favorable to the plaintiff." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015). "A district court may find a claim preempted only if the facts alleged in the complaint do not plausibly give rise to a claim that is not preempted." *Id*.

Defendant moves to dismiss the FAC on the ground that Plaintiffs' claims are both "expressly" and "impliedly" preempted by the FDCA.

**A. The FDCA Does not "Expressly" Preempt Plaintiffs' Claims**

Express pre-emption occurs when "Congress ... withdraw[s] specified powers from the States by enacting a statute containing an express pre-emption prevision." *Arizona v. United States*, 132 S. Ct. 2492, 2500-01 (2012).

Section 379r(a) of the FDCA is its express pre-emption provision. As noted above, this provision specifically prohibits state requirements that are not identical with federal requirements: "no State . . . may establish or continue in effect any requirement-(1) that relates to the regulation of a drug ... and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter[.]" 21 U.S.C. § 379r(a). Thus, a state law that applies to drugs or cosmetics is pre-empted if it imposes a requirement that is not identical to the requirements of the FDCA and the FDA's regulations. *See In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 588 F. Supp. 2d 527, 538 (S.D.N.Y. 2008) ("Where federal requirements address the subject

matter that is being challenged through state law claims, such state law claims are preempted to the extent they do not impose identical requirements.").

On the other hand, it is well established that consumer claims based on violations of state law requirements that are identical to FDA regulations and standards are not preempted. *See, e.g., In re Pepsico, Inc.*, 588 F. Supp. 2d at 532 (rejecting argument that plaintiff's claims were preempted by the FDCA, explaining that "state law causes of action are not preempted where they merely provide a damages remedy for claims premised on a violation of federal law that does not itself provide a private right of action"); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 284 (S.D.N.Y. 2014) (rejecting preemption argument where state consumer claims were based on a violation of federal FDA labeling standards, stating that "Plaintiffs' claims explicitly track the requirements imposed by federal law for fat content claims. Plaintiffs merely seek damages from Defendants under state law for their alleged failure to comply with the labeling requirements of 21 C.F.R. § 101.62(b). Nothing in the language of the FDCA, NLEA, or related regulations expressly preempts state law claims for deceptive practices, breach of express warranty, or unjust enrichment premised upon an alleged failure to follow federal food labeling requirements.").

And this holds true specifically with respect to state-law claims against sunscreen manufacturers for misrepresenting the SPF protection provided by their sunscreen products. Indeed, because "the FDCA prohibits sunscreen labeling that is false or misleading," and also "requires that every sunscreen contain an SPF value derived from FDA-approved testing," *Dayan v. Swiss-Am. Prods., Inc.*, No. 15 CIV. 6895 (DLI) (VMS), 2017 WL 9485702, at *4 (E.D.N.Y. Jan. 3, 2017), *report and recommendation adopted,* No. 15CV6895DLIVMS, 2017 WL 1214485 (E.D.N.Y. Mar. 31, 2017) (citing 21 U.S.C. § 352(a); 21 U.S.C. § 362(a); 21 C.F.R. § 201.327(a)(1)), state-law consumer claims against sunscreen manufacturers for allegedly

misrepresenting sunscreens' SPF protection, in violation of the federal labeling standards, are not preempted by the FDCA. *See, e.g., Dayan*, 2017 WL 9485702, at *4 ("Plaintiffs' claims rest on the allegation that the product was advertised as having a SPF value of 50 when it has in fact a lower, less protective number, thus deceiving Plaintiffs. Plaintiffs' claim thus arises from Defendant's failure to display an accurate SPF value on the Product. This is what the FDCA already requires, and so the FDCA's "savings clause" applies to Plaintiff's claims.") (citing 21 U.S.C. § 379f); *Carrol v. S.C. Johnsons & Son, Inc.*, No. 17-CV-05828, 2018 WL 1695421, at *2-3 (N.D. Ill. Mar. 29, 2018).

In *Dayan v. Swiss-American Products*, for instance, the court rejected a defendant's argument that the plaintiff's state law claims (based on allegedly false and misleading SPF values on a sunscreen's product label) were preempted, explaining as follows:

> Under even the strictest of these standards, Plaintiff's claims are not expressly preempted. The FDCA prohibits sunscreen labeling that is false or misleading. See 21 U.S.C. § 352(a); 21 U.S.C. § 362(a)). The FDCA also requires that every sunscreen contain an SPF value derived from FDA-approved testing. 21 C.F.R. § 201.327(a)(1). Plaintiff's claims rest on the allegation that the product was advertised as having a SPF value of 45 when it has in fact a lower, less protective number, thus deceiving Plaintiff. Were Plaintiff to succeed in this action, Defendant would be held liable for failing to label properly the product's SPF value, a standard identical to the standard established by the FDCA. Plaintiff asks that the product conform precisely to rules established by the FDCA; namely, that the product display an accurate SPF value. This is what the FDCA already requires, and so the FDCA's 'savings clause' applies to Plaintiff's claims.

*Dayan*, 2017 WL 9485702, at *4.

Likewise, the court in *Carrol v. S.C. Johnsons & Son, Inc.* reached the same conclusion with respect to similar state-law SPF mislabeling claims, explaining:

> Both parties agree that the FDA regulates the SPF testing procedures and labeling requirements for the Products. *See* 21 C.F.R. § 201.327. The FDA regulates products under the Food Drug and Cosmetics Act ('FDCA') which expressly preempts claims seeking to enforce state requirements that differ from those established by the FDA. 21 U.S.C. § r(a). The FDCA does not provide a private

right of action; however, states can impose the identical requirement or requirements, and thus can effectively enforce a violation of the Act as a violation of state law. . . . Plaintiffs allege that their independent testing complies with the standard that federal regulators adhere to in determining whether a product label accurately states the product's SPF rating. . . . Accordingly, the Court concludes that at this stage of the proceeding, Plaintiff's claims are not preempted under the FDCA.

*Carrol*, 2018 WL 1695421, at *2-3.

