# Exhibit 2



August 23, 2022

**TO BE FILED UNDER SEAL**

**By Email**
The Honorable Vincent L. Briccetti
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

    Re:    *United States v. David Winne,* **19 Cr. 379 (VB)**

Dear Judge Briccetti:

    The Government respectfully submits this letter in advance of the sentencing of David Winne ("Winne," or the "defendant")—currently scheduled for September 7, 2022—to advise the Court of his substantial assistance in the investigation and prosecution of Gabriel Letizia ("Letizia") and other former employees of Letizia's company, AMA Laboratories, Inc. In light of Winne's substantial assistance, and assuming that he continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), that the Court sentence Winne in light of the factors set forth in U.S.S.G. § 5K1.1(a)(1)–(5).

 **Case Background**

    **I.  AMA Laboratories, Inc.**

    AMA Laboratories, Inc. ("AMA") was a consumer product testing company located in New City, New York. Related defendant Gabriel Letizia began operating AMA in 1986 and became its sole owner in 2003.

    AMA purported to test the safety and efficacy of cosmetics, sunscreens, and other products on specified numbers of volunteer panelists for consumer products companies. Clients of AMA, including some of the largest cosmetics and sunscreen companies in the world, used the test results to support their claims that their products were safe, effective, hypoallergenic, or provided a certain sun protection factor ("SPF"), including after exposure to water. AMA's Repeat Insult Patch Testing ("RIPT") department performed tests of on human panelists to determine the frequency and degree of adverse skin reactions. AMA's Special Studies ("SS") department performed efficacy tests on certain products that had already gone through RIPT testing. AMA clients that

manufactured sunscreens used the test results from AMA's SPF department to comply with FDA regulations requiring sunscreen manufacturers to have their products tested and to maintain the test results for possible review by the FDA.

## II. The Conspiracy to Defraud AMA's Customers by Conducting Fraudulent Laboratory Testing

From 1987 until law enforcement's April 2017 search of AMA, Letizia and AMA personnel acting at his direction participated in a conspiracy to defraud AMA's customers of more than $46 million by conducting fraudulent testing and sending its customers reports with fabricated data. In 2017, AMA had approximately 60 employees. Participants in the scheme included Winne (AMA's Technical Director), Mayya Tatsene (AMA's Clinical Laboratory Director), Kaitlyn Gold (AMA's Supervising SPF Laboratory Technician), and Patrycja Wojtowicz (AMA's Associate Director of the SS department), all of whom have pleaded guilty to their participation in the conspiracy, and other AMA personnel acting at their direction.

By 2012, the majority of laboratory testing reports AMA sent to its customers were fraudulent, for two reasons. First, at Letizia's instruction, AMA personnel rarely tested products on the number of panelists requested and paid for by AMA's clients. Instead, AMA tested products on a far lower number of panelists, for example in the case of RIPT testing, typically 20 or less, rather than the 50 it reported to its clients. AMA's fees were based, in part, on the number of panelists that were to participate in the study. AMA employees had panelists who agreed to partake in studies at AMA fill out consent forms and other paperwork as if they would be participating in all of the studies that were being performed at AMA that time. This was done even for panelists who only participated in a single study, so that their information could be fraudulently used for other AMA studies in which the panelists were not actually going to participate. These panelists were then used as "phantom" panelists in other studies, and their consent forms for those studies would falsely make it appear, including to FDA inspectors and AMA's customers who might audit AMA's files, that the panelists had participated in studies when, in fact, they had not. AMA sent its clients fraudulent test results that included fictitious data for these "phantom" panelists.

Second, AMA personnel routinely falsified test results relating to its clients' products, which included suppressing adverse reactions and deviating from testing protocols. AMA personnel reported adverse reactions to clients only in extreme cases and often offered to retest the product and, in some cases, change the test procedure with the hope of reducing the number of reported negative reactions. They also falsified data to accord with prior results from smaller "screener" study results or client expectations.

From 2012 through April 2017, approximately 70% of the reports prepared by AMA were fraudulent, principally because AMA failed to test the requisite numbers of panelists. The deliberate falsification of safety and efficacy data for consumer products, including sunscreens, used by millions of people, including children and babies, created a significant risk of harm.

AMA, which had approximately 50 employees, received approximately $46,200,000 from clients for its preparation of fraudulent reports from 2012 through 2017. During this same period, Letizia, AMA's sole owner, received wages and shareholder distributions of approximately $8.5 million, and Winne received compensation of more than $1.9 million.

## II.  Winne's Participation in the Conspiracy

Winne joined the conspiracy in approximately 1988 when he began working at AMA as a Laboratory technician. At the time, AMA conducted both animal toxicology studies and human clinical testing, and was owned and led by Letizia and Letizia's then-common law wife, Shyla Cantor ("Cantor"). Letizia was AMA's Executive Director. Cantor was AMA's Study Director.

