**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| AGATHA LEWANDOWSKA GIANNESE; AND ANDREA FAHEY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, *Plaintiffs*,<br><br>v.<br><br>EDGEWELL PERSONAL CARE BRANDS, LLC, *Defendant.* | No. 3:25-cv-01717 (VAB) |

**RULING AND ORDER ON MOTION TO DISMISS**

Agatha Lewandowska Giannese and Andrea Fahey (the "Plaintiffs") have sued Edgewell Personal Care Brands, LLC (the "Defendant" or "Edgewell")) for unjust enrichment ("Count One"), unfair and deceptive practices in violation of 815 ILCS 505/1 ("Count Two"), breach of express warranty in violation of 810 ILCS 5/2-313 ("Count Three"), unfair and deceptive practices in violation of Fla. Stat. § 501.201 ("Count Four"), fraud in violation of Illinois and Florida common law  ("Count Five"), and negligent misrepresentation in violation of Illinois and Florida common law ("Count Six"). Compl., ECF No. 1 (Oct. 10, 2025) ("Compl."). On April 17, 2026, Plaintiffs filed the First Amended Complaint. First Am. Compl., ECF No. 40 (Apr. 17, 2026) ("First Amended Complaint").

Edgewell has filed a motion to dismiss the First Amended Class Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). Mot. to Dismiss, ECF No. 41 (May 1, 2026).[1]

[1] Because of the filing of the First Amended Complaint, ECF No. 40, which supersedes in its entirety the original Complaint, *see Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) ("[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect."), the pending motions to dismiss the original Complaint, ECF No. 36, and to take judicial notice in support of the motion to dismiss the original Complaint, ECF No. 37, are **DENIED** as moot.

For the following reasons, the motion to dismiss is **GRANTED in part and DENIED in part**.

The claim for injunctive relief, and the Illinois breach of warranty claim are dismissed from the case. All of the other claims remain in the case.

To the extent that the Plaintiffs can remedy the deficiencies identified in this Ruling and Order, they may seek leave to file a Second Amended Complaint by **December 4, 2026**.

If no proposed Second Amended Complaint is filed by **December 4, 2026**, Edgewell must file its Answer by **December 18, 2026**, and the parties are further instructed to file their Rule 26(f) report by **January 8, 2027**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### Factual Allegations

On or about July 28, 2023, Lewandowska Giannese purchased "Hawaiian Tropic Everyday Active SPF 50 Sport Sunscreen Lotion" (the "Product"). She, along with Fahey on behalf of a putative class, allege that "[s]unscreens, topically applied products that protect against sunburns and other effects of exposure to ultraviolet radiation (such as skin cancer and premature aging), are sold by numerous companies in varying SPF values…". First Am. Compl. ¶ 12.

They allege that "SPF is a standardized rating system that measures the fraction of sunburn-producing ultraviolet rays capable of reaching the skin. The SPF value of a sunscreen product informs consumers of the level of sunburn protection provided by the sunscreen by indicating the approximate measure of time that a person who has applied the sunscreen can stay in the sun without getting burned." *Id.* ¶ 13.

They also allege that Edgewell is labeling, distributing, advertising, promoting, and marketing its sunscreen product in a false, deceptive, and unlawful manner. First Am. Compl. ¶ 1. They further allege that the Product only provides SPF 20 protection, despite being advertised as providing SPF 50 protection. *Id.* ¶ 2. They allege that this scheme is carried out "to capitalize on consumer demand for high-SPF sunscreens, such as SPF 50 sunscreens." *Id.* ¶ 3.

Lewandowska Giannese allegedly relied on Edgewell's representations of the Product, including its advertised SPF value, and that she made her purchase because of the high SPF value of the Product, because she "values the filtration, absorption, and reflection capabilities against UV rays provided by high SPF sunscreens." *Id.* ¶ 41-44. After purchasing it, however, she "found the Product to be neither of the quality nor the absorption or filtration she expected" and subsequently discontinued her use of the product. *Id.* ¶ 46.

After her purchase, on or about February 21, 2025, "Plaintiffs' counsel purchased the Product, bearing UPC 075486091170 and expiration date 08/2027, for 14.99 plus tax at a CVS retail store in Miami, Florida." *Id.* ¶ 23. Their counsel allegedly submitted the Product to a laboratory for "FDA-compliant testing", which allegedly found that the Product provides SPF protection. *Id.* ¶ 24-25. They allege that Edgewell either knew or should have known that the Product, with its combination of active ingredients, would be unable to provide SPF 50 protection. *Id.* ¶ 31.