Significantly, Defendant has previously litigated, and lost, the same express preemption arguments it makes in the Motion. In *Anglin*, also an SPF-mislabeling class action, the Eastern District of Missouri found that state-law claims like those alleged by Plaintiffs here are not expressly preempted by the FDCA insofar as they do not seek to impose any requirements beyond those which federal law already imposes:

> The Court agrees that to the extent Plaintiffs' state law claims do not seek to impose any requirements on Defendants beyond those which federal law already requires, those claims are not preempted. See 21 U.S.C. § 379r(f); see also, e.g., *Baker*, 2015 WL 12843827, at *2 ("a state law is not preempted when the state law seeks to impose liability [for mislabeling] consistent with the FDCA."); *Curran v. Bayer Healthcare LLC*, No. 17 C 7930, 2018 WL 2431981, at *3 (N.D. Ill. May 30, 2018) (in SPF mislabeling case, holding "to the extent plaintiff is merely seeking to use state-law causes of action to enforce the labeling requirements set out in 21 C.F.R. § 201.327, his claims are not preempted."). To the extent Plaintiffs seek to add or change the requirements for sunscreen labeling or testing, however, those claims would be preempted. *See, e.g., Curran*, 2018 WL 2431981, at *3. Further, if Plaintiffs rely on FDA compliant testing of the Products in "an attempt to enforce the identical requirements of the FDCA as it applies to SPF labeling . . . [such] claims are not preempted." *Curran*, 2018 WL 2431981, at *3.

*Anglin*, 2018 WL 6434424, at *8.[2]

---

[2] The court in *Anglin* noted that the plaintiffs had relied on a *Consumer Reports* article as the basis for their SPF-mislabeling claims against with respect to certain of the products at issue, and thus granted plaintiffs leave to file an amended complaint following further FDA-complaint testing by their counsel. Here, Plaintiffs' counsel has already conducted fully FDA-compliant testing on the subject Product, the results of which are attached as Exhibit A to the FAC.

This Court should reach the same conclusion. The FAC alleges that Defendant violated state law by falsely and misleadingly labeling the Product as providing greater protection from the sun's harmful radiation than other lower-SPF sunscreens, in violation of state law, thereby deceiving Plaintiffs about the sun protection capabilities of the Product and inducing them to either purchase a product they otherwise would not have bought at all, or to pay more money for the product than they would have paid had they known of its true, materially inferior sun protection capabilities. None of Plaintiffs' claims seek to impose any requirements on Defendant beyond those that federal law already imposes: an accurate statement of the sunscreen's SPF on its label. *See* FAC ¶ 40. Nor do Plaintiffs' claims rely on any state standard which exceeds the applicable federal requirements. *See id*. Accordingly, Plaintiffs' claims are not expressly preempted by the FDCA. *See Dayan*, 2017 WL 9485702, at *4; *Carrol*, 2018 WL 1695421, at *2-3; *Anglin*, 2018 WL 6434424, at *8.

Defendant nevertheless contends that the FDCA expressly preempts Plaintiffs' claims because, "[b]y challenging the SPF value on the basis of subsequent testing conducted by a private third party, Plaintiffs are . . . seeking to impose requirements that are different from those imposed by the FDCA." (Mot. at 20.) The argument is without merit. Plaintiffs are not seeking to impose a requirement that a Product that was subjected to premarket SPF testing in compliance with the applicable FAC monograph must be retested by some other lab at a later point in time. Plaintiffs tested the Product in compliance with the FDA monograph, and attached the results of that testing to the FAC, to support their allegations that any such testing Defendant performed prior to bringing the Product to market did not yield (and indeed could not have yielded) anywhere close to an SPF 50 result, thereby demonstrating the plausibility of their claims for relief – which, again, merely

11

seek to redress Defendant's failure to truthfully represent the SPF value of the Product on its label. *See, e.g., Smith v. Allmax Nutrition, Inc.*, 2015 U.S. Dist. LEXIS 171897 (E.D. Cal. Dec. 23, 2015).

Defendant says that "FDA has determined that the best approach is to *require* manufacturers to state the SPF value on the front panel of their sunscreen products, and to *require* that they do so by conducting and relying on testing done pursuant to a rigorous and highly detailed testing methodology. That is what Edgewell has done, and the FAC does not allege otherwise." (Mot. at 21.) In point of fact, the FAC does allege otherwise. The FAC specifically alleges that Defendant did *not* "conduct[] and rely[] on testing done pursuant" to the monograph. *See* FAC ¶¶ 33-36. And tellingly, Defendant has refused to date to produce the results of any SPF testing it did conduct on the Product before bringing it to market. Plaintiffs, on the other hand, attach to the FAC a copy of the results of fully FDA-compliant SPF testing their counsel commissioned of the Product, which yielded an SPF 20 result. FAC ¶ 25, Ex. A.

Grasping at straws, Defendant contends that the FDCA expressly preempts Plaintiffs' claims because the "testing methodology" used in the SPF testing commissioned by Plaintiffs' counsel, the results of which are attached as Exhibit A to the FAC, "is not 'exactly the same' as that required by FDA" in two respects: (1) Plaintiffs' testing "used a different definition of MED"; and (2) Plaintiffs' testing did not use the SPF value on the label of the Product as the "expected SPF" for purposes of administering initial doses of UV radiation to subjects. This too misses the mark.

For one thing, Plaintiffs specifically allege in the FAC that their testing was conducted in compliance with the FDA monograph. FAC ¶ 25. Any attempt by Defendant to disprove the truth of that allegations presents issues of fact that are not susceptible to resolution on a motion to dismiss. *See, e.g., Dayan*, 2017 WL 9485702, at *13 ("It is not the Court's role in evaluating a

Rule 12(b)(6) motion to weigh competing evidence and determine which side's is the most persuasive. Plaintiff has alleged that the product falsely advertised itself as SPF-45 when its SPF is lower than that. He has submitted tests that he alleges were conducted in compliance with FDA regulations that he claims substantiate his allegations. Defendant's tests may ultimately prove more persuasive than Plaintiff's, but evaluating 'issues of fact, credibility, and the weight of the evidence' when it comes to scientific studies is not the role of the Court on a motion to dismiss") (collecting cases).

Even if the Court were to reach the merits of these issues in deciding the Motion, both of Defendant's attacks on Plaintiffs' testing methodology are baseless.

First, Plaintiffs' testing did not use a "different definition of MED." The applicable Administrative Order defines MED as "the smallest UV dose that produces perceptible redness of the skin (erythema) with clearly defined borders at 16-24 hours after exposure." Admin. Order § M020.80(e). The "MED Scoring Scale" used in Plaintiffs' testing methodology likewise defines MED as "the smallest UV dose that produces perceptible redness of the skin (erythema) with clearly defined borders at 16-24 hours after exposure (Score of at least 1 on the MED Scoring Scale)." FAC, Ex. A, at 7. Thus, the definition of MED used in Plaintiff's testing methodology – i.e., the smallest UV dose that scores a 1 or higher on the "MED Scoring Scale" – is synonymous with the definition of MED in § M020.80(e) of the Administrative Order. Plaintiffs' testing methodology did not define MED differently than the monograph.