From his earliest days at AMA, Winne was instructed how to conduct the fraud by both Letizia and Cantor, who trained Winne and other laboratory technicians to use fewer panelists in studies and then "paper up" the data sheets by adding "phantom" panelists. By 1989, as AMA hired additional laboratory technicians, Winne trained them how to create the fraudulent reports. In the 1990s, Winne mostly stopped working in the laboratories, and took on managerial, client liaison, and billing responsibilities. Senior laboratory technicians, including coconspirators Kaitlyn Gold and Patrycja Wojtowicz, took over the training of new laboratory technicians in the processes necessary to generate the fraudulent reports.

Letizia and Cantor's separation led to Cantor's departure from AMA in 2003 to open a separate independent laboratory. Some of AMA's staff left with Cantor. Winne and approximately seven AMA personnel remained with Letizia at AMA.

After Cantor's departure from AMA, Winne, who was promoted to the position of Technical Director, supervised all of the laboratory testing, and reported only to Letizia. In this role, Winne directed the senior personnel at AMA, including Tatsene, Gold, and Wojtowicz, and was a senior leader of the scheme, which continued until law enforcement's April 2017 search of AMA. Winne's was one of the final signatures placed on the fraudulent laboratory reports sent to AMA's customers.

Beginning in approximately 2007, Winne was also a liaison between AMA and its customers. Fully aware that AMA was preparing fraudulent reports, Winne helped to solicit new business, including at trade shows he attended with Letizia. As Winne knew, Letizia falsely claimed to have received a Ph.D., and used the title "Dr." in correspondence.

In approximately 2004, Letizia offered to make Winne a partner at AMA. Winne declined, and instead requested a salary increase, because Winne was concerned that he would otherwise bear responsibility for AMA's financial obligations, including for example the company's agreement to make many of its employees' car payments. At the time of law enforcement's search of AMA in April 2017, Winne's annual salary was approximately $430,000.

After law enforcement's April 6, 2017 search of AMA, Letizia's son and daughter conducted an internal investigation of the company. On May 10, 2017, AMA suspended Winne without pay.

**Winne's Cooperation**

Winne, through counsel, expressed an interest in cooperating with the Government just days after law enforcement's April 7, 2017 search of AMA, and was the first of the four cooperating AMA defendants to appear for a proffer, on April 21, 2017. He appeared for four subsequent proffers on April 28, 2017, November 30, 2017, March 12, 2019, and March 29, 2019, as well as a December 20, 2019 interview following his guilty plea. In addition, he gave the Government correspondence with AMA personnel and other AMA records he had retained after his departure form AMA.

From his first proffer, Winne reported that he and other AMA employees regularly conducted testing with fewer panelists than its clients paid for and sent the clients reports with falsified data for the "phantom" panelists.

**Winne's Substantial Assistance**

**I. Description**

The assistance Winne provided was substantial and, along with other corroborating evidence led directly to Letizia's indictment, plea and sentence. The information provided by Winne was credible and corroborated by other former AMA personnel and AMA records.

Winne reported that he began participating in the fraud immediately after he began working at AMA in 1998 and that it pervaded AMA's operations. He reported his own preparation of fraudulent reports as a laboratory technician, his training of subsequent laboratory technicians to prepare fraudulent reports and ultimately his supervision of the scheme as AMA's Technical Director.

Winne reported that, at Letizia's direction, he and other AMA personnel had panelists at AMA sign general informed consent forms and other paperwork so that they could be used as "phantom" panelists for testing in which they had not actually participated.

Partly on the basis of information Winne provided at his April 28, 2017 proffer, the Government was able to obtain a search warrant for AMA's offsite records archive, and seized additional records reflecting fraudulent studies performed by AMA.

Winne made the Government aware that Letizia did not have a Ph.D. as he represented to AMA's customers.

Winne provided considerable information that helped the Government to understand AMA's organizational structure and operations, and provided copies of his correspondence with AMA personnel and other documents he had retained following his suspension from AMA.

Most significantly, Winne provided information about significant conversations he had with Letizia concerning the fraudulent laboratory test reports. For example, Winne reported that:

- approximately one month into his employment at AMA, Letizia told Winne to have panelists fill out all of the paperwork, including consent forms and medical history, for every human test offered at AMA, even if the panelist would only participate in a single study, so that AMA could later use the patients' identifiers in studies in which they did not actually participate, a practice that continued for three decades.

- Letizia told Winne that because AMA was a small laboratory, the authorities would not "come after" them.

- In approximately 2004, Letizia hired a contractor, Beth Phillips, who was also the property manager for the AMA campus, to install a new computer system to generate a database for RIPT test information. Phillips discovered AMA's use of "phantom" panelists, and during a meeting with Letizia and Winne about it told Letizia that she was considering reporting it to the FDA. Letizia ended Phillips's role on the software project, but allowed her to continue to serve as AMA's property manager and later entered into a long-term romantic relationship with her. Phillips never reported the scheme to AMA.