On or about May 2, 2025, Ms. Fahey allegedly purchased the Product in Florida. First Am. Compl. ¶ 50. She too allegedly relied on Edgewell's representations of the SPF value on the label of the Product and expected the Product would provide SPF 50 protection. *Id.* ¶ 54. She allegedly started using the Product immediately after the Purchase, and "found the Product to neither be of the quality nor the absorption or filtration she expected (nor that any reasonable

consumer would expect) from a sunscreen providing SPF 50 protection." *Id.* ¶ 55. As a result, she later discontinued her use of the Product. *Id.*

Lewandowska Giannese and Fahey, on their behalf as well as on behalf of a putative class, allege that "[t]he FDA did not test or approve the SPF value of the Product, or even review any results of any SPF testing performed by the Defendant of the Product, prior to the Product being manufactured, marketed, and advertised by Defendant and sold to consumers in the United States." *Id.* ¶ 32. Finally, they allege that "Defendant failed to conduct any *in vivo* SPF testing of the final formulation of the Product…prior to manufacturing, distributing, and marketing the Product to consumers in the United States." *Id.* ¶ 33.

**Procedural History**

On October 10, 2025, Lewandowska Giannese and Fahey, on their behalf as well as on behalf of a putative class, filed this lawsuit against Edgewell. ECF No. 1 (Oct. 10, 2025).

On March 27, 2026, Edgewell filed a motion to dismiss the Complaint. Mem. in Support of Mot. to Dismiss, ECF No. 36-1 (Mar. 27, 2026).

On April 17, 2026, Lewandowska Giannese and Fahey, on their behalf as well as on behalf of a putative class, filed their First Amended Complaint. First Am. Compl., ECF No. 40 (Apr. 17, 2026) ("First Am. Compl.").

On May 1, 2026, Edgewell filed a motion to dismiss the First Amended Complaint. Mem. in Support of Mot. to Dismiss, ECF No. 41-1 (May 1, 2026) ("Mot.").

On June 6, 2026, Plaintiffs filed their response to the motion to dismiss. ECF No. 47. ("Resp. to Mot. to Dismiss.")

On June 19, 2026, Edgewell filed a reply to the response. ECF No. 48.

## II. STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (alteration in original) (citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of N.Y.C.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III. DISCUSSION

Edgewell argues that the First Amended Complaint should be dismissed because (1) the claims are preempted by the FDCA, (2) the claims fail under the doctrine of primary jurisdiction, (3) Plaintiffs lack Article III standing, (4) Plaintiffs lack standing to seek injunctive relief, and (5) Plaintiffs' state law claims are invalid for numerous reasons. Mot. at 1-2.

The Court will address each issue in turn, starting with Article III standing.

### A. Standing

"[A] federal court should ordinarily resolve any doubts about the existence of subject matter jurisdiction prior to considering the merits of a complaint." *Pantane v. Nestle N. Ame., Inc.*, 314 F. Supp. 3d 375, 380 (D. Conn. 2018) (citations omitted). "In accordance with the Constitution's 'case-or-controversy' requirement, a federal court lacks jurisdiction over a lawsuit unless a plaintiff alleges concrete and particularized injury-in-fact that is fairly traceable to a defendant's wrongful conduct and redressable by a court order." *Id.* (citing *Spokeo, Inc. v.* Robins, 578 U.S. 330, 338 (2016)).

"[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Moreover, at the pleading stage, all reasonable inferences must be drawn in favor of the plaintiff. *See Calcano v. Swarovski N. Am. Ltd.*, 36 F. 4th 68, 72 n.1 (2d Cir. 2022) ("In reviewing the court's decision on a motion to dismiss for lack of standing, we accept these facts as true and draw all reasonable inferences in Plaintiffs' favor.")

But there must be sufficient facts "to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief." *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F. 4th 58, 65-66 (2d Cir. 2021) (internal quotation mark and citation omitted). That analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Edgewell argues that Plaintiffs lack a meaningful link between testing done by their counsel for the purchases of litigation and their own purchases.

The Court disagrees.

Even if Plaintiffs did not actually test the exact products that they purchased, their Complaint alleges that:

> [T] he Products that Plaintiffs purchased, like the Product purchased by each member of the Classes during the time period relevant to this action, came in the same container with the same labeling as the Product sent for testing by Plaintiffs' counsel, contained the same amounts of the active ingredients and each of the numerous "inactive" ingredients as the Product sent for testing by Plaintiffs' counsel, and was produced and manufactured in the same manner pursuant to the

> same procedures as the Product sent for testing by Plaintiffs' counsel. Moreover, during the time period relevant to this action, there were no reported recalls, production or manufacturing issues, or other events with respect to the Product to suggest that any containers of the Product sold to consumers might contain sunscreen that was produced or manufactured in a different manner or pursuant to different procedures, or with different amounts of active or "inactive" ingredient(s), than any other containers of the Product.
>
> First Am. Compl. ¶ 28.

At this stage of litigation, these allegations are sufficient to plausibly establish that the Product that they purchased, which was labeled in the exact same manner as the Product that their counsel purchased, was misrepresenting its SPF value. *Cf. Patane*, 314 F. Supp. 3d at 380 ("If Nestle indeed mislabeled its water as plaintiffs claim, it is plausible to conclude that plaintiffs chose to buy Poland Spring water and paid more for it than for non-spring water alternatives. It is likewise plausible to conclude that Nestle was well aware of the likely effect that labeling its water as "100% Natural Spring Water" would have on consumer preferences. The facts alleged plausibly establish an injury-in-fact caused by Nestle's alleged wrongful conduct and redressable by an award of damages.") (citations omitted).