Notably, Plaintiffs recently obtained documents demonstrating that, to the extend Defendant conducted *any* SPF testing of the Product at issue in this case prior to bringing it to market, it used a laboratory called AMA Laboratories, Inc. *See* **Exhibit 1** hereto (testing methodology purportedly used by AMA on Defendant's behalf to test the SPF value of its

sunscreen products). Page 6 of this document reflects that any SPF testing of the Product

that AMA was supposed to perform on Defendant's behalf called for the use of a scoring scale for

determining the MED value. Given that Defendant hired AMA to use the same sort of scoring

scale to test its sunscreen products' SPF values that Consumer Product Testing Co. used to test the

Product's SPF value on Plaintiffs' behalf, there is no good-faith basis for Defendant to argue in

the Motion that the use of an MED scoring scale by Plaintiffs' lab somehow was not in compliance

with the monograph.[3]

---

[3]     Moreover, as Defendant is undoubtedly aware, the "results" of any SPF testing AMA claims to have conducted on Defendant's sunscreen products most likely rest on fake, falsified data. Indeed, as the U.S. Department of Justice recently explained, over a period spanning more than three decades, from 1986 through 2019, AMA was in the business of falsifying SPF testing data and generating fake SPF testing results for the sunscreen companies that had retained it to conduct FDA-mandated premarketing testing of the efficacy of their sunscreen products. AMA's clients included many of the largest cosmetics companies in the world, among them Defendant. *See* U.S. Department of Justice, U.S. Attorney for the Southern District of New York, Letter to J. Briccetti re: *United States v. David Winne,* No. 19-cr-379-VB (S.D.N.Y.), dated Aug. 23, 2022, a copy of which is attached hereto as **Exhibit 2**, 1-3; *see also* Ex. 1 hereto (Defendant's testing methodology purported utilized by AMA to test its sunscreens).
        Things continued to run smoothly for AMA until the Federal Bureau of Investigation arrested its owner, Gabriel Letizia, and four of his foot soldiers in 2019, pursuant to federal indictments handed down in the Southern District of New York. All five pled guilty to falsifying SPF testing results on an industrial scale over a period spanning 30 years. Ex. 2 at 6. As the government explained, for over three decades "AMA purported to test the safety and efficacy of cosmetics, sunscreens, and other products on specified numbers of volunteer panelists for consumer products companies," *id.* at 1 – but rather than perform the requisite testing of these products as mandated by the FDA, simply prepared fraudulent reports made up of fake data to falsely substantiate the efficacy of these products, giving its clients the green light to sell unsafe and ineffective over-the-counter drugs to American consumers *en masse*. Letizia was sentenced to 5 years in federal prison and ordered to forfeit over $46 million in ill-begotten gains for his role in the scheme – all attributable to revenue he generated from providing bogus test results to some of the largest cosmetics companies in the world (but only $1.4 million of which he was ordered to pay as restitution because, tellingly, only three of the 240 corporate "victims" of the scheme bothered to publicly come forward to try to recover their "losses"). Ex. 2 at 6. Mr. Letizia's co-defendants either received lesser prison sentences or supervised release, in some instances thanks to the 5K1.1 sentencing departures they received for their cooperation in the prosecution of Letizia. *See* Ex. 2 (sentencing memo re: D. Winne). Many of AMA's former employees now work for AMA's former clients.

Second, setting an initial "expected SPF" value of the Product lower than the value represented on the Product's label is not in violation of the applicable FDA regulations. For one thing, the FDA regulations do not even define the phrase "expected SPF value." That is because the "expected SPF value" initially set during the testing of a product has no bearing on the outcome of the testing. For example, if the Product in question actually provided SPF 50 protection, there would have been no erythema observed on any of the subjects when tested at the "expected SPF" values initially set by the examiner (i.e., SPF 25 for subjects 1-4 and SPF 20 for subjects 5-13), which would have rendered the results invalid, *see* FDA Final Administrative Order (OTC000006) § M020.80(e)(5) (directing to "[r]eject test data for a test subject if erythema is not present on either the unprotected or protected test sites"), and required the examiner to adjust the expected SPF value higher until erythema was observed. Thus, the "expected SPF value" initially set by the examiner did not (and indeed could not) affect the actual SPF value of the Product yielded from the testing. The result of the testing would have been the same regardless of the "expected SPF

---

As one of the largest cosmetics companies in the world, Defendant undoubtedly was aware of AMA's demise as it happened in 2019, and has thus known since at least 2019 – and likely much earlier – that the results of any SPF testing of the Product that AMA claimed to have conducted on Defendant's behalf are most likely bogus. Plaintiffs have served discovery requests to Defendant aimed at determining, *inter alia*, whether it continues to this day to rely on AMA-generated SPF testing "results" as purported substantiation for its representations about a popular over-the-counter drug's effectiveness at protecting against skin cancer. To date, Defendant has refused to produce any documents or information in response to these requests (*See* ECF No. 47 (discussion of issue in Plaintiffs' opposition to Defendant's motion to stay discovery).)

To the extent the Court finds that any of Plaintiffs' claims are insufficiently pled, Plaintiffs respectfully request leave to amend to allege additional facts that Plaintiffs recently became aware of concerning Defendant's relationship with AMA and the "results" of any SPF testing AMA was commissioned to perform on Defendant's behalf with respect to the Product.

value" initially set by the examiner.[4] The examiner did not deviate from the monograph by setting an initial "expected SPF value" below the SPF 50 value represented on the label.

Plaintiffs' claims are not expressly preempted by the FDCA, and the Motion should be denied.

**B. The FDCA Does not "Impliedly" Preempt Plaintiffs' Claims**

Defendant also contends that the FDCA impliedly preempts Plaintiffs' claims because they "are entirely based on the FDCA and would require the Court to interpret and apply complex FDA regulations." (Mot. at 13.) That is a remarkably sloppy misreading of Plaintiffs' claims.

Implied pre-emption arises when, "in the absence of explicit statutory language . . . Congress intended the Federal Government to occupy [a field] exclusively," or when state law "actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). A claim may be impliedly pre-empted when it concerns a field in which "[1] the pervasiveness of the federal regulation precludes supplementation by the States, [2] the federal interest in the field is sufficiently dominant, or [3] 'the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose.'" *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) (ellipsis in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

---

[4]    Moreover, the reason the examiner started with an "expected SPF value" below the value on the label was to comply with applicable Good Clinical Practice ("GCP") regulations, which dictate that the examiner must protect the rights, safety and welfare of people who participate in clinical trials (including by, for example, examining the active and inactive ingredients of the subject product to determine a safe starting point for the testing). And after examining, *inter alia*, the active and inactive ingredients of the Product in question, the examiner found that the Product appeared incapable of providing SPF 50 protection and that it would thus be irresponsible to blindly accept the SPF 50 value on the Product's label as a starting point. Simply put: the testing commissioned by Plaintiffs' counsel fully complied with all applicable FDA requirements, while also protecting the rights, safety, and welfare of testing subjects as mandated by GCP regulations.