- After another AMA employee ultimately created the database, Letizia told Winne that they needed to have the database generate data entries in order to "get out of the business of kids filling out the sheets with zeroes," (a zero reflected no adverse reaction), which Winne understood to mean that they needed to automate the process of the laboratory technicians' generating fictitious data for the "phantom" panelists. Ultimately, the system was configured to default to entries of zeroes for all adverse reaction measurements for all panelists in the study, unless changed by a technician.

- After law enforcement's April 2017 search of AMA, while discussing what had become of the cash taken out of AMA's bank accounts, purportedly for the purpose of paying the "phantom" panelists,[1] Letizia told Winne that much of it had been used to pay for car repairs and medical expenses for AMA personnel.

---

[1] AMA's actual panelists were paid in cash beginning in approximately 2007, but sufficient cash was withdrawn from AMA's accounts to also pay the "phantom" panelists.

- Also after the search, Winne observed Letizia shredding documents that had not been seized. When Winne saw Letizia doing so, Letizia told Winne not to say anything because the office might have been bugged.

- Letizia would sometimes instruct staff to change laboratory testing results for actual panelists. For example, if an SPF test reflected an SPF level of 28, Letizia instructed AMA staff to round it up to 30. As Letizia would sometimes say, "if the client wants a blue shirt, we turn on a blue light."

During his proffers, Winne forthrightly admitted his own criminal conduct and described the criminal conduct of others. Importantly, he was careful not to speculate or claim more knowledge than he actually had in an effort to ingratiate himself.

Partly as a result of Winne's cooperation, the Government was able to obtain an indictment in July 2019, and a superseding indictment in October 2019, charging Letizia with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, wire fraud in violation of Title 18, United States Code, Section 1343, and engaging in a monetary transaction in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957. Letizia subsequently waived indictment and pleaded guilty to a superseding information charging him with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 371, and two counts of misbranding, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1). On May 18, 2022, Judge Karas sentenced Letizia to 60 months' imprisonment in 19-CR-00548 (KMK), and ordered that Letizia pay restitution in the amount of $1,440,238 and forfeiture in the amount of $46,200,000.

Winne's willingness to testify, had Letizia moved forward towards trial, was critical to the Government's obtaining his guilty plea and sentence. It is likely that Letizia was aware that Winne was cooperating with the Government, and that the testimony he would have provided at trial, including about Letizia's direct communications with him in furtherance of the fraud as outlined above, were a factor in Letizia's decision to plead guilty.

## II. Section 5K1.1 Factors

In light of Winne's cooperation, the Government has determined that he has rendered substantial assistance. Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance: (1) the "significance and usefulness" of assistance (§ 5K1.1(a)(1)); (2) the "truthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2)); (3) the "nature and extent" of assistance (§ 5K1.1(a)(3)); (4) "any injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§ 5K1.1(a)(4)); and (5) the "timeliness" of assistance (§ 5K1.1(a)(5)).

*First*, the information provided by Winne has been significant and useful in law enforcement's investigative and prosecutive efforts. *See* U.S.S.G. § 5K1.1(a)(1). As described

above, his cooperation enabled the Government to obtain a warrant to search AMA's office records archive, charge Letizia, and obtain Letizia's guilty plea and sentence of 60 months' imprisonment. In addition, Winne would would have been a witness at trial against related defendants Tatsene, Gold, and Wojtowicz had they not also waived indictment and pleaded guilty.

*Second*, the Government assesses that Winne's information was truthful, complete, and reliable. *See* U.S.S.G. § 5K1.1(a)(2). The information he provided about AMA and Letizia's activities was consistent with information obtained from other former AMA personnel and records.

*Third*, the nature and extent of Winne's assistance was significant. *See* U.S.S.G. § 5K1.1(a)(3). Winne participated in multiple lengthy proffer sessions in which he provided detailed information about his own criminal conduct, and the criminal conduct of others.

*Fourth*, Winne's cooperation was timely. *See* U.S.S.G. § 5K1.1(a)(5). He began cooperating within days of law enforcement's April 2017 search of AMA, and continued to cooperate as requested, without hesitation.

**Conclusion**

For the foregoing reasons, the Government believes that David Winne has provided substantial assistance in the investigation and prosecution of others. The Government therefore respectfully requests that the Court sentence Winne in light of the relevant facts stated above and the factors set forth in Section 5K1.1(a)(1)–(5) of the Guidelines.

Due to the sensitive nature of the information contained in this letter, the Government respectfully requests that it be filed under seal.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Jeffrey C. Coffman
James McMahon
Olga I. Zverovich
Assistant United States Attorneys

cc:    Jeffrey A. Udell, Esq
jlavignealbert@schlamstone.com

Robert Flemen
U.S. Probation Officer
Robert_Flemen@nysp.uscourts.gov