Accordingly, this case will not be dismissed in its entirety on standing grounds.

### B. The Claims for Injunctive Relief

A plaintiff "must demonstrate standing separately" for "each form of relief sought." *Nicosia v. Amazon.com, Inc.*, 934 F.3d 220, 239 (2d Cir. 2016) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). "[P]urchasers of a consumer product who claim to be deceived by that product's packaging…have, at most, alleged a past harm." *Berni v. Barilla S.P.A.*, 964 F.3d 141, 147 (2d Cir. 2020).

Separately, Edgewell also argues that Plaintiffs lack standing to seek injunctive relief, because they claim that Plaintiffs cannot demonstrate that they are likely to be harmed again in the future.

The Court agrees.

Here, Plaintiffs have admittedly discontinued their use of the Product. Compl. ¶ 46, 55 ("As a result, Plaintiff Lewandowska Giannese later discontinued her use of the product.… [a]s a result, Plaintiff Fahey later discontinued her use of the Product."). As a result, given that they know of the alleged defect in the Product's labeling, it is unlikely that they will be deceived again. Now that they are aware of the alleged deception, there is no imminent risk of future injury that would support injunctive relief. *See, e.g., Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 162 (D. Conn. 2024) (dismissing injunctive relief claim because "the Second Circuit has 'squarely foreclosed the possibility of injunctive relief for past purchasers'") (citing *Berni*, 964 F.3d at 148).

Accordingly, because there is no likelihood of future harm, their claim for injunctive relief will be dismissed.

**C. The Doctrine of Primary Jurisdiction**

The doctrine of primary jurisdiction "applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Palmer v. Amazon.com, Inc.*, 51 F. 4th 491, 505 (2d Cir. 2022) (citing *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58-59 (2d Cir. 1994). In order to invoke the primary jurisdiction doctrine, courts must determine that agencies should have the "initial decisionmaking responsibility." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir.

2006). And while application does not deprive a court of its jurisdiction, if a court determines that the doctrine applies it may either (1) retain jurisdiction or (2) dismiss the case without prejudice. *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993). In the latter instance, if the court wishes to dismiss the case without prejudice, it must determine whether or not the parties will be "unfairly disadvantaged." *Id.* at 268. "To determine whether a party will be unfairly disadvantaged, a court can look to the relief the party is seeking." *Palmer*, 51 F.4th at 505.

But the threshold issue is whether the doctrine applies, which requires the court to look to "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. *U.S. v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). The Second Circuit has explained that the doctrine (1) "seeks to foster 'uniformity and consistency in the regulation of business entrusted to a particular agency'" and (2) "recognizes that, for certain matters, 'the expert and specialized knowledge of the agencies should be ascertained before judicial consideration of the legal claim'". *Palmer*, 51 F. 4th at 506. And in determining whether deference to an agency is appropriate, courts review the four factors outlined in *Ellis*:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

443 F.3d at 82-83. To be clear, "the doctrine has a 'relatively narrow scope,' and does not apply when the claim involves matters within the 'traditional realm of judicial competence.' *Clinger v. Edgewell Pers. Care Brands, LLC*, 2023 U.S. Dist. LEXIS 41461 (D. Conn. Mar. 13, 2023) (citing *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988).

Edgewell argues that the Court should "dismiss the case out of deference to FDA, pursuant to the doctrine of primary jurisdiction." Mot. at 23.

The Court disagrees.

The Second Circuit has cautioned that the doctrine has a "relatively narrow scope." *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F. 2d 848, 851 (2d Cir. 1988). As a result, courts inside and outside of this Circuit have routinely rejected arguments to dismiss cases under this doctrine for the reasons advanced by Edgewell. *Clinger v. Edgewell Pers. Care Brands,, LLC*, 2023 U.S. Dist. LEXIS 41461 (D. Conn. Mar. 13, 2023) (finding that the FDA does not have special expertise in determining if a warning label would be deceptive to a consumer); *Patane*, 369 F. Supp. 3d at 389 (finding that Nestle failed to show adequate reason to believe that referral to the FDA would advance the litigation); *In re Edgewell Pers. Care Co. Litig.*, 2018 WL 7858623, at *6 (citing *Dapeer v. Neutrogena,* 95 F. Supp. 3d 1366, 1376 (S.D. Fla. 2015) (finding primary jurisdiction "inappropriate" because plaintiff's claims that sunscreen did not provide the marketed water resistance and sun protection "rest on a determination of whether Neutrogena's marketing of its high SPF products is false and misleading"); *Manuel et al. v. Pepsi-Cola Co.*, No. 17-cv-7955 (PAE), 2018 WL 2269247, at *6 (S.D.N.Y. May 17, 2018) (declining to invoke primary jurisdiction in action involving nutritional impact of artificial sweeteners); *Keskinen v. Edgewell Pers. Care Co.*, No. 217CV07721ABPJWX, 2018 WL 6137607, at *2-4 (C.D. Cal. Apr. 17, 2018) (finding that "[t]he primary jurisdiction doctrine does not apply every time a case implicates the expertise of a federal agency."). Here, the factors similarly do not lean toward deference to the FDA.