In *Medtronic v. Lohr*, the Supreme Court held that implied preemption does not encompass state rules that merely duplicate the FDA's rules regulating manufacturing practices and labeling. *See Medtronic*, 518 U.S. at 495. Thus, a state law claim that provides a traditional damages remedy for violations of common-law duties will be allowed to stand, when those duties parallel federal requirements. *See id.* The Supreme Court in *Medtronic* also explained that "because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action." Thus, there is a presumption that federal law does not impliedly preempt state law absent other factors. *See id.*

Defendant argues that Plaintiffs' claims are impliedly preempted because "the challenged statement – the numerical SPF value – is required to appear on the Product pursuant to an FDCA disclosure requirement." (Mot. at 15.) But this argument presumes that Defendant conducted monograph-compliant testing that yielded an SPF 50 result. The FDCA's disclosure requirement mandates an *accurate* statement of the numerical SPF value of the Product, as yielded by monograph-compliant testing. *See Gisvold v. Merck & Co., Inc.*, 62 F. Supp. 3d 1198, 1202 (S.D. Cal. 2014) ("[T]he regulations . . . mandate that OTC sunscreen labels state the SPF value resulting from the detailed testing procedure described in the regulation."). In this case, however, Plaintiffs specifically allege that Defendant did *not* conduct monograph-compliant SPF testing of the Product, or that, to the extent Defendant did, such testing did not yield (and could not possibly have yielded) an SPF 50 result. *See* FAC ¶¶ 33-34. Plaintiffs bolster these allegations with the results of the FDA-compliant SPF testing of the Product they commissioned, which yielded an SPF value of just 20 (FAC ¶ 25, Ex. A), along with other well-pled facts plausibly demonstrating that the Product is incapable of testing at SPF 50 given the composition of its formula. *See* FAC ¶ 31. Because the FDCA does not require, and in fact prohibits, an SPF 50 disclosure statement on

17

the label of a product that actually provides only SPF 20 protection, there is no merit in Defendant's argument that Plaintiffs' claims merely "challenge . . . a statement that 'exist[s] solely by virtue of the FDCA disclosure requirements.'" (Mot. at 16 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (U.S. 2001).)

Nor is there any merit to Defendant's argument that Plaintiffs' claims "rise or fall based solely on whether [Plaintiffs] prove" violations of FDA regulations. (Mot. at 16.) In support of this argument, Defendant wagers all its chips on the Supreme Court's decision in *Buckman*. But *Buckman* involved allegations that the defendant manufacturers "made fraudulent representations to the [FDA] in the course of obtaining [pre-market] approval." *Buckman,* 531 U.S. at 344. The Court held that "plaintiffs' state-law fraud-on-the-FDA claims conflicted with, and were therefore impliedly pre-empted by, federal law" because the FDA alone was charged with the pre-market approval process. Here, a pre-market approval process is not at issue. Moreover, as explained by the court in *Rosen v. St. Jude Med., Inc.*, 41 F. Supp. 3d 170, 186 (N.D.N.Y 2014), "while *Buckman* stated that an alleged violation which exists 'solely from the violation of FDCA requirements' is preempted, it made clear that its decision did not conflict with *Medtronic*, which held that 'state-law causes of action that parallel federal safety requirements' are not preempted." *Buckman*, 531 U.S. at 353.

Thus, "the problem with Defendant's arguments is that they attempt to broaden both the scope of Plaintiff's claims and the doctrine of implied pre-emption." *Dayan*, 2017 WL 1214485, at *4. In this case, like in *Dayan*, the crux of Plaintiff's claims is that Defendant's Product was represented as having an SPF of 50 when it actually has a lower, less protective SPF value, thereby deceiving Plaintiffs. *See, e.g.,* FAC ¶¶ 1-5, 26, 38, 46, 55, 58. Properly viewed in this way, "Plaintiff[s'] claims can, in fact, sit side-by-side with the FDA's SPF labeling regime." *Id.*

As the court in *Dayan* explained, Defendant's argument that Plaintiffs' claims are "wholly FDCA-dependent" and "co-existent" with FDA regulations "drastically overstates Plaintiff[s']allegations." *Id.*, at *4. "In actuality, the [FAC] does not articulate a *per se* challenge to Defendant's testing or labeling; instead, the allegation that the SPF value is not correct is used only to substantiate Plaintiff[s'] claim that Plaintiff[s] w[ere] deceived because the [Product] did not protect [them] to the degree that was expected." *Id.*; *see* FAC ¶¶ 1-5, 38, 46, 55. "Although Plaintiff[s'] allegations touch on areas regulated by the FDCA and require reference to the FDCA's rules regarding measurement of SPF, Plaintiff[s'] state law claims sit next to federal regulations and are not premised on Defendant's alleged failure to comply with FDCA requirements. [] In this sense [Plaintiffs'] claims are identical to the claims made by the plaintiff in *Kent* and *Bayer* which were not pre-empted." *Dayan*, 2017 WL 9485702, at *7–8 (citing *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 375 (E.D.N.Y. 2010) ("Although these statements touch on areas regulated by the FDA, and may even require reference to FDA definitions as to what the requirements are for adequate sources of calcium and phytosterols and what the dangers of larger doses of aspirin are, they are not preempted. The misleading nature of the statement can be verified without relying on any special expertise of the FDA and is therefore properly before this Court.") (citing *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 93 (2d Cir. 2006), *aff'd sub nom. Warner-Lambert Co., LLC v. Kent*, 552 U.S. 440 (2008)).

Because the claims Plaintiffs allege in this case "sound in traditional state tort law" and "would exist even if the FDCA had not been enacted," Plaintiffs' claims are not impliedly preempted. *Dayan*, 2017 WL 9485702, at *7 ("[T]o avoid implied pre-emption, a claim must be one that sounds in traditional state tort law and would exist even if the FDCA had not been enacted,

i.e. the claim must be parallel to the FDCA and not depend on it." (citing *In re Bayer*, 701 F. Supp. 2d at 376-78)).