As to the first factor, "the question at issue" is whether the Defendants have engaged in unfair and deceptive marketing practices by misrepresenting the SPF of their Product. To get to

the root cause of this issue, however, requires this Court to determine whether or not the Product is what it purports to be. The FDA engages in specific, detailed testing methodology to determine whether a product is as advertised in terms of SPF. This analysis requires minimal subject matter expertise and mainly is dependent on a knowledge of the FDA's regulatory schemes and whether or not misrepresentations made by the Defendant were accurate or deceptive. The FDA lacks special expertise in assessing whether the labels would be deceptive to a reasonable consumer, but this analysis of basic tort principles falls squarely within the realm of judicial capabilities. *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, 95 F. Supp. 3d 284, 292 (D. Conn. 2015) (quoting *Goya*, 846 F.2d at 851) ("The Second Circuit has cautioned that the doctrine has a 'relatively narrow scope," and does not apply when the claim involves matters within the "traditional realm of judicial competence.")**)**.

As to the second factor, while the Defendant argues that the issue is "particularly within the agency's discretion," this does not accurately assess the actual "question at issue." The issue is whether the labeling was deceptive, which is not related to the FDA's subject matter expertise and clearly involves matters within the "traditional realm of judicial competence." *See Goya*, 846 F. 2d at 851.

As to the third factor, there is minimal risk of inconsistent rulings, because these decisions would be based on a multitude of cases of FDCA and tort precedent. *Hydrocarbon Trading v. Exxon Corp.*, 89 F.R.D. 650, 654 (S.D.N.Y Apr. 7, 1981) ("the risk of inconsistent judgments would not be substantial" in light of clear agency interpretation of law).

Finally, as to the fourth factor, the Defendants concede that they are unaware of a pending application to the FDA on this issue. Mot. at 25; *see also Ellis*, 443 F.3d at 89 ("if prior application

to the agency is absent, this factor may weigh against referral of the matter to the agency on the basis of primary jurisdiction.")

Accordingly, none of these factors weigh in favor of deference to the FDA on Plaintiffs' claims, and the Court declines to dismiss the case based on the doctrine of primary jurisdiction.

**D. Preemption**

As a general matter, the Supremacy Clause provides that the laws of the United States shall be the supreme law of the land, anything in the Constitution or laws of any state to the contrary notwithstanding. U.S. Const. Art. VI, cl. 2. As a result, Congress has the power to preempt state law. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000).

Federal law can preempt state law impliedly or expressly. "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona v. United States*, 567, U.S. 387, 399. Additionally, state law must give way to federal law when (1) "the States are precluded from regulating conduct in a field that Congress, acting within its property authority, has determined by be regulated by its exclusive governance", and (2) when state laws conflict with federal law. *Id*.

In considering whether federal law preempts state law, the "ultimate touchstone" is the intent of Congress in passing the statute. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)). For courts to conclude that Congress intended to preempt state law, however, Congress's intent must be "clear and manifest." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009).

Edgewell argues that all of Plaintiffs' claims are expressly and impliedly preempted by federal law, specifically the Food, Drug, and Cosmetic Act ("FDCA"). In its view, Plaintiffs'

claims are predicated entirely on the FDCA and impose requirements on it that are not identical to those prescribed by the FDCA.

The Court will address each preemption claim in turn.

**1. Express Preemption**

Express preemption occurs when "Congress ... withdraw[s] specified powers from the States by enacting a statute containing an express pre-emption prevision." *Arizona v. United States*, 567 U.S. 387, 399 (2012). The Supreme Court has explained that "the FDCA and its regulations provide the United States with nearly exclusive enforcement authority." *POM Wonderful LLC v. Coca-Cola Co.*, 573, U.S. 102, 109 (2014). Congress included an express preemption provision, which states that "no State or political subdivision of a State may establish or continue in effect any requirement…that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter." 21 U.S.C. § 379r(a)(2).

Thus, "a state law that applies to drugs or cosmetics is preempted if it imposes a requirement that is not identical to the requirements of the FDCA and the FDA's regulations." *Dayan v. Swiss-America*, No. 15 CIV. 6895 (DLI) (VMS), 2017 WL 9485702, at *7 (E.D.N.Y. Jan. 3, 2017). But courts in the Second Circuit have acknowledged that "consumer claims based on violations of state law requirements that are identical to FDA regulations and standards are not preempted." *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 588 F. Supp. 2d 527, 538 (S.D.N.Y. 2008).

To evaluate whether Plaintiffs' various claims are expressly preempted by the FDCA, we must first turn to the FDCA's express preemption provision. The FDCA provides that "no State or political subdivision of a State may establish or continue in effect any requirement that is

different from or in addition to, or that is otherwise not identical with, a requirement under this Act…". 21 U.S.C. § 379r(a)(2).