Plaintiffs' claims are neither expressly or impliedly preempted, and the Motion should be denied. *See In re Bayer Corp.*, 701 F. Supp. 2d at 369 ("For a state-law claim to survive, then, the claim must be premised on conduct that both (1) violates the FDCA and (2) would give rise to a recovery under state law even in the absence of the FDCA."); *see also Pearsall v. Medtronics, Inc.*, 147 F. Supp. 3d 188, 194 (E.D.N.Y. 2015).

## II.     The Primary Jurisdiction Doctrine Does not Apply

Additionally, Defendant asks the Court to "dismiss the case out of deference to FDA, pursuant to the doctrine of primary jurisdiction." (Mot. at 23.) The Court should decline the invitation.

It is well established that, "[i]n assessing whether a label is misleading, court[s] need not apply the primary jurisdiction doctrine, even where the label pertains to a scientific or technical term or claim, such as an SPF rating." *In re Edgewell Pers. Care Co. Litig.*, 2018 WL 7858623, at *6 (citing *Dapeer v. Neutrogena,* 95 F. Supp. 3d 1366, 1376 (S.D. Fla. 2015) (finding primary jurisdiction "inappropriate" because plaintiff's claims that sunscreen did not provide the marketed water resistance and sun protection "rest on a determination of whether Neutrogena's marketing of its high SPF products is false and misleading"); *Keskinen*, 2018 WL 6137607, at *2-4 (declining to invoke primary jurisdiction in action concerning accuracy of SPF rating advertised); *Manuel et al. v. Pepsi-Cola Co.*, No. 17-cv-7955 (PAE), 2018 WL 2269247, at *6 (S.D.N.Y. May 17, 2018) (declining to invoke primary jurisdiction in action involving nutritional impact of artificial sweeteners); *Yeldo v. MusclePharm Corp.*, 290 F. Supp. 3d 702, 705, 714-715 (E.D. Mich. 2017)

(declining to invoke primary jurisdiction in action concerning dietary supplement's health and medical claims that plaintiff argued were refuted by scientific studies)).

As the court explained in denying Defendant's motion to dismiss similar SPF mislabeling claims in *Keskinen*:

> Courts are generally well-equipped to handle state-law challenges to labeling of FDA-regulated products. See *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1124 (N.D. Cal. 2010); *Cortina v. Goya Foods, Inc.*, 94 F. Supp. 3d 1174, 1190 (S.D. Cal. 2015). Thus, courts "routinely retain jurisdiction over" false advertising cases involving such products, even when some scientific examination might be necessary. *Bruaner v. MusclePharm Corp.*, 2015 WL 4747941, at *4-5 (C.D. Cal. Aug. 11, 2015) . . . .

> Here, the FAC raises a straightforward issue: whether or not the SPF 100 labels on Defendants' Sunscreen Products are accurate. Defendants point out that FDA regulations provide mandatory testing procedures for determining a product's SPF rating, but the FDA's involvement in this case's central question ends there. Manufacturers themselves are required to perform SPF tests, not the FDA. *See* 21 C.F.R. § 201.327(i-j). Once manufacturers perform the tests, they are not required to obtain pre-marketing review or approval of their labels from the FDA. U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, FDA, "Labeling and Effectiveness Testing: Sunscreen Drug Products for Over-The-Counter Human Use — Small Entity Compliance Guide" (Dec. 2012). Thus, while the FDA provides rules for SPF testing, it is up to Defendants to follow those rules and properly label their Sunscreen Products. Plaintiff alleges that Defendants have failed to do so. Plaintiff's claims therefore do not require resolution of an issue "committed to a regulatory agency," *Clark*, 523 F.3d at 1114; they require examination of a responsibility left to Defendants.

*Keskinen*, 2018 WL 6137607, at *2-4. Numerous other courts, including those presiding over other cases against Defendant, are in accord. *See In re Edgewell Pers. Care Co. Litig.*, 2018 WL 7858623, at *7 ("[T]he FDA's involvement with SPF ratings labels ends with the regulations. Manufacturers, not the FDA, perform FDA prescribed tests that determine the applicable and final SPF rating and label for a product, and they "are not required to obtain pre-marketing review or approval of their labels from the FDA" so long as they conduct their tests pursuant to FDA regulations. Plaintiffs' claim that defendants' incorrectly labeled the Products with SPF 50 instead

of a lower number is primarily a legal issue of alleged misrepresentation, based on results of FDA-regulated testing rather than technical expertise.").

Because "the FAC raises a straightforward issue: whether or not the SPF [50] label[] on Defendants' [] Product[] [is] accurate," *Keskinen*, 2018 WL 6137607, at *3, the Court deny the Motion to dismiss on the basis of the primary jurisdiction doctrine, consistent with the legion of authority cited above.

### III.    Plaintiffs Have Article III Standing

According to Defendant, Plaintiffs lack Article III standing to pursue their claims because their "theory of injury depends entirely on their counsel's testing of a unit of product they themselves did not purchase," and because "they do not allege facts showing a meaningful link between that testing and their own purchases." (Mot. at 25.)  Nothing could be further from the truth.

As an initial matter, this is not a case involving an adulterated or contaminated batch of products produced outside of the normal or intended manufacturing processes.  This is a case about a Product that was uniformly produced, manufactured, and labeled exactly as Defendant intended, with the same ingredients and amounts thereof, and provided the same sun protection to all who purchased it.  As the FAC alleges, "Defendant and its agents complied with all applicable stability and analytical testing requirements with respect to the manufacture and production of the Product, such that all batches of the Product sold to consumers in the United States during the time period relevant to this action contained the same or materially the same final formulation of the Product, including the proper levels of each active and 'inactive' ingredient." FAC ¶ 27.  The FAC further alleges:

> Thus, the Products that Plaintiffs purchased, like the Product purchased by each member of the Classes during the time period relevant to this action, came in the

same container with the same labeling as the Product sent for testing by Plaintiffs' counsel, contained the same amounts of the active ingredients and each of the numerous "inactive" ingredients as the Product sent for testing by Plaintiffs' counsel, and was produced and manufactured in the same manner pursuant to the same procedures as the Product sent for testing by Plaintiffs' counsel. Moreover, during the time period relevant to this action, there were no reported recalls, production or manufacturing issues, or other events with respect to the Product to suggest that any containers of the Product sold to consumers might contain sunscreen that was produced or manufactured in a different manner or pursuant to different procedures, or with different amounts of active or "inactive" ingredient(s), than any other containers of the Product.

FAC ¶ 28. Moreover, the FAC alleges that "[a]t all times relevant hereto, the Product purchased and subjected to testing by Plaintiffs' counsel was protected from exposure to direct sun and excessive heat." FAC ¶ 29.