Edgewell argues that "the FDCA expressly preempts imposition of any requirement that is 'different from or in addition to, or that is otherwise not identical with, a requirement under this chapter…". Mot. at 17. Relying on *Critcher v. L'Oréal USA*, Inc., 959 F.3d 31, 35-36 (2d Cir. 2020), Edgewell argues that the FDCA preempts "not only those state laws that are in conflict with it . . . but also any state law that provides for . . .requirements that are not *exactly the same* as those set forth in the FDCA and its regulations." *Id*.

On the other hand, Plaintiffs argue that their claims are not preempted by the FDCA, in part, because "consumer claims based on violations of state law requirements that are identical to FDA regulations and standards are not preempted." Resp. to Mot. to Dismiss at 8 (citing *In re Pepsico., Inc.*, 588 F. Supp. 2d at 532). Plaintiffs further argue that they "merely seek damages from Defendants under state law for their alleged failure to comply with the labeling requirements 21 C.F.R. § 101.62(b)." *Id*.

The Court agrees.

Here, the claims do not require anything beyond what the FDCA explicitly requires. The FDCA prohibits sunscreen labeling that is false or misleading. *See* 21 U.S.C. § 352(a); 21 U.S.C. § 362(a). The FDCA also requires that every sunscreen includes a label with an SPF value derived from FDA-approved testing. 21 C.F.R. § 201.327(a)(1).

Plaintiffs allege that "[b]y falsely representing the SPF protection provided by the Product, Defendant has knowingly misled and continues to knowingly mislead consumers into believing that they are purchasing a sunscreen of better quality and with better filtration, absorption, and reflection capabilities against ultraviolet radiation than the lower-SPF product

that they actually receive…". First Am. Compl. ¶ 4. Plaintiff's claims thus do not impose any requirements on Edgewell beyond those that federal law already requires and Plaintiff's claims do not rely on any state standard that is different or exceeds the requirements outlined in the FDCA.

While Edgewell argues that the claims would impose requirements additional to and different from those required under the FDCA, because the FDA does not contemplate retesting and because they allege that Plaintiff's testing methodology is not exactly the same as the FDA's methodology, "[n]one of these arguments are persuasive at this time, because '[a]t the pleading stage,' a plaintiff 'need not prove the accuracy' of an independent investigative study's findings 'or the rigor of its methodology.'" *Clinger* at *16, (citing *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017). In other words, at this stage of the case, there is not a sufficient basis to conclude that the Plaintiff's claims rest on an underlying state law standard that departs from the federal standard.

Accordingly, Edgewell's motion to dismiss the claims on the basis of express preemption will be denied.

**2. Implied Preemption**

The Supreme Court has held that, "in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). A claim is impliedly preempted when "the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where 'the object sought to be obtained by the federal law and the character of the obligations

imposed by it…reveal the same purpose.'" *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

And the Supreme Court has made clear that in any such analysis, courts should begin "with the assumption that the historic police powers of the States [are] not to be superseded…unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Schneidewind*, 485 U.S. at 299 ("[a] pre-emption question requires an examination of congressional intent."). Our analysis begins with congressional intent.

When Congress passed the FDCA in 1938, it sought to provide "national uniformity to the manufacture and sale of cosmetics—including skin creams—which until that point had been regulated exclusively by the various laws of the states." *Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 35 (2020). This desire for a uniform regulatory scheme, described in Section 337(a) of the FDCA, states that "all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a).

In *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996), the Supreme Court explained, however, that "because the States are independent sovereigns in our federal systems, we have long presumed that Congress does not cavalierly preempt state-law causes of actions." The Supreme Court also held that the FDCA "does not pre-empt state rules that merely duplicate the FDA's rules regulating manufacturing practices and labeling," and further explained that providing a traditional damages remedy for violations of common law claims are permissible when the requirements are parallel to federal requirements. *Medtronic*, 518 U.S. at 495. "[A]lthough *Medtronic* can be read to allow certain state-law causes of action that parallel federal safety requirements, it does not and cannot stand for the proposition that any violation of

the FDCA will support a state-law claim." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001).

But the Supreme Court has recognized "that Congress did not regard state tort litigation as an obstacle to achieving its purposes," *Wyeth v. Levine*, 555 U.S. 555, 574 (2009), under the FDCA. And an implied preemption defense would only succeed if it is "impossible" for a manufacturer to "comply with its state-and-federal-law obligations [such that it] stand[s] as an obstacle to the accomplishment of Congress' purposes in the FDCA." *Id.* at 581. There thus is no bar to a state law "providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel' rather than add to, federal requirements." *Riegel v. Medtronics, Inc.*, 552 U.S. 312, 330 (2008) (citations omitted).

As a result, courts, including the Second Circuit, have recognized a "narrow gap" for state-law claims: "The plaintiff must be suing for conduct that violates the FDCA (or else his claim is expressly preempted by Section 360(k)(a))), but the plaintiff must not be suing because the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*)." *Glover v. Bausch & Lomb*, 6 F.4th 229, 237 (2d Cir. 2021)(internal quotation marks and citations omitted).