These allegations plausibly demonstrate that the sunscreen from the container of the Product that Plaintiffs' counsel purchased and subjected to testing provides the "same or materially the same SPF protection" as the sunscreen found in the other containers of the Product purchased by Plaintiffs and other consumers. Contrary to what the Motion would have the Court believe, these allegations do, in fact, "explain[] 'why a third party's analysis can be reasonably extrapolated to [their] individual purchases.'" (Mot. at 26 (quoting *Kell v. Lily's Sweets, LLC*, 2024 WL 1116651, at *5 (S.D.N.Y. Mar. 13, 2024)).

Ignoring the allegations of the FAC recited above, Defendant asks the Court to dismiss Plaintiffs' claims for lack of Article III based entirely on a pair of outlying district court decisions in *Dunning v. Supergoop*, LLC, 2025 WL 34822 (S.D.N.Y. Jan. 6, 2025) and *Dunning v. Supergoop, LLC*, 2026 WL 501627 (S.D.N.Y. Feb. 24, 2026), where the court dismissed a plaintiff's SPF mislabeling claims because the complaint was not accompanied by the results of SPF testing that was conducted on the exact sunscreen lotion found in the specific container of the product that the plaintiff had purchased. To reach this conclusion, the court improperly applied a

framework applicable to adulterated, contaminated product cases, even though the case before it was not that type of a case. With all due respect, the decisions in *Dunning* were wrongly decided and the Court should not adopt their reasoning here.

Prior to the decisions in *Dunning*, no court presiding over any of the numerous SPF mislabeling cases filed over the past decade (all of which were based upon factual allegations similar to those alleged here) had ever taken issue with a plaintiff's Article III standing, including in cases where no testing results were attached to the complaint and in cases where, as here, test results were attached to the complaint and the testing had been performed on containers of the product purchased by plaintiff's counsel rather than the plaintiffs themselves. *See, e.g., Dayan*, 2017 WL 9485702; *Carrol*, 2018 WL 1695421; *Anglin*, 2018 WL 6434424. This is because the "price-premium theory of injury" pled by Plaintiffs here, and previously pled by the plaintiffs in all the prior SPF mislabeling litigation of the past decade, "has been broadly accepted in the Second Circuit" to satisfy the standing requirements of Article III. *See, e.g.*, *Axon v. Florida's Natural Growers, Inc.*, 813 F. App'x 701, 703-04 (2d Cir. 2020) ("[Plaintiff] has suffered an injury-in-fact because she purchased products bearing allegedly misleading labels and sustained financial injury—paying a premium—as a result."); *Onaka v. Shiseido Ams. Corp.*, No. 21 Civ. 10665 (PAC), 2023 WL 2663877, at *4 & n.3 (S.D.N.Y. Mar. 28, 2023) (collecting cases); *see also, e.g., Bowen v. Energizer Holdings, Inc. n/k/a Edgewell Personal Care Products, LLC*, 118 F.4th 1134, 1147 (9th Cir. 2024) (finding Article III standing, explaining that "[t]he district court relies on the mistaken premise that Bowen's theory of Article III injury requires her to prove that benzene in the quantity found in the bottle of Ultra Sport 50 that she purchased—0.29 ppm—is unsafe. That is not the case. Instead, Bowen need prove only that she 'paid more for [the product] than [she] otherwise would have paid, or bought it when [she] otherwise would not have done so,' absent

Defendants' 'false representations—or actionable non-disclosures—about [the product]"). This court should follow suit.

Moreover, the FAC here, unlike the pleadings in the *Dunning* matters, *does* contain allegations concerning the uniform nature of the formula contained within all containers of the Product sold to consumers in the United States (as discussed above), *see* FAC ¶¶ 27-29 – allegations which establish a strong link between the efficacy of the tested Product and the efficacy of all other containers of the Product purchased by Plaintiffs and other consumers. *Cf., e.g., Dunning*, 2025 WL 34822, at *6 (dismissing claims for lack of Article III standing where complaint contained "no allegations that allow the inference that the Purchased Products were like those that allegedly proved deficient in testing").

## IV.    The Claims Alleged in the FAC are Adequately Pled[5]

Additionally, Defendant moves to dismiss the FAC for failure to state claims for relief pursuant to Rule 12(b)(6). This too is baseless. The FAC's allegations plausibly demonstrate Plaintiffs' entitlement to relief for each of their claims, and the Motion should be denied.

### A. Plaintiffs Adequately Allege a Claim for Unjust Enrichment Under Connecticut Common Law

Defendant argues that "Plaintiffs' unjust enrichment claims . . . must be dismissed because Connecticut law does not apply." (Mot. at 29.) Wrong.

Unjust enrichment is "a broad and flexible remedy," "[w]ith no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006). In order to recover

---

[5]    Plaintiffs hereby withdraw their requests for injunctive relief (*see* FAC, at 34 (Prayer for Relief, Part F)), and consent to the dismissal of their claims for negligent misrepresentation (*see id.* ¶¶ 137-146 (Sixth Claim for Relief)).

for unjust enrichment, a plaintiff "must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Id.* "A claim for unjust enrichment is an equitable claim. In matters of equity, the court is one of conscience which should be ever diligent to grant relief against inequitable conduct, however ingenious or unique the form may be." *Town of New Hartford v. Connecticut Res. Recovery Auth.*, 291 Conn. 433, 459 (2009).

"As the Connecticut Supreme Court recognized in *Town of New Hartford*, 'restitution, which is a remedy for unjust enrichment ..., is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep.'" *NCA Invs. Liquidated Tr. v. Dimenna*, No. 3:16-CV-156 (VAB), 2019 WL 7050139, at \*12 (D. Conn. Dec. 23, 2019) (quoting *Town of New Hartford,* 291 Conn. at 460 & D. Dobbs, Remedies (1973), § 4.1, p. 224). Thus, "[a]lthough unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit." *Geriatrics, Inc. v. McGee*, 332 Conn. 1, 25 (2019). "Therefore, the plaintiffs do not have to show that they 'directly' conferred a benefit on the defendants. It is enough for plaintiffs to show, as they do here, that the defendants benefitted from their purchase of the sunscreen from a retail seller." *Clinger v. Edgewell Pers. Care Brands, LLC*, No. 3:21-CV-1040 (JAM), 2023 WL 2477499, at \*15–16 (D. Conn. Mar. 13, 2023) (citations omitted).