Edgewell argues that the claims are impliedly preempted because they are entirely based on the FDCA and would require the Court to interpret and apply complex FDA regulations for three reasons: (1) that the numerical SPF value is required on the Product because of an FDCA disclosure requirement; (2) that the Plaintiffs' claims, like those in *Patane*, are "wholly FDCA-dependent"; and (3) that the Plaintiffs' claims cannot be resolved without reference to the FDA's standards.

As to the first, in its view, because an FDA Administrative Order requires it to state, "SPF [Insert numerical SPF value resulting from testing under M020.80]" and that "[t]he entire text shall appear in the same font style, size, and color with the same background color," Admin. Order § M020.50(a)(1)(i)(A)-(B), Plaintiffs' claims are "a challenge to a statement 'that exist[s] solely by virtue of the FDCA disclosure requirements.'" Mot. at 16 (quoting *Buckman Co. v. Pls. Legal Comm.*, 531 U.S. 341, 353 (2001)). As to the second, relying on *Patane v. Nestle Waters N. Am., Inc.*, 314 F. Supp. 3d 375, 387 (D. Conn May 17, 2018), Edgewell argues that Plaintiffs' claims "rise or fall based solely on whether [Plaintiffs] prove [violation of them]." Mot. at 16 (quoting *Patane*, 314 F. Supp 3d at 388). As to the third, Edgewell argues that Plaintiffs' claims "can[not] be resolved through reference to standards other than those of the FDA." Mot. at 16 (quoting *In re Chantix (Varenicline) Mktg., Sales Practices & Products Liab. Litig. (No. II)*, 735 F. Supp. 3d 352, 380 S.D.N.Y. 2024).

The Court disagrees.

First, Plaintiffs allege that Edgewell's testing did not yield a SPF 50 result and pled facts plausibly demonstrating that the Product does not have a SPF 50 value. Since the FDCA's disclosure requirement mandates accurate statements of the numerical SPF value of the Product, *see Gisvold v. Merck & Co., Inc.*, 62 F. Supp. 3d 1198, 1202 (S.D. Cal. 2014) ("[T]he regulations . . . mandate that OTC sunscreen labels state the SPF value resulting from the detailed testing procedure described in the regulation."), their claims do not exist solely due to the FDCA disclosure requirements, but instead are related to the alleged misbranding of the Product, and the alleged deceit of consumers as a result.

Second, after *Buckman* and consistent with *Glover*, courts in this Circuit have found that "to avoid implied preemption, a claim must be one that sounds in traditional state tort law and

would exist even if the FDCA had not been enacted, i.e. the claim must be parallel to the FDCA and not depend on it." *Dayan*, 2017 WL 9485702, at *19 (E.D.N.Y. Jan. 3, 2017). While Plaintiff's claims are related to areas regulated by the FDCA and require reference to the FDCA's rules, they are not premised on Edgewell's failure to comply with those requirements. Instead, they are "traditional claim[s] of consumer misrepresentation" and Plaintiffs have "threaded the needle and alleged conduct that violates the FDCA but sounds in traditional principles of state law and would give rise to recovery even had the FDCA never been enacted." *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 375 (E.D.N.Y. 2010); *see also Desiano*, 467 F. 3d at 93, *aff'd sub nom. Warner-Lambert Co., LLC v. Kent*, 552 U.S. 440 (2008) (finding claims against a medical device manufacturer are not impliedly preempted by the FDCA pursuant to *Buckman* where the complaint alleges putative violations of state common law duties).

Third, while Plaintiffs' claims are related to the FDCA, they do not require any special expertise. They are state tort law claims, well within the reasonable duties of a federal court to resolve. *Cf. In re Bayer*, 701 F. Supp. 2d at 371 ("Guarding against false or deceptive advertising in the marketplace, including false claims of FDA approval, is within the province of false advertising suits and state law consumer protection claims, many of which were enacted to ensure an honest marketplace."). Courts routinely retain jurisdiction over state law challenges to labeling of FDA-related products and are well equipped to adjudicate these types of claims, even when some scientific background information is necessary. *See Desiano*, 467 F.3d at 98 ("Because of its important role in state regulation of health and safety, common law liability cannot be easily displaced in our federal system.").

Accordingly, Edgewell's motion to dismiss the claims on the basis of implied preemption will be denied.

### E. The State Law Claims

Finally, Edgewell argues that Plaintiffs' state law claims fail for numerous reasons, including that (1) Connecticut law does not apply to the unjust enrichment claims, (2) the breach of warranty claim fails for lack of notice, (3) the fraud claims fail under Fed. R. Civ. P. 9(b) for failure to support a "strong inference" of fraudulent intent, and (4) the economic loss rule bars the fraud and negligent misrepresentation claims.

The Court addresses each argument in turn.

#### 1. The Connecticut Unjust Enrichment Claim

Federal courts apply state law to state law claims. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). To determine which state's law to apply, federal courts apply "the conflict-of-laws rules of the state in which the federal court sits." *Cantor Fitzgerald Inc. v. Lutnick*, 313 F. 3d 704, 710 (2d Cir. 2002). While Connecticut courts have referred to unjust enrichment as a quasi-contractual claim and a tort claim, they "also have recognized, more accurately, that it is neither a species of tort nor a contract but, rather, an equitable 'means of recovery in restitution.'" *Reclaimant Corp. v. Deutsch*, 332 Conn. 590, 599-600 (2019) (quoting *Walpole Woodworkers, Inc. v. Manning, 307 Conn. 582, 587 (2012))*.