Notably, Connecticut courts "previously ha[ve] referred to unjust enrichment as both a tort and a quasi-contractual claim; however, [they] also have recognized, more accurately, that it is neither a species of tort nor a contract but, rather, an equitable 'means of recovery in restitution.'" *Reclaimant Corp. v. Deutsch*, 322 Conn. 590, 599-600 (2019) (quoting *Walpole Woodworkers,*

*Inc. v. Manning*, 307 Conn. 582, 587 (2012)). "Thus, for choice of law purposes, with respect to unjust enrichment claims, Connecticut applies the most significant relationship test governing actions for restitution as set forth by the Second Restatement of the Conflict of Laws." *Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, No. 3:19-CV-01324 (JCH), 2024 WL 2106837, at *14 (D. Conn. Mar. 1, 2024) (citing *Walpole Woodworkers, Inc.*, 307 Conn. at 600; 1 Restatement (Second) of Conflict of Laws § 221). Pursuant to Section 221 of the Second Restatement, "<u>when restitution did not result from any relationship between the parties, the contact to be afforded the most weight is the place where the benefit was received</u>." *Connecticut Gen. Life Ins. Co.*, 2024 WL 2106837, at *14 (citing 1 Restatement (Second) of Conflict of Laws § 221 cmt. d.) (emphasis added).

Here, Plaintiffs both purchased the Product from third-party retailers, not from Defendant, so the restitution sought by Plaintiffs "did not result from any relationship between the parties." *See id.;* FAC ¶¶ 9-10 (Plaintiffs allege purchasing from Amazon and Publix). Accordingly, "the contact to be afforded the most weight is the place where the benefit was received" by Defendant. *See Connecticut Gen. Life Ins. Co.*, 2024 WL 2106837, at *14 (citing 1 Restatement (Second) of Conflict of Laws § 221 cmt. d.). The FAC alleges numerous facts demonstrating that the place where Defendant received the benefit of Plaintiffs' purchases of the Product was Connecticut, where it is headquartered and where it retains revenue attributable to Plaintiffs' purchases of the Product. *See, e.g.,* FAC ¶ 74 ("Defendant received and retained, at its corporate headquarters in Connecticut, the monetary revenue and profits that it received attributable to sales of the Product to Plaintiffs and members of the Nationwide Class."); *id.* ¶ 75 ("Defendant has knowingly and willingly accepted and enjoyed these benefits in Connecticut."); *id.* ¶ 77 ("As a result of Defendant's misrepresentations that the Product provides SPF protection of 50—made on the

labeling of the Product and in advertising and promotional materials for the Product, from Defendant's headquarters in Connecticut—Defendant wrongfully received and retained, in Connecticut, monetary revenue and profits attributable to sales of the Product."). Accordingly, Connecticut law applies to Plaintiffs' claims for unjust enrichment. *See Connecticut Gen. Life Ins. Co.*, 2024 WL 2106837, at *14 (citing 1 Restatement (Second) of Conflict of Laws § 221 cmt. d.).

The FAC adequately states claims for unjust enrichment under Connecticut law, and the Motion should be denied.

### B. Plaintiff Giannese's Breach of Express Warranty Claim is Exempt from Illinois's Pre-Suit Notice Requirement

Defendant's bid to dismiss Plaintiff Giannese's breach of express warranty claim for lack of pre-suit notice also fails.

While it is true that Illinois law generally requires that a plaintiff provide notice prior to litigation, so as to give the potential defendant an opportunity to cure the alleged breach, *see* 810 ILCS 5/2-607, there are exceptions to the rule. Among other exceptions, "the notice requirement is excused 'if the seller already has actual knowledge of the defect of the particular product.'" *Fuchs v. Menard, Inc.*, No. 17-CV-01752, 2017 WL 4339821, at *6 (N.D. Ill. Sept. 29, 2017) (quoting *Allstate Ins. Co. v. Daimler Chrysler,* 2004 WL 442679, at *2 (N.D. Ill. Mar. 9, 2004) & citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 590-91 (1996)); *see also Kinman v. Kroger Co.*, 604 F. Supp. 3d 720, 726 (N.D. Ill. 2022) ("Direct notice is not required when ... the seller has actual knowledge of the defect of the particular product." (citation omitted)); *Powell v. Subaru of Am., Inc.*, 502 F. Supp. 3d 856, 877-888 (D.N.J. 2020) (pre-suit notice requirement inapplicable where defendant aware of issue).

Here, the FAC alleges that Defendant knew, prior to Plaintiffs' filing of this case, that the Product does not provide SPF 50 protection and is thus falsely and misleadingly labeled. *See* FAC

¶¶ 30-31, 36. Defendant has also been sued numerous times over the years for misrepresenting its sunscreen products' SPF values. *See, e.g., In re Edgewell Pers. Care Co. Litig.*, 2018 WL 7858623; *Keskinen,* 2018 WL 6137607; *Anglin*, 2018 WL 6434424. Accordingly, Defendant's actual knowledge of the misrepresentations at issue are sufficient to excuse Plaintiffs' compliance with 810 ILCS 5/2-607's pre-suit notice requirement. *See Fuchs*, 2017 WL 4339821, at *6.[6]

Moreover, this action has been pending for months. The parties have engaged in motions practice and mediation. To say that Defendant is not "on notice" of the claims against it is an incredulous fiction. Plaintiff Giannese's breach of express warranty claim should not be dismissed for failure to provide pre-suit notice, especially because Defendant has identified no prejudice it would suffer if the claim is allowed to proceed. The Motion should be denied.

**C. Plaintiffs' Claims Sounding in Fraud Satisfy Rule 9(b)'s Particularity Standard**

Defendant argues that Plaintiffs fail to state their fraud-based claims with particularity. (Mot. at 31.)

Rule 9(b) requires the circumstances under which a fraudulent statement was made to be alleged with particularity; it does not require a defendant's intent or knowledge to be pleaded with particularity. Fed. R. Civ. P. 9(b). Instead, it specifically provides that such allegations may be made generally. *See id.*; *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 903 (9th Cir. 2013) ("At the pleading stage, a plaintiff need not allege willfulness with specificity.").

---

[6] Courts also routinely find that the filing of a complaint, and especially an amended complaint, satisfies the notice requirement for a breach of express warranty claim. *See, e.g.*, *In re Bridgestone/Firestone, Inc. Tires Products*, 155 F. Supp. 2d 1069 (S.D. Ind. 2001) (holding that notice can be satisfied by filing of suit); *Siqueiros v. Gen'l Motors, LLC*, No. 16-cv-07244, 2021 WL 2115400, at *13 (N.D. Cal. May 25, 2021); *Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 683 (E.D. Pa. 2011).