Section 21 of the Restatement (Second) is about "what law governs a person's right to recover from another, on grounds of fairness and good conscience, the amount by which the other has been unjustly enriched at his expense." 1 Restatement (Second), Conflict of Laws c. 8, topic 6, introductory note, p. 726 (1971). And Section 221 explains that "[i]n actions for restitution, the rights and liabilities of the parties with respect to the particular issue are

determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principle stated in § 6. *Id.*, § 221(1). As a result, Connecticut applies the "most significant relationship" as described in the Restatement (Second) of Conflict of Laws for unjust enrichment claims. *See Griffin v. Travelers Prop. Cas. Co. of Am.*, 2025 US. Dist. LEXIS 96223 at *9 (D. Conn. May 14, 2025) ("When analyzing choice-of-law questions with respect to statutory and common law claims sounding in tort or equity, Connecticut courts, again, apply the 'most significant relationship' test").

Applying the Restatement (Second) of Conflicts of Laws, courts have found that "the contact to be afforded the most weight is the place where the benefit was received." *Conn. Gen. Life Ins. Co. v. BioHealth Laboratories, Inc.*, No. 3:19-CV-01324 (JCH), 2024 WL 2106837 at *32 (D. Conn. March 1, 2024) (citing 1 Restatement (Second) of Conflict of Laws § 221 cmt. d.).

Edgewell argues that Plaintiffs' Connecticut unjust enrichment claims need to be dismissed "because Connecticut law does not apply." Mot. at 29.

The Court disagrees.

Section 221 of the Restatement (Second) of Conflict of Laws provides that, "[c]ontacts to be taken into account in applying the principles of §6 to determine the law applicable to an issue include: (b) the place where the benefit or enrichment was received" and "(d) the domicil, residence, nationality, place of incorporation, and place of business of the parties." 1 Restatement (Second) of Conflict of Laws § 221(b), (d); *see, e.g., Phillips v. Scott*, 446 F.Supp.2d 70, 80 (D. Conn. 2006) (citing and applying these criteria). Here, while Plaintiffs allegedly purchased the Product in Florida and Illinois, they allege that Edgewell received the benefit of Plaintiffs' purchases in Connecticut, "where it is headquartered and where it retains revenue attributable to

Plaintiffs' purchases of the Product." Resp. to Mot. to Dismiss at 27 (citing to First Am. Compl. ¶¶ 74, 75, and 77).

At this stage of the case, these allegations are sufficient to support their unjust enrichment claim based on Connecticut law. *See Conn. Gen. Life Ins. Co.*, 2024 WL 2106837 at *31-32 (finding that factor given most effect is "the place where the benefit was received).

Accordingly, Edgewell's motion to dismiss the unjust enrichment claim will be denied.

**2. The Illinois Breach of Warranty Claim**

"Under Illinois law, a plaintiff must provide notice to a putative defendant before filing suit to bring a claim for breach of express or implied warranty." *Rudy v. D.F. Stauffer Biscuit Co., Inc.*, 666 F. Supp. 3d 706, 720 (N.D. Ill. 2023). *See* 810 ILCS 5/2-607(3)(a) ("[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."). There are exceptions, however, to this rule. The Illinois Supreme Court has held that "[d]irect notice is not required when…the seller has actual knowledge of the defect of the particular product." *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 492 (Ill. 1996).

Edgewell argues that this Illinois breach of warranty claim must be dismissed for lack of notice.

In response, Plaintiffs argue that Edgewell should have been on notice, because parties have brought suit against Edgewell multiple times across jurisdictions for the same or similar claims of misrepresentation of their sunscreen's SPF values. Resp. to Mot. to Dismiss at 29.

The Court disagrees.

In *Connick*, the Illinois Supreme Court grappled with this exact issue: whether "generalized knowledge" of problems with a product line is sufficient to establish actual

knowledge. *Connick*, 174 Ill. 2d at 493 ("It is uncontroverted that Suzuki was aware of the safety concerns regarding the Samurai. Suzuki knew of the unfavorable report about the Samurai issued by Consumers Union, as evidenced by its attempts to counter that report with its own publicity. Moreover, Suzuki entered settlement agreements with several states following attorney general investigations of the Samurai's safety risks."). There, the court held that "even if a manufacturer is aware of problems with a particular product line, the notice requirement of section 2-607 is satisfied only where the manufacturer is somehow apprised of the trouble with the particular product purchased by a particular buyer." *Id*. at 493-94. The relevant examples of actual knowledge provided there included (1) the "seller hospital removed [the] defective medical device from [the] plaintiff,"; (2) the "seller's employee visited plaintiff 'to get to the bottom of why' the product was malfunctioning,"; and (3) the "car was towed to the seller's auto dealership and [the] seller's employees were told that the car needed major repairs." *Id*. at 494 (internal citations removed).