Here, Plaintiffs allege the circumstances surrounding Defendant's allegedly fraudulent statements with particularity. Plaintiff Gianesse alleges that she purchased the Product on July 28, 2023 from her home in Cook County, Illinois on Amazon.com. Plaintiff Fahey alleges that she purchased the Product on May 2, 2025 in a Publix store near her home in Florida. FAC ¶¶ 9-10. In making their purchases of the Product, they allege that they relied on the prominent SPF 50 representations on the Product's label. FAC ¶ 43-44, 52-53. They allege that an FDA-compliant SPF test of the Product conducted by their counsel revealed that those representations were false. FAC ¶¶ 23-25. "These allegations sufficiently provide the 'time, place, and specific content of the false representations.'" *Keskinen*, 2018 WL 6137607, at \*4–5 (quoting *California Pharmacy Mgmt., LLC v. Zenith Ins. Co.*, 669 F. Supp. 2d 1152, 1159 (C.D. Cal. 2009)).

Defendant nevertheless argues that Plaintiffs "do not allege any facts showing that Edgewell <u>consciously</u> misrepresented the Product's SPF protection[.]" (Mot. at 32 (emphasis added).) Not so. The FAC alleges several facts bearing on Defendant's mindset in making the misrepresentations at issue:

- "Defendant knowingly and intentionally misrepresented the SPF protection provided by the Product for the purpose of increasing its revenues and maximizing its corporate profits," FAC ¶ 131;

- "Defendant made these misrepresentations and omissions with knowledge of their falsehood," *id*. ¶ 132; that "Defendant's misrepresentations and omissions concerning the SPF protection provided by the Product were intended to induce Plaintiffs, the Florida Subclass members, and Illinois Subclass members to purchase the Product," *id*. ¶ 133;

- "Defendant failed to conduct any in vivo SPF testing of the final formulation of the Product (i.e., of the lotion comprised of the same active and "inactive" ingredients, and the amounts

of each, as the Products purchased by Plaintiff and putative Class members and tested by Plaintiffs' counsel) prior to manufacturing, distributing, and marketing the Product to consumers in the United States," *id*. ¶ 33;

- "[b]ased on the Product's final formulation and ingredient(s) alone, Defendant either knew or should have known that the true SPF protection provided by the Product is nowhere close to 50," *id*. ¶ 31;

- "Defendant, as the producer, manufacturer, distributor, and labeler of the Product, and the employer of a dedicated team of product testing professionals, has been aware or should have been aware, since the Product's inception and throughout the time period relevant to this action, that the true SPF protection provided by the Product is not anywhere close to 50," *id*. ¶ 30; and

- "Defendant either knew or should have known, based on the procedures used and/or the results yielded by any in vivo testing it performed of the SPF value of the final formulation of the Product prior to the Product being marketed to consumers in the United States, that its representation that the Product provides SPF protection of 50 was not derived from testing conducted in compliance with the applicable FDA regulations, was false, deceptive, and misleading, and was likely to damage the consuming public," *id*. ¶ 36.

Although these allegations concerning Defendant's knowledge of the falsity of the Product's represented SPF value are alleged "in general terms," Rule 9(b) explicitly allows a plaintiff to allege "conditions of a person's mind . . . generally." Fed. R. Civ. P. 9(b); *see Keskinen*, 2018 WL 6137607, at *5 ("That Plaintiff[s] generally alleged Defendant['s] knowledge of the falsity of [its] statements therefore does not weigh in favor of dismissal.").

Plaintiffs complied with the requirements of Rule 9(b) in alleging their fraud-based claims, and the Motion should be denied. *See id.* (denying motion to dismiss substantially the same claims based on substantially the same allegations for failure to satisfy Rule 9(b)).

**D. Neither Florida's nor Illinois's Economic Loss Doctrine Bars Plaintiffs' Fraud Claims**

Finally, Defendant argues that Plaintiffs' fraud-based claims are barred by Florida's and Illinois's economic loss doctrines, because they "seek only economic damages and thus impermissibly attempt to recast disappointed commercial expectations as tort claims." (Mot. at 33.) The argument is without merit. Neither state's economic loss doctrine applies to Plaintiffs' claims for fraud.

Florida's economic loss doctrine does not apply to Plaintiff Fahey's fraud claim. The Florida Supreme Court recently rolled back Florida's economic loss doctrine by limiting its application with respect to fraud claims to the products liability context. *In re Takata Airbags Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1338-39 (S.D. Fla. 2016). Because this is not a products liability action, Florida's economic loss doctrine does not apply to Plaintiff Fahey's fraud claim. *See, e.g., Miller v. Samsung Elecs. Am., Inc.*, No. CIV.A. 14-4076, 2015 WL 3965608, at *10 (D.N.J. June 29, 2015) ("Because the Court determines that this action sounds in consumer fraud—and not in products liability—Florida's economic-loss doctrine does not bar Plaintiff's common law fraud claim."); *Taylor v. Walter Kidde Portable Equip., Inc.*, 727 F. Supp. 3d 534, 545–46 (M.D.N.C. 2024).

Likewise for Plaintiff Giannese's fraud claim under Illinois law. Illinois's economic loss doctrine does not bar this claim because it alleges that Plaintiff Giannese was fraudulently induced into believing that Defendant's Product provides the represented degree of sun protection and then purchasing the Product based on that belief. *See In re Chicago Flood Litig.*, 176 Ill. 2d 179, 199

(1997) (noting that "*Moorman* articulated three exceptions to the economic loss rule," including "where the plaintiff's damages are proximately caused by a defendant's intentional, false representation") (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 88-89 (1982)).

Plaintiffs' claims for fraud are not barred by economic loss doctrines, and the Motion should be denied.

**CONCLUSION**

For the foregoing reasons, the Motion should be denied.[7]

Dated: June 5, 2026                             Respectfully submitted,

                                      /s/ Frank S. Hedin
                                      Frank S. Hedin

Frank S. Hedin (*pro hac vice*)
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Tel: (305) 357-2107
Fax: (305) 200-8801
fhedin@hedinllp.com

*Counsel for Plaintiffs & Putative Classes*

James J. Reardon, Jr.
**REARDON SCANLON LLP**
45 South Main Street Suite 305
West Hartford, CT 06107
Tel: 860-955-9455
Fax: 860-520-5242
james.reardon@reardonscanlon.com

*Local Counsel for Plaintiffs & Putative Classes*

---

[7]     To the extent the Court finds that any of Plaintiffs' claims are insufficiently pled, in any respect, Plaintiffs respectfully request leave to amend to allege additional facts to cure such insufficiencies. *See* Fed. R. Civ. P. 15(a)(2).