In each of those examples, the seller had knowledge that was specific to the actual plaintiff in the case. That is not the case here.

Accordingly, the Illinois breach of warranty claim, Count Three, will be dismissed.

**3. The Fraud Claims**

Under Rule 9(b), Plaintiffs must allege "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Specifically, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) ("[T]he 'complaint must adequately specify

the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'") (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)). Although a plaintiff may plead generally the requisite fraudulent intent, the facts alleged must give rise to a strong inference of fraudulent intent, which may include factsshowing that the defendant(s) had both motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).

Edgewell argues that "Rule 9(b)'s heightened pleading standard applies to Plaintiffs' fraud claim as well as their consumer protection, negligent misrepresentation, and unjust enrichment claims," and that Plaintiffs have failed to allege their claims with the requisite particularity for a fraud claim. Mot. at 31.

The Court disagrees.

Here, Plaintiffs allege in their First Amended Complaint where the Plaintiffs purchased the products, that they relied on the SPF representations on the Product's label, and that an FDA-compliant test of the Product showed that the representations were false. First Am. Compl. ¶ 24 ("Plaintiffs' counsel then submitted the purchased Product to a reputable and qualified laboratory for testing. The lab tested the Product…following the FDA testing methods embodied in FDA Final Rule, Labeling and Effectiveness Testing"); *Id.* ¶¶ 44, 53 (alleging that prior to purchase both Plaintiffs "necessarily and justifiably relied upon the written statements on the Product, including those pertaining to its SPF, as accurate.")

At the pleading stage, this is sufficient to satisfy the requirements under Rule 9(b). *Keskinen*, 2018 WL 6137607, at *4-5 (allegations providing the "time, place, and specific

content of the false representations" is sufficient to meet the heightened particularity requirements of 9(b)).

Accordingly, Edgewell's motion to dismiss the fraud claims will be denied.

**4. The Economic Loss Rule**

In Florida, the state's economic loss doctrine prohibits a tort action "if the only damages suffered are economic losses." *Tiara Condo. Ass'n v. Marsh & McLennan Cos. Inc.*, 110 So. 3d 399, 401 (Fla. 2013). "The rule has its roots in the products liability arena, and was primarily intended to limit actions in the products liability context." *Id*. But it has been applied in other matters. *Id*. at 402 ("Despite its underpinnings in the products liability context, the economic loss rule has also been applied to circumstances when the parties are in contractual privity and one party seeks to recover damages in tot for matters arising from the contract.") There are several exceptions to the economic loss rule, however, including "fraudulent inducement, and negligent misrepresentation, or free-standing statutory causes of action." *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1338 (S.D. Fla. 2016) (quoting *Tiara*, 110 So. 3d at 401).

In Illinois, the *Moorman* doctrine established the rule that "a plaintiff cannot recover solely economic losses in tort." *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 176 (1982); *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 435 N.E. 2d 443, 61 Ill. Dec. 746 (1982) ("[a] plaintiff cannot recover in tort its purely economic losses for any innocent misrepresentations made by defendant."). There are three exceptions: "(1) where the plaintiff sustained damage, i.e., *personal injury or property damage*, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud; and (3) where the plaintiff's damages are proximately

caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *In re Chi. Flood Litig.*, 176 Ill. 2d 179, 199 (1997) (internal quotation marks and citations omitted) (emphasis in original).

Edgewell argues that all of Plaintiffs' tort claims are barred by the respective Florida and Illinois's economic loss doctrines, "because they only seek economic damages."

The Court disagrees.

Plaintiffs' claims fit squarely into the exceptions provided for under both Florida and Illinois law. They have alleged that they were "fraudulently induced into believing that Defendant's Product provides the represented degree of sun protection and then purchas[ed] the Product based on that belief." Resp. to Mot. to Dismiss at 32.

At this stage of the case, these allegations are sufficient to find that the claim is not barred by the economic loss doctrine under either state's laws. *See Tiara*, 110 So.3d at 406 ("refus[ing] to extend its application to actions based on fraudulent inducement and negligent representation cases."); *In re Chi. Flood Litig.*, 166 Ill. at 199 (exempting from the application of the economic loss rule, "where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, i.e., fraud . . . and . . . where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transaction.") (internal quotation marks and citations omitted).

Accordingly, the claims are not barred by the economic loss doctrine.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED in part and DENIED in part**.

The claim for injunctive relief, and the Illinois breach of warranty claim are dismissed from the case. All of Plaintiffs' other claims remain in the case.

To the extent that the Plaintiffs can remedy the deficiencies identified in this Ruling and Order, they may seek leave to file a Second Amended Complaint by **December 4, 2026**.

If no proposed Second Amended Complaint is filed by **December 4, 2026**, Edgewell must file its Answer by **December 18, 2026**, and the parties are further instructed to file their Rule 26(f) report by **January 8, 2027**.

**SO ORDERED** at New Haven, Connecticut, this 13th day of November, